**THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

**I-KARE TREATMENT CENTER, LLC**

**Plaintiff**

**v.**

**PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK CO., INC.; RICHARD S. SACKLER; JONATHAN D. SACKLER; MORTIMER D.A. SACKLER; KATHE A. SACKLER; ILENE SACKLER LEFCOURT; BEVERLY SACKLER; THERESA SACKLER; DAVID A. SACKLER; TRUST FOR THE BENEFIT OF MEMBERS OF THE RAYMOND SACKLER FAMILY; RHODES TECHNOLOGIES; RHODES TECHNOLOGIES, INC.; RHODES PHARMACEUTICALS L.P; RHODES PHARMACEUTICALS, INC.; THE P.F. LABORATORIES, INC.; STUART D. BAKER; ABBOTT LABORATORIES; ABBOTT LABORATORIES, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS SOLUTIONS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ALLERGAN USA INC.; ALLERGAN FINANCE LLC; WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; PAR PHARMACEUTICALS COMPANIES, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; SPECGX LLC; ANDA, INC.; INSYS THERAPEUTICS, INC.; JOHN N. KAPOOR; RUSSELL PORTENOY, M.D.; PERRY FINE, M.D.; SCOTT FISHMAN; LYNN WEBSTER, M.D.; AMERICAN PAIN FOUNDATION; THE ACADEMY OF INTEGRATIVE PAIN MANAGEMENT F/K/A AMERICAN ACADEMY OF PAIN MANAGEMENT; CVS HEALTH CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; WALGREENS EASTERN CO., INC.; WALGREEN CO.; RITE AID CORPORATION; ABC CORPORATIONS 1-100 ENGAGED IN THE MANUFACTURE OF OPIOIDS; ABC CORPORATIONS 1-100 ENGAGED IN THE DISTRIBUTION OF OPIOIDS; AND ABC CORPORATIONS 1-100; JANE AND JOHN DOES 1-100**

**CIVIL CASE NO.**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES the Plaintiff, I-KARE TREATMENT, LLC ("Plaintiff"), by and through its attorneys, for its Complaint against Defendants Purdue Pharma L.P.; Purdue Pharma Inc.; the Purdue Frederick Company, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Rhodes Technologies; Rhodes Technologies, Inc.; Rhodes Pharmaceuticals L.P.; Rhodes Pharmaceuticals, Inc.; the P.F. Laboratories, Inc.; Stuart D. Baker; Abbott Laboratories; Abbott Laboratories, Inc.; Teva Pharmaceutical Industries, Ltd.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals Solutions, Inc.; Allergan PLC f/k/a Actavis PLC; Allergan USA Inc.; Allergan Finance, LLC; Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Par Pharmaceuticals Companies, Inc.; Insys Therapeutics, Inc.; John N. Kapoor; Mallinckrodt PLC; Mallinckrodt LLC; SpecGx LLC; ABC Corporations 1-100 Engaged in the Manufacturing of Opioids (collectively, "Manufacturers," "Manufacturer Defendants," or "Defendants"); McKesson Corporation, Cardinal Health Inc., AmerisourceBergen Drug Corporation; Anda, Inc.; ABC Corporations 1-100 Engaged in the Distribution of Opioids (Collectively, "Distributors," "Distributor Defendants," or "Defendants") Russell Portenoy; Perry Fine; Scott Fishman; and Lynn Webster; (collectively, "Physicians," "Physician Defendants," or "Defendants"); CVS Health Corporation; Walgreens Boots Alliance, Inc.,; Walgreen Eastern Co., Inc.; Walgreen Co.; ABC Corporations 1-100 (collectively, "Distributors," "Pharmacies," "Retailers," "Pharmacy Defendants," "Retailer Defendants," or

"Defendants"); American Pain Foundation; Academy of Integrative Pain Management f/k/a American Academy of Pain Management; American Academy of Pain Management; and Jane And John Does 1-100 (all Defendants collectively, "Defendants") alleges as follows:

**INTRODUCTION**

1. Plaintiff, I-KARE TREATMENT, LLC, by and through the undersigned attorneys, for their Complaint assert two categories of claims against Defendants for their role in the creation of the opioid epidemic:

- claims against the manufacturers of prescription opioid drugs as a result of their negligent and intentionally deceptive marketing campaign that was designed to drastically increase the demand for and sale of opioids and opioid prescriptions as well as their own market share; and
- claims against entities in the supply chain that reaped enormous financial rewards by violating their common law and statutory duties to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market.

2. From the time morphine was first isolated for medicinal use, physicians have understood that opioids are risky medications that leave patients prone to addiction and overdose. That is why heroin was made illegal in 1924, and it is why the first synthetic opioids (Percocet and Vicodin) were prescribed only for short-term pain.

3. Plaintiff brings this civil action to recover monetary losses that have been incurred as a direct and proximate result of Defendants' false, deceptive, and unfair marketing, lobbying and market manipulation, of unlawful diversion of prescription opioids causing an opioid epidemic

followed by subsequent patents market manipulation for "Medication Assisted Treatment" ("MAT") as a primary treatment for opioid addiction, which is part of an ongoing corrupt business enterprise in violation of RICO.

4. In September 2012, the FDA awarded grants to study the following research topics: 1) opioid and benzodiazepine prescribing habits of physicians; 2) prescribing tools such as SBIRT, PDMPs, REMS, health insurer initiatives and treatment contracts and 3) prevalence of urine drug screens following opioid prescriptions.

5. Defendant, Teva Women's Health, Inc. obtained FDA approval for Revia, an opioid antagonist on November 20, 1984. Revia blocks the effect of intravenously administered opioids. The average retail price of Revia is $107.48 and Teva's fentanyl lozenge Actiq costs $71.92 per 200 mcg lozenge.

6. Defendant, Teva Pharmaceuticals USA manufactures Cassipa, a buprenorphine and naloxone combination that doses opioid addicts with both an opioid and an opioid antagonist to treat opioid addiction. Cassipa is a higher dosage version of Suboxone. Reuters reported that TEVA has not launched Cassipa due to pending court action to block the generic release by Dr. Reddy's Laboratories.

7. Defendants, who manufacture Medication Assisted Treatment claim the opioids in the MAT will reduce withdrawal symptoms and desire to use opioids without the cycles of highs and lows associated with opioid misuse and abuse. The Opioid Epidemic and its consequences could have been, and should have been, prevented by Defendants who control the U.S. opiate drug distribution industry and defendant, Rhodes Pharmaceutical, Inc. ("Rhodes"), which is another pharmaceutical company the Sackler family has ownership interest, holds a patent for an antidote to the opioid addiction.

8. The Defendants, who control the manufacturing and the dispensing of prescription opioids, have operated as an Opioid Enterprise that profited greatly by allowing the geographic area that I-Kare Treatment Center, LLC serves to be a casualty of the Opioid Enterprise.

9. Manufacturing Defendants have lobbied, marketed and promoted "MAT therapy" to the exclusion of inpatient detoxification programs and outpatient counseling. Political PACS have lobbied insurance companies to deny treatment consisting of outpatient counseling and inpatient detoxifications and counseling. Research has shown that methadone maintenance is more effective when it includes individual and/or group counseling, with even better outcomes when patients are provided with, or referred to, other needed medical/psychiatric, psychological, and social services (e.g., employment or family services).[1] Research indicates that most addicted individuals need at least 3 months in treatment to significantly reduce or stop their drug use and that the best outcomes occur with longer durations of treatment. Recovery from drug addiction is a long-term process and frequently requires multiple episodes of treatment.[2]

10. Opioid Treatment Programs ""OTPs" provide MAT therapy and federal law requires patients receiving MAT therapy also receive counseling. Due to the gaps in treatment coverage, manufacturing defendants continue to profit enormously from the opioid MAT drugs now adopted and used for opioid addiction in all OTPs, leaving the OTP providers, such as Plaintiff, to shoulder the costs of counseling and monitoring drug screens.

11. Plaintiff is a SAMSHA certified facility that can provide MAT therapy, but many insurance carriers will not cover or not cover enough of the counseling costs and drug

---

[1] https://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/evidence-based-approaches-to-drug-addiction-treatment/pharmacotherapies

[2] https://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/principles-effective-treatment

monitoring costs required of an OTP due to Defendants marketing and lobbying efforts of MAT Therapy.

12. To comply with SAMSHA certification, Plaintiff must turn down opioid addicted patients that lack the ability to pay privately for deficits in funding MAT treatment and counseling. As a healthcare provider, Plaintiff seeks reimbursement from Defendants for unreimbursed care provided to opioid addicted patients in the geographic area where Plaintiff is located.

13. Prior to the opioid epidemic, physicians understood that opioids were risky medications that leave patients prone to addiction and overdose. That is why heroin was made illegal in 1924, and it is why the first synthetic opioids (Percocet and Vicodin) were prescribed only for short-term pain.

14. Purdue created and patented oxycodone in the 1990s, at the direction of Richard, Mortimer and Raymond Sackler, Purdue marketed the drug as safe, non-addictive, and appropriate for chronic pain-even though no legitimate scientific evidence supported these claims. Other opioid manufacturers likewise invented proprietary opioid formulations, that was also marketed as safe, non-addictive and appropriate for chronic pain.

15. This coordinated misinformation about the safety, use and efficacy of opioids assured a large percentage of Americans would be prescribed Oxycodone which led to the Opioid Epidemic.

16. Once the opioid enterprise reached maximum market potential, manufacturing defendants further profited by patenting "MAT" drugs to treat the Opioid-addicted population. Teva Pharmaceuticals USA manufactures Cassipa, a buprenorphine and naloxone combination that doses opioid addicts with both an opioid and an opioid antagonist to treat opioid addiction.

Cassipa is a higher dosage version of Suboxone. Reuters reported that TEVA has not launched Cassipa due to pending court action to block the generic release by Dr. Reddy's Laboratories.

17. For years, Defendants and their agents have had the ability to substantially reduce the death toll and adverse economic consequences of opioid diversion, including the deaths and health ruination of hundreds of thousands of citizens. Substantial expenditures by Plaintiff in dealing with the problem have gone un-recouped and unreimbursed. All the Defendants in this action share responsibility for perpetuating the epidemic.

18. Defendants have foreseeably caused damages to Plaintiff including the unreimbursed and/or un-recouped costs of providing: (a) counseling, medical care and other treatments and expenses for patients suffering from opioid-related addiction; (b) counseling and rehabilitation services; (c) security measures; (d) added regulatory compliance; lost opportunity costs; (e) the diversion of healthcare assets; and (g) increased labor costs as well as lost productivity of its employees.

19. Plaintiff brings this civil action for Injunctive Relief, all compensatory and punitive relief allowed under theories of civil Racketeer Influenced Corrupt Organization (RICO) Act 18 U.S.C.A. § 1962, negligence, negligence per se, and any other relief allowed by law against the Defendant Opioid drug manufacturers, distributors, and retailers, that by their collective action or inaction, injured and continues to injure, Plaintiff.

20. The opioid manufacturers ran a decades-long misinformation campaign to convince doctors and patients everywhere that prescription opioids are a miracle cure for chronic pain, and should be prescribed widely—whether to treat recurring pain from work injuries, joint pain from arthritis, or neck pain resulting from a car accident – despite the fact that the manufacturers knew that opioids were neither safe nor effective for this purpose.

21. To win over those who might be skeptical of the drug makers' claims, the manufacturers hired well-regarded doctors, who styled themselves as pain management experts, to advocate for use of opioids all across the country. They also sponsored "pain advocacy" groups, which acted as fronts for the drug companies' message. These same tactics were used by cigarette manufacturers, who used industry-funded scientists and front groups to try to convince the public that cigarettes were safe, despite a wealth of scientific evidence to the contrary.

22. Doctors believed the misinformation that was carefully and systematically presented to them over the years. Believing that the opioids were indeed safe and effective for chronic pain, doctors prescribed the opioid manufacturers' products in larger and larger numbers resulting in billions of dollars for Purdue and its top executives—including, Richard, Mortimer, and Raymond Sackler.

23. Meanwhile, the opioid manufacturers knew that their claims lacked scientific basis and that, in fact, their prescription opioids were highly addictive and ultimately ineffective at treating long-term pain. Pain patients develop tolerance to the drugs over time and are forced to take stronger and stronger doses, until they become so sedated that they risk falling asleep at the wheel of their car or having their central nervous system (and breathing) shut down.

24. As doctors prescribed more and more prescription opioids, and the manufacturers continued to conceal and obscure the truth about their drugs, the rates of opioid addiction and overdose skyrocketed. Addicted individuals spent their life savings fueling their drug addiction and were often forced to switch to a cheaper opioid: heroin. Rates of heroin addiction skyrocketed as well.

25. Rather than seeing a national crisis, pharmaceutical distributors saw an opportunity for massive profits. They sent prescription opioids to any and every prescriber or pharmacy that

placed orders, even though they are required by to stop shipment on suspicious orders and report them to law enforcement. Stopping suspicious shipments would mean losing out on millions of dollars in illicit profits, and so the opioid distributors agreed to do nothing. They stood aside and allowed select prescribers and pharmacies to divert massive amounts of prescription opioids into the black market.

26. On the marketing side, the crisis was precipitated by the defendants who manufacture, sell, and market prescription opioid painkillers ("Manufacturing Defendants" or "Manufacturers"). Through a massive marketing campaign premised on false and incomplete information, the Manufacturing Defendants engineered a dramatic shift in how and when opioids are prescribed by the medical community and used by patients. The Manufacturing Defendants relentlessly and methodically, but untruthfully, asserted that the risk of addiction was low when opioids were used to treat chronic pain, and overstated the benefits and trivialized the risk of the long-term use of opioids.

27. The Manufacturing Defendants' goal was simple: to dramatically increase sales by convincing doctors to prescribe opioids not only for the kind of severe pain associated with cancer or short-term post-operative pain, but also for common chronic pains, such as back pain and arthritis. They did this even though they knew that opioids were addictive and subject to abuse, and that their other claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded.

28. The Manufacturing Defendants' push to increase opioid sales worked. Through their publications and websites, endless stream of sales representatives, "education" programs, and other means, Manufacturing Defendants dramatically increased their sales of prescription opioids and reaped billions of dollars of profit as a result. Since 1999, the amount of prescription opioids

sold in the U.S. nearly quadrupled. In 2016, 289 million prescriptions for opioids were filled in the U.S.—enough to medicate every adult in America around the clock for a month.

29. Meanwhile, the Defendants made blockbuster profits. In 2012 alone, opioids generated $8 billion in revenue for drug companies. By 2015, sales of opioids grew to approximately $9.6 billion.

30. On the supply side, the crisis was fueled and sustained by those involved in the supply chain of opioids, including manufacturers, distributors, pharmacies, the Sackler family, front groups, key opinion leaders, and other related entities who failed to maintain effective controls over the distribution of prescription opioids, and who instead have actively sought to evade such controls. These defendants have contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

31. From the day they made the pills to the day those pills were consumed in our community, Manufacturing Defendants had control over the information regarding addiction they chose to spread and emphasize as part of their massive marketing campaign. By providing misleading information to doctors about addiction being rare and opioids being safe even in high doses, then pressuring doctors into prescribing their products by arguing, among other things, that no one should be in pain, Manufacturing Defendants created a population of addicted patients who sought opioids at never before-seen rates. The scheme worked, and through it the Manufacturing Defendants caused their profits to soar as more and more people became dependent on opioids. As many as 1 in 4 patients who receive prescription opioids long-term for chronic pain in a

primary care setting struggles with addiction. And as of 2017, overdose death rates involving prescription opioids were five times higher than they were in 1999.

32. As millions of people became addicted to opioids, "pill mills," self-styled as "pain clinics," sprouted nationwide and rogue prescribers stepped in to supply prescriptions for non-medical use. These pill mills, typically under the auspices of licensed medical professionals, issue high volumes of opioid prescriptions under the guise of medical treatment. Prescription opioid pill mills and rogue prescribers cannot channel opioids for illicit use without the negligence, willful blindness, or knowing support of those in the supply chain.

33. Defendants' conduct has had severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction and overdose from illicit drugs such as heroin. The costs are borne directly by Plaintiff. These necessary and costly responses to the opioid crisis include, but are not limited to, increased healthcare costs, the handling of emergency responses to overdoses, providing addiction treatment, handling opioid- related investigations, arrests, adjudications, and incarceration, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing of children in foster care.

34. The opioid epidemic has enriched both opioid manufacturers and distributors. But it has destroyed communities, and left healthcare providers, states and governments to bear much of the costs.

35. It is time that the opioid manufacturers and distributors begin paying for the havoc they have wrought. Plaintiff brings this lawsuit to enjoin Defendants' illegal conduct and to hold Defendants responsible for the harm that conduct has caused the Plaintiff and the patients they serve that need proper opioid addiction treatment beyond prescribing medications.

## JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction under 28. U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et seq. ("RICO").

37. This court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C.A. § 1367 because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

38. Jurisdiction of this Court also exists pursuant to 28 U.S.C. § 1392 as the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of attorney's fees and costs.

39. This Court has personal jurisdiction over Defendants because they conduct systematic and substantial business in Florida, are licensed as a business in Florida and Pennsylvania, consented to be sued in Pennsylvania by registering an agent for service of process, consensually submitted to the jurisdiction of Pennsylvania by obtaining a business license, and have the requisite minimum contacts with Pennsylvania and Florida necessary to constitutionally permit the Court to exercise jurisdiction.

40. Venue is further proper in this District pursuant to 28 U.S.C.A. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District and each Defendant transacted affairs and conducted activity that gave rise to the claim of relief in this District, such that Defendants are deemed to reside in this state and in this judicial district. 28 U.S.C.A. §§ 1391(b)(1), (b)(2) and (c)(2).

## PARTIES

### A. PLAINTIFF

41. Plaintiff, I-Kare Treatment Center, LLC is a private non-profit corporation organized under the laws of the State of Florida, with a principal place of business in West Palm Beach, Florida. Plaintiff treats patients from various locations throughout the United States.

### B. DEFENDANTS

#### 1. Opioid Manufacturers

42. The defendants within this subsection will be referred to throughout as the "Opioid Manufacturers" or "Manufacturer Defendants."

**Purdue Defendants**

43. Purdue Pharma L.P. is a limited partnership that is organized under the laws of Delaware with headquarters in Stamford, Connecticut and is licensed as a foreign limited partnership in Florida.

44. Purdue Pharma Inc. is a New York corporation with its principal place of business in Stamford, Connecticut and licensed as a foreign corporation in Florida.

45. The Purdue Frederick Company is a Delaware corporation with its principal place of business in Stamford, Connecticut.

46. Purdue is privately held by the Sackler family–one of America's wealthiest families with a collective net worth of thirteen billion dollars.

47. Defendant Dr. Richard S. Sackler is a board member and the former President and Co-Chairman of Purdue Pharma L.P. Dr. Sackler is the named inventor on multiple patents directed

toward the opioids at issue in the opioid addiction epidemic. Upon information and belief, he is a resident of Connecticut or New York.

48. Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut. He is a son of Raymond Sackler and has been a member of the board of directors of Purdue and Purdue related entities since the 1990s. Defendant Mortimer D.A. Sackler is a natural person residing in New York County, New York. He is the son of Mortimer Sackler and has been a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

49. Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

50. Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

51. Defendant Beverly Sackler is a natural person residing in Fairfield County, Connecticut. She is the widow of Raymond Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

52. Defendant Theresa Sackler is a natural person residing in New York County, New York. She is the widow of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

53. Defendant David A. Sackler is a natural person residing in New York County, New York. He is the son of Richard Sackler (and the grandson of Raymond Sackler) and has served as a member of the board of directors of Purdue and Purdue-related entities since 2012.

54. Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust") is a trust of which Defendants Beverly Sackler, Richard S. Sackler, and/or Jonathan D. Sackler are trustees. They are sued in both their own capacity and in their capacity as trustees. It is the 50% direct or indirect beneficial owner of Purdue and the Purdue-related entities and the recipient of 50% of the profits from the sale of opioids by Purdue and Purdue-related entities.

55. Defendant Stuart D. Baker is a natural person residing in Suffolk County, New York. He has served as a senior executive of, and/or counsel to, Purdue, Purdue-related entities, and members of the Sackler families since the 1990s.

56. Defendant Rhodes Technologies ("Rhodes Tech") is a Delaware general partnership formed on April 12, 2005 with its principal place of business in Coventry, R.I.

57. Defendant Rhodes Technologies Inc. ("Rhodes Tech Inc.") is a Delaware corporation formed January 28, 1999 with its principal place of business in Coventry, R.I. Rhodes Tech Inc. is a general partner of Rhodes Tech.

58. Defendant Rhodes Pharmaceuticals L.P. ("Rhodes Pharma") is a Delaware limited partnership formed November 9, 2007 with its principal place of business in Coventry, R.I.

59. Defendant Rhodes Pharmaceuticals Inc. ("Rhodes Pharma Inc.") is a New York corporation formed on November 9, 2007. Rhodes Pharma Inc. is a general partner of Rhodes Pharma.

60. Defendant The P.F. Laboratories, Inc. ("PF Labs") is a New Jersey corporation with its principal place of business located in Totowa, New Jersey.

61. The Purdue defendants will be referred to collectively as "Purdue." Purdue manufactures, promotes, sells, and distributes opioids, such as OxyContin, MS Contin, Dilaudid/Dilaudid HP,

Butrans, Hysingla ER, and Targiniq ER, in the United States. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual sales revenue from OxyContin in the U.S. has fluctuated between $2.47 billion and $2.99 billion. The sales revenue from OxyContin has quadrupled since 2006. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

**Abbott Laboratories**

62. Abbott Laboratories, Inc. is a corporation organized under the laws of Illinois. Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois, and Abbott Laboratories, Inc. is an Illinois corporation with its principal place of business in Abbott Park, Illinois (collectively, "Abbott"). Abbott Laboratories is licensed and registered with the Florida Secretary of State to do business in Florida.

63. Abbott was primarily engaged in the promotion, and distribution of opioids nationally, in the State of Florida, and in Palm Beach County, due to a copromotional agreement with Defendant Purdue. Pursuant to that agreement, beginning in 1996, Abbott began actively promoting, marketing and distributing Purdue's opioid products.

64. Abbott, as part of the co-promotional agreement, helped make OxyContin into the largest-selling opioid in the nation. Under the co-promotional agreement with Purdue, the more Abbott generated in sales, the higher the reward. Specifically, Abbott received 25 to 30 percent of all net sales for prescriptions written by doctors its sales force called on.

65. In 2012, Abbott spun off the company's branded drug business, naming the new company AbbVie, Inc.

**Teva Defendants**

66. Cephalon Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania, and is registered with the Florida Secretary of State to do business in Florida. The

company is licensed by the New Jersey Department of Health to manufacture, label, repackage, or distribute prescription drugs and controlled substances in Florida.

67. Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc.

68. Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania, and is registered with the Florida Secretary of State to do business in Florida. Teva USA is licensed by the Florida Department of Health to distribute prescription drugs and controlled substances in Florida. Teva USA is a wholly owned subsidiary of Teva Ltd.

69. Cephalon, Inc. manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the United States. Actiq has been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain."[3] Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[4] In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs, and agreed to pay $425 million.[5]

70. Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for

---

[3] *Highlights of Prescribing Information, ACTIQ® (fentanyl citrate) oral transmucosal lozenge, CII,* FDA (2009), https://www.accessdata.fda.gov/drgusatfda_docs/label/2009/020747s0301b1.pdf.
[4] *Highlights of Prescribing Information, FENTORA®* (fentanyl citrate) buccal tablet, CII (2011), FDA https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021947s015lbl.pdf.
[5] Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to Pay $425 *Million & Enter Plea to Resolve Allegations of Off-Label Marketing* (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

Cephalon in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.

71. All of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.[6] Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 – the year immediately following the Cephalon acquisition – attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including inter alia sales of Fentora®.[7] Through interrelated operations like these, Teva Ltd. operates in the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder.

72. Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. will be referred to collectively as "Teva."

**Janssen Defendants**

73. Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen Pharmaceuticals, Inc. is licensed by the New Jersey

---

[6] E.g., ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left).
[7] Teva Ltd., Annual Report (Form 20-F) 62 (Feb. 12, 2013), http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2 012.pdf.

Department of Health to distribute prescription drugs and controlled substances in New Jersey. Janssen Pharmaceuticals, Inc. is a wholly owned subsidiary of Johnson & Johnson ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

74. Noramco, Inc. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware. Noramco is licensed by the New Jersey Department of Health as a manufacturer or repackager/labeler of prescription drugs and controlled substances. Noramco was a wholly owned subsidiary of J&J until July 2016.

75. Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, Inc. are companies that are now known as "Janssen Pharmaceuticals, Inc."

76. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals, Inc.'s stock, and corresponds with the FDA regarding Janssen Pharmaceuticals, Inc.'s products. J&J controls the sale and development of Janssen Pharmaceuticals, Inc.'s drugs, and Janssen Pharmaceuticals, Inc.'s profits inure to J&J's benefit.

77. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., Noramco, and J&J will be referred to collectively as "Janssen."

78. Janssen manufactures, promotes, sells, and distributes drugs in the United States, including the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

**Endo Defendants**

79. Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

80. Endo Pharmaceuticals Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Solutions Inc. is a wholly owned subsidiary of Endo Health Solutions Inc. Endo Pharmaceuticals Inc. is registered with the Florida Secretary of State to do business in Florida, and is licensed by the Florida Department of Health to distribute prescription drugs and controlled substances in Florida.

81. Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly- owned subsidiary of Defendant Par Pharmaceutical Companies, Inc., a Delaware corporation with its principal place of business in Chestnut Ridge, New York. Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are referred to collectively herein as “Par Pharmaceutical.”

82. Endo Health Solutions Inc., Endo Pharmaceuticals Inc., and Par Pharmaceutical will be referred to collectively as “Endo.”

83. Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States. Opioids made up roughly $403 million of Endo’s overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 to 2013, and it accounted for 10% of Endo’s total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

**Allergan/Actavis Defendants**

84. Allergan PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. According to their website, Allergan also has a headquarters in the United States under the name Allergan USA, Inc., which is headquartered in Madison, New

Jersey. Allergan PLC is the product of a few acquisitions and mergers. In March 2015, Allergan PLC was acquired by Actavis PLC, and the combined company took the name "Allergan PLC." Actavis PLC was itself the product of an acquisition: in October 2012, Watson Pharmaceuticals, Inc.'s acquired Actavis, Inc., and the combined company adopted the name "Actavis PLC."

85. Defendant Allergan Finance, LLC is incorporated in the State of New Jersey at One Executive Drive, Fort Lee, New Jersey, and operates as a subsidiary of Allergan PLC. Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in January 2013. Defendant Actavis, Inc. was acquired by Watson Pharmaceuticals, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then Actavis PLC in October 2013 and is now known as Allergan Finance.

86. Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is registered with the Florida Secretary of State to do business in Florida. Watson Laboratories, Inc. is a wholly-owned subsidiary of Allergan PLC.

87. Actavis Pharma, Inc. is a Delaware corporation with its principal place of business in New Jersey. Actavis Pharma, Inc. is registered with the Florida Secretary of State to do business in Florida, and is licensed by the Florida Department of Health as a distributor of prescription drugs and controlled substances. Actavis Pharma, Inc. was formerly known as Watson Pharma, Inc.

88. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey, and is licensed by the Florida Department of Health as a manufacturer, labeler, or repackager of prescription drugs and controlled substances.

89. Each of the Actavis defendants is owned by Allergan PLC, which uses them to market and sell its drugs in the United States. Allergan PLC exercises control over these marketing and sales efforts, and profits from the sale of Allergan/Actavis products ultimately inure to its benefit.

90. Allergan PLC, Allergan USA, Inc., Actavis PLC, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. will be referred to collectively as "Actavis."

91. Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

**Insys Defendants**

92. Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona.

93. Insys was founded in 2002 by Dr. John Kapoor, a serial pharmaceutical industry entrepreneur "known for applying aggressive marketing tactics and sharp price increases on older drugs." [8]

94. Kapoor founded Insys, and at various times held executive management positions in the company, including Executive Chairman of the Board of Directors, President and Chief Executive Officer, as well as principal shareholder. As founder, majority shareholder, CEO and Executive Chairman of the Board of Insys, Kapoor managed, directed and controlled the development, promotion, distribution and sale of Subsys.

---

[8] U.S. Senate Homeland Security & Governmental Affairs Committee, Insys Therapeutics and the Systemic Manipulation of Prior Authorization (quoting Fentanyl Billionaire Comes Under Fire as Death Toll Mounts From Prescription Opioids, WALL STREET J. (Nov. 22, 2016).

95. Despite Kapoor's public statements that his involvement with Insys was merely as "an investor" and that he was "not involved in day-to-day operations," documentary evidence shows otherwise. Kapoor admitted that he spends "a significant amount of time on Insys," and as set forth in detail below, Kapoor was intimately involved in, and directed, Insys's operations on a daily basis.

96. In addition to participating in a daily "update" conference call with Insys high level executives, Kapoor's in-depth involvement with Insys ranged from, among other things, reviewing and approving sales pitch scripts to doctors, to developing physician targets, to discussing and directing Subsys strategy—including how to increase the percentage of approvals of Subsys prior authorizations—to closely managing various personnel changes throughout the company and formulating incentive compensation plans for Insys's sales force.

97. Furthermore, Kapoor received, among many other things, (i) "Daily JK emails" and weekly "JK" reports tracking, inter alia, Subsys' market performance; (ii) Subsys Low Strength Reports tracking Subsys prescriptions written for 100 mcg and 200 mcg doses; (iii) Subsys Writer Tracker Reports tracking top Subsys prescribers trending by week; (iv) Actiq and Fentora High Dose Writers Reports tracking ideal targets to "switch" to Subsys; and (v) Super Voucher Daily Reports tracking super voucher redemptions.

98. Indeed, as late as January 2016, Kapoor demanded from Insys Executive Vice President and former Chief Operating Daniel Brennan ("Brennan") that "issues like sales compensation, realignment of territories and sales bonuses .get [his] agreement prior to announcing to the Field" to ensure they "fit into [his] philosophy" and to avoid "disruption in sales" of Subsys.

99. As set forth in detail below, under Kapoor's firm direction and close management, Insys engaged in a deliberate and multifaceted scheme to illegally expand Subsys's off-label

prescriptions to grow the company's profits without regard to the law or consumer safety. In so doing, Kapoor violated the CFA and FCA, and is personally liable for those violations under both statutes.

100. On or about September 15, 2017, the United States Department of Justice identified Kapoor as an unindicted co-conspirator in its criminal prosecution of six former Insys executives and managers—including former CEO Michael Babich ("Babich") and Vice President of Sales, Alec Burlakoff ("Burlakoff" )—on Insys-related federal charges of racketeering conspiracy, mail fraud conspiracy, wire fraud conspiracy, and conspiracy to violate the Anti- Kickback law.

101. On October 26, 2017, the United States Department of Justice arrested Kapoor and charged him with federal RICO conspiracy, as well as other federal felonies, including conspiracy to commit mail and wire fraud and conspiracy to violate the Anti-Kickback statute. Those charges were contained in a superseding indictment in which Kapoor was added to the previously-alleged conspiracy involving Babich, Burlakoff and other former Insys executives.

102. On October 29, 2017, Kapoor resigned from Insys's Board of Directors.

103. Insys develops, markets, and sells prescription drugs, including Subsys, a sublingual spray of fentanyl, in Palm Beach County and nationally.

104. Subsys is a highly addictive synthetic opioid mouth-spray approved for treatment of cancer pain in patients who are tolerant of other opioids. Subsys is a form of fentanyl – a narcotic up to 50 times more powerful than heroin and 100 times more powerful than morphine.

105. To reduce the risk of abuse, misuse, and diversion, the FDA instituted a Risk Evaluation and Mitigation Strategy ("REMS") for Subsys and other TIRF products, such as Cephalon's Actiq and Fentora. The purpose of REMS was to educate "prescribers, pharmacists, and patients on the potential for misuse, abuse, addiction, and overdose" for this type of drug and to "ensure

safe use and access to these drugs for patients who need them." Prescribers must enroll in the TIRF REMS before writing a prescription for Subsys.

106. Since its launch, Subsys has been an extremely expensive medication, and its price continues to rise each year. Depending on a patient's dose strength and frequency of use, a month's supply of Subsys could cost in the thousands of dollars.

107. Due to its high cost, in most instances prescribers must submit Subsys prescriptions to insurance companies or health benefit payors for prior authorization to determine whether they will pay for the drug prior to the patient attempting to fill the prescription. According to the U.S. Senate Homeland Security and Governmental Affairs Committee Minority Staff Report ("Staff Report"), the prior authorization process includes "confirmation that the patient had an active cancer diagnosis, was being treated by an opioid (and, thus, was opioid tolerant), and was being prescribed Subsys to treat breakthrough pain that the other opioid could not eliminate. If any one of these factors was not present, the prior authorization would be denied ...."

108. These prior authorization requirements proved to be daunting. Subsys received reimbursement approval in only approximately 30% of submitted claims. In order to increase approvals, Insys created a prior authorization unit, called the Insys Reimbursement Center ("IRC"), to obtain approval for Subsys reimbursements. This unit employed a number of fraudulent and misleading tactics to secure reimbursements, including falsifying medical histories of patients, falsely claiming that patients had cancer, and providing misleading information to insurers and payors regarding patients' diagnoses and medical conditions.

109. Subsys has proved to be extremely profitable for Insys. Insys made approximately $330 million in net revenue from Subsys last year. Between 2013 and 2016, the value of Insys stock rose 296%.

110. Since its launch in 2012, Insys aggressively worked to grow its profits through fraudulent, illegal, and misleading tactics, including its reimbursement-related fraud. Through its sales representatives and other marketing efforts, Insys deceptively promoted Subsys as safe and appropriate for uses such as neck and back pain, without disclosing the lack of approval or evidence for such uses and misrepresented the appropriateness of Subsys for treatment those conditions. It implemented a kickback scheme wherein it paid prescribers for fake speakers' programs in exchange for prescribing Subsys. All of these fraudulent and misleading schemes had the effect of pushing Insys's dangerous opioid onto patients who did not need it.

111. Insys incentivized its sales force to engage in illegal and fraudulent conduct. Many of the Insys sales representatives were new to the pharmaceutical industry and their base salaries were low compared to industry standard. The compensation structure was heavily weighted toward commissions and rewarded reps more for selling higher (and more expensive) doses of Subsys, a "highly unusual" practice because most companies consider dosing a patient specific decision that should be made by a doctor.

112. The Insys "speakers' program" was perhaps its most widespread and damaging scheme. A former Insys salesman, Ray Furchak, alleged in a qui tam action that the sole purpose of the speakers' program was "in the words of his then supervisor Alec Burlakoff, 'to get money in the doctor's pocket.'" Furchak went on to explain that "[t]he catch … was that doctors who increased the level of Subsys prescriptions, and at higher dosages (such as 400 or 800 micrograms instead of 200 micrograms), would receive the invitations to the program—and the checks." It was a pay-to-prescribe program.

113. Insys's sham speaker program and other fraudulent and illegal tactics have been outlined in great detail in indictments and guilty pleas of Insys executives, employees, and prescribers across the country, as well as in a number of lawsuits against the company itself.

114. According to Insys's 2016 annual report, Subsys was the most prescribed transmucosal "immediate-release fentanyl, with 42% market share, which translates to nearly $300 million in annual U.S. product sales for Insys - an increase of 270% in sales over just a year. See Insys-Annual Report filed on Form 10-K on April 3, 2017 at 1.

115. The broad sales of Subsys raised suspicion over Insys' sales practices, especially because it appeared that only 1 % of Subsys sales were generated by oncologists. Subsequent investigations revealed rampant off-label marketing and sales practices resulting in widespread prescriptions of the drug for unapproved uses.

116. The United States Federal Bureau of Investigations ("FBI"), as well as Colorado, Florida, Illinois, Massachusetts, Maryland, Minnesota, New Hampshire, New Jersey, New York, Oregon, Pennsylvania and Washington have issued subpoenas to Insys in regard to its marketing campaign for Subsys. These investigations ended in many criminal indictments of sales persons, executives, and outside physician groups that took bribes.

117. In 2013, The Department of Health and Human Services Office of Inspector General (DHHS-OIG) began investigating Insys for possible illegal off-label marketing of Subsys.

118. In 2015, the Oregon Department of Justice cited Insys for misrepresenting, among other things, that Subsys should be used to treat migraine, neck pain, back pain, and other off-label uses. Insys paid $1.1 million to settle the matter.

119. In 2015, Insys paid $4.5 million to Illinois over allegations of deceptive marketing for off-label uses.

120. In 2017, Insys agreed to pay New Hampshire $2.9 million to settle allegations of aggressive and deceptive marketing.

121. In May 2017, former Insys manager Elizabeth Gurrieri pled guilty to wire fraud conspiracy in connection with Subsys sales. In July 2017, two former lnsys sales representatives pled guilty to federal kickback charges. One of them, Natalie Levine, is the wife of indicted former CEO of lnsys Michael Babich.

122. In addition, at least three civil suits have been brought against Insys for unethical marketing by estates of persons who overdosed as a result of being prescribed Subsys.

123. The Senate Homeland Security and Government Affairs Committee, led by Senator Claire McCaskill (D-MO) ("McCaskill Investigation"), is investigating the involvement of opioid manufacturers in the current crisis. The conclusion to McCaskill's initial report, Fueling an Epidemic, states that Insys "has repeatedly employed aggressive and likely illegal techniques to boost prescriptions of its fentanyl product Subsys [that] included actions to undermine critical safeguards in the prior authorization process[. ][9]

124. In December of 2016, six Insys executives and managers were indicted and then, in October 2017, Insys's founder and owner was arrested and charged with multiple felonies in connection with an alleged conspiracy to bribe practitioners to prescribe Subsys and defraud insurance companies. A U.S. Department of Justice press release explained that, among other things: "Insys executives improperly influenced health care providers to prescribe a powerful opioid for patients who did not need it, and without complying with FDA requirements, thus putting patients at risk and contributing to the current opioid crisis." A Drug Enforcement Administration ("DEA") Special Agent in Charge further explained that: "Pharmaceutical

---

[9] Minority Report, U.S. HSGAC (Sept. 6, 2017), Fueling an Epidemic: Insys Therapeutics and the Systemic Manipulation of Prior Authorization, https://www.hsdl.org/?view&did=803959.

companies whose products include controlled medications that can lead to addiction and overdose have a special obligation to operate in a trustworthy, transparent manner, because their customers' health and safety and, indeed, very lives depend on it."

**Mallinckrodt Defendants**

125. Mallinckrodt, PLC is an Irish public limited company headquartered in Staines- upon-Thames, United Kingdom, with its U.S. headquarters in Missouri. Mallinckrodt PLC was incorporated in January 2013 for the purpose of holding the pharmaceuticals business of Covidien PLC, which was fully transferred to Mallinckrodt plc in June 2013. Mallinckrodt PLC also operates under the registered business name Mallinckrodt Pharmaceuticals.

126. Mallinckrodt, LLC is a limited liability company organized and existing under the laws of the State of Delaware and is registered with the Florida Secretary of State to do business in Florida. Since 2013, Mallinckrodt, LLC has been a wholly owned subsidiary of Mallinckrodt, PLC. Prior to 2013, Mallinckrodt, LLC was a wholly-owned subsidiary of the Irish public limited company Covidien PLLC (formerly known as Tyco Healthcare).

127. Defendant SpecGx LLC is a Delaware limited liability company with its principal place of business in Clayton, Missouri and a wholly-owned subsidiary of Mallinckrodt PLC.

128. Mallinckrodt, PLC; Mallinckrodt, LLC; and SpecGx LLC will be referred to collectively as "Mallinckrodt."

129. Mallinckrodt manufactures, markets, and sells drugs in the United States including generic oxycodone, of which it is one of the largest manufacturers, and opioids sold since at least June 2009 under the brand names Exalgo (hydromorphone), Xartemis (oxycodone/acetaminophen) and Roxicodone (oxycodone) (known by the street names "M," "roxies/roxys," or "blues"). In July 2017 Mallinckrodt agreed to pay $35 million to settle

allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

130. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States based on prescriptions.

131. Mallinckrodt operates a vertically integrated business in the United States: (1) importing raw opioid materials, (2) manufacturing generic opioid products, primarily at its facility in Hobart, New York, and (3) marketing and selling its products to drug distributors, specialty pharmaceutical distributors, retail pharmacy chains, pharmaceutical benefit managers that have mail-order pharmacies, and hospital buying groups.

132. Mallinckrodt made thousands of payments to physicians nationwide, including in Plaintiff's community, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

133. ABC Corporations 1-100 engaged in the manufacturing of opioids.

### 2. Opioid Distributors

134. The opioid distributor defendants ("Opioid Distributors" or "Distributor Defendants") are McKesson Corporation; Cardinal Health, Inc.; AmerisourceBergen Drug Corporation; Anda, Inc.; CVS Health Corporation; Walgreens Boots Alliance, Inc.; Walgreens Eastern Co., Inc.; Walgreen Co. This category also includes Defendants identified below as Front Groups and/or Key Opinion Leaders.

135. At all relevant times, the Opioid Distributors have distributed, supplied, sold, and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non- medical

purposes. The Distributor Distributors universally failed to comply with both common law and statutory duties. The Opioid Distributors are engaged in "wholesale distribution," as defined under federal, and State law. Plaintiff alleges the unlawful conduct by the Opioid Distributors is responsible for the volume of prescription opioids plaguing Plaintiff's community.

136. McKesson Corporation ("McKesson") is a Delaware corporation with its principal place of business located in San Francisco, California. McKesson is registered with the Florida Secretary of State to do business in Florida, and is licensed by the Florida Department of Health to distribute prescription drugs and controlled substances in Florida. At all relevant times, McKesson operated as a nationwide pharmacy wholesaler.

137. Cardinal Health, Inc. ("Cardinal") is an Ohio corporation with its principal office in Dublin, Ohio. At all relevant times, Cardinal operated as a licensed pharmacy wholesaler through its wholly owned subsidiaries (Cardinal Health 100-113, 122, 132,200, 203)[10] in Florida and nationally.[11] Cardinal Health is licensed by the Florida Department of Health to label, repackage, and distribute prescription drugs and controlled substances. Cardinal's wholly-owned subsidiaries operates a wholesale drug distribution center licensed by the Florida Department of Health to operate as a distributor of prescription drugs and controlled substances in Florida.

138. AmerisourceBergen Drug Corporation ("AmerisourceBergen") is a Delaware corporation with its principal place of business is in Chesterbrook, Pennsylvania. AmerisourceBergen is registered with the Florida Secretary of State to do business in Florida. At all relevant times, AmerisourceBergen operated as a nationwide pharmacy wholesaler. AmerisourceBergen

---

[10] Cardinal has registered its subsidiaries for business in Florida, including subsidiaries.

[11] Cardinal Health is a significant distributor of opioids in the United States. Cardinal Health's largest customer is CVS Health ("CVS"), which accounted for 25% of Cardinal Health's fiscal year 2016 revenue. According to its website, CVS operates numerous pharmacies in the County.

maintains wholesale drug distribution centers licensed by the Florida Department of Health to operate as a distributor of prescription drugs and controlled substances in Florida.

139. Defendant Anda, Inc. ("Anda"), is a Florida corporation with its principal office located in Olive Branch, Mississippi. Through its various DEA registrant subsidiaries and affiliated entities, Anda is the fourth largest distributor of generic pharmaceuticals in the United States. In October 2016, Defendant Teva USA acquired Anda for $500 million in cash. At all times relevant to this Complaint, Anda distributed prescription opioids throughout the United States, including in Illinois and Plaintiff's Community.

140. The data which reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. See Madel v. USDOJ, 784 F.3d 448 (8th Cir. 2015). Neither the DEA nor the wholesale distributors will voluntarily disclose the data necessary to identify with specificity the transactions which will form the evidentiary basis for the claims asserted herein.[12] [13]

141. Consequently, Plaintiff has named the three wholesale distributors (i.e., AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation) which dominate 85% of the market share for the distribution of prescription opioids. The "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs. See Fed. Trade Comm'n v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal Health, Inc., McKesson Corporation, and AmerisourceBergen Drug Corporation predecessors). Each has been

[12] See Declaration of Katherine L. Myrick, Chief, Freedom of Information (FOI)/Privacy Act Unit ("SARF"), FOI, Records Management Section ("SAR"), Drug Enforcement Administration (DEA), United States Department of Justice (DOJ), Madel v. USDOJ, Case 0:13-cv-02832-PAM-FLN, (Document 23) (filed 02/06/14) (noting that ARCOS data is "kept confidential by the DEA").

[13] See Declaration of Tina Lantz, Cardinal Health VP of Sales Operation, Madel v. USDOJ, Case 0:13-cv-02832-PAM-FLN, (Document 93) (filed 11/02/16) ("Cardinal Health does not customarily release any of the information identified by the DEA notice letter to the public, nor is the information publicly available. Cardinal Health relies on DEA to protect its confidential business information reported to the Agency.").

investigated and/or fined by the DEA for the failure to report suspicious orders. Plaintiff has reason to believe each has engaged in unlawful conduct which resulted in the diversion of prescription opioids into their community and that discovery will likely reveal others who likewise engaged in unlawful conduct. Plaintiff names each of the "Big 3" herein as defendants and place the industry on notice that Plaintiff is acting to abate the public nuisance plaguing their community. Plaintiff will request expedited discovery to secure the data necessary to reveal and/or confirm the identities of the wholesale distributors, including data from the ARCOS database.

142. ABC Corporations 1-100 engaged in the distribution of opioids.

### 3. Front Groups/Physicians/Key Opinion Leaders

143. Russell Portenoy, M.D., is an individual residing in New York. Defendant Dr. Portenoy is a physician licensed to practice medicine in the state of New York. Dr. Portenoy was instrumental in promoting opioids for sale and distribution nationally.

144. In 1986, Defendant Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, while at the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy." [14]

145. Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> The traditional approach to chronic nonmalignant pain does not accept the long-term administration of opioid drugs. This perspective has been justified by the perceived

[14] Russell K. Portenoy & Kathleen M. Foley, Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases, 25(2) Pain 171 (1986).

> likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.[15]

According to Portenoy, these problems could constitute "compelling reasons to reject long term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain." [16]

146. For the reasons outlined by Dr. Portenoy, and in the words of one researcher from the Harvard Medical School, "it did not enter [doctors'] minds that there could be a significant number of chronic pain patients who were successfully managed with opioids." [17]

147. Perry Fine, M.D., is an individual residing in Utah. Dr. Fine was instrumental in promoting opioids for sale and distribution nationally and in Ocean.

---

[15] Russell K. Portenoy, Opioid Therapy for Chronic Nonmalignant Pain: Current Status, 1 Progress in Pain Res. & Mgmt. 247 (1994) (emphasis added).

[16] *Id.*

[17] Igor Kissin, Long-term opioid treatment of chronic nonmalignant pain: unproven efficacy and neglected safety?, 6 J. PAIN RESEARCH 513, 514 (2013) (quoting Loeser JD, Five crises in pain management, 20(1) Pain Clinical Updates 1-4 (2012).

148. Dr. Fine, served on the Board for the American Pain Foundation and reviewed its publications, which understated the risks and overstated the benefits of opioids and were intended to reach the public.

149. The APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes—including death—among returning soldiers. APF also engaged in a significant multimedia campaign—through radio, television and the internet—to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach County residents.

150. Dr. Fine received consulting fees from Defendants as a result of his leadership status and role on the APF Board.[18]

151. Scott Fishman, M.D., is an individual residing in California. Dr. Fishman was instrumental in promoting opioids for sale and distribution nationally.

152. Like Dr. Fine, Dr. Fishman served on the Board for the American Pain Foundation and reviewed its publications, which understated the risks and overstated the benefits of opioids and were intended to reach the public.

153. Additionally, in 2007 Teva sponsored and distributed through its sales representatives FSMB's Responsible Opioid Prescribing, which was drafted by Dr. Fishman. Dr. Fishman was frequently hired by a consulting Firm, Conrad & Associates LLC, to write opioid marketing

[18] Evaluating the Propriety and Adequacy of the Oxycontin Criminal Settlement: Before the S. Comm. On the Judiciary, 110th Cong. 46-50, 110-116 (2007) (statements of Dr. James Campbell, Chairman, APF), https://www.judiciary.senate.gov/imo/media/doc/Campbell%20Testimony%20073107.pdf (accessed Feb. 27, 2017). Purdue was also able to exert control over APF through its relationships with APF's leadership. Purdue-sponsored KOLs Russell Portenoy and Scott Fishman chaired APF's board. Another APF board member, Perry Fine, also received consulting fees from Purdue. APF board member Lisa Weiss was an employee of a public relations firm that worked for both Purdue and APF. Weiss, in her dual capacity, helped vet the content of the Purdue-sponsored Policymaker's Guide, which is described below.

pieces disguised as science. Dr. Fishman's work was reviewed and approved by drug company representatives, and he felt compelled to draft pieces that he admits distorted the risks and benefits of chronic opioid therapy in order to meet the demands of his drug company sponsors.

154. Responsible Opioid Prescribing was a signature piece of Dr. Fishman's work and contained a number of deceptive statements. This publication claimed that, because pain had a negative impact on a patient's ability to function, relieving pain—alone—would "reverse that effect and improve function." However, the truth is far more complicated; functional improvements made from increased pain relief can be offset by a number of problems, including addiction.

155. Endo sponsored FSMB's Responsible Opioid Prescribing, drafted by Dr. Fishman, which in various ways deceptively portrayed the risks, benefits, and superiority of opioids to treat chronic pain.

156. Lynn Webster, M.D., is an individual residing in Utah. Dr. Webster was instrumental in promoting opioids for sale and distribution nationally.

157. Dr. Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a front group that ardently supports chronic opioid therapy.[19] She is a Senior Editor of Pain Medicine, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Teva, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Teva).

[19] Journal supplements are paid for by drug manufacturers and, although they may be designed to blend into the rest of the journal, are not peer-reviewed and constitute drug company advertising.

158. Dr. Webster had been under investigation for overprescribing by the DEA, which raided his clinic in 2010. More than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses. Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to presort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue. In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue titled, Managing Patient's Opioid Use: Balancing the Need and the Risk. Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach County doctors.

159. Dr. Webster also was a leading proponent of the concept of "pseudo addiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids. As he and his co-author wrote in a book entitled Avoiding Opioid Abuse While Managing Pain (2007), when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response." Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudo addiction] obviously became too much of an excuse to give patients more medication." [20]

### 4. **Pharmacy Defendants**

---

[20] John Fauber & Ellen Gabler, Networking Fuels Painkiller Boom, Milwaukee Wisc. J. Sentinel (Feb. 19, 2012).

160. Defendant CVS Health Corporation is a Delaware corporation with its headquarters and principal place of business located in Woonsocket, Rhode Island. CVS Health Corporation is registered with the Florida Secretary of State to do business in Florida.

161. Defendant Walgreens Boots Alliance, Inc.; Walgreen Eastern Co., Inc.; Walgreen, Co. are Delaware corporations with headquarters in Deerfield, Illinois. Walgreens Boots Alliance and Walgreen Eastern Co. are registered with the Florida Secretary of State to do business in Florida.

162. The above-listed pharmacies were instrumental in sale and distribution of opioids nationally. They engaged in the filling of prescriptions for opioid that led to the opioid epidemic.

163. ABC Corporations 1-100 engaged in the filling of prescriptions for opioids.

**5. Defendants' Agents**

164. All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants or their officers, agents, employees, or other representatives while actively engaged in the management of Defendant's affairs within the course and scope of their duties and employment, and/or with Defendant's actual, apparent, and/or ostensible authority.

165. Jane and John Does 1-100, and ABC Corporations 1-100 actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendant's actual, apparent, and/or ostensible authority.

166. The combined acts and/or omissions of each Defendant resulted in indivisible injuries to Plaintiff. Each of the above-named Defendants is a joint tortfeasor and/or coconspirator and is jointly and severally liable to Plaintiff for the negligent acts and omissions alleged herein. Each

of the above-named Defendants directed, authorized or ratified the conduct of each and every other Defendant.

## FACTUAL BACKGROUND

### A. The Opioid Epidemic Caused By Defendants

167. The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

168. Opioids are a class of "analgesic," which are drugs that treat pain or tissue irritation. Tylenol and aspirin are analgesics, but opioids are much more powerful. The dangers of opioid addiction have long been known. During the Civil War, injured soldiers treated with morphine often became addicted.[21] "In 1898, the Bayer Co. started production of another opioid, heroin, on a commercial scale. From its first clinical trials, it was considered a 'wonder drug.'"[22] But soon, people became addicted, and addicts learned that they could get a more intense high from injecting it.[23] When the opioids Percocet and Vicodin came on the market in the mid-to-late 1970s, physicians understood the dangers of addiction, and these drugs were only seen fit for the management of short-term pain, such as from surgery, or to ease the suffering of the terminally ill. But, when the Opioid Manufacturers began inventing their patented opioids in the 1990s, they sought to convince the medical community and the world that opioids were safe and effective for all types of pain, including chronic lower-back pain and arthritis.

---

[21] Sonia Moghe, Opioid history: From 'wonder drug' to abuse epidemic, CNN (Oct. 14, 2016), http://cnn.it/1X4yjE9.
[22] *Id.*
[23] *Id.*

169. Unfortunately, the Opioid Manufacturers' misinformation campaign was wildly successful and spurred an opioid epidemic in the United States, the worst drug epidemic in the nation's history. The past two decades in the United States have been characterized by a dramatic increase in the diversion of opioids from licensed prescribers and pharmacies to the illegal market.[24]

170. Fueled by legal and illegal sales, the Opioid Manufacturers and Distributors collectively generated $8 billion per year in revenue from prescription opioids, as of 2009.[25]

171. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[26] For each 100 American citizens, 80 opioid prescriptions were issued each year.[27]

172. By 2011, the U.S. Department of Health and Human Services, and the Centers for Disease Control and Prevention declared prescription painkiller overdoses at epidemic levels.

173. Approximately 5,500 people begin misusing prescription opioids every day.[28]

174. In 2016, the President of the United States declared an official opioid epidemic.[29]

**B. The Opioid Manufacturers' Misinformation Campaign**

175. The opioid epidemic did not happen by accident; it was foreseen and purposefully fueled by those in a position to profit from a far greater demand and consumption of the drugs than is

[24] See Dart, RC, et al., Trends in Opioid Analgesic Abuse and Mortality in the United States, 372 N. ENG. J. MED. 241 (2015).
[25] See Katherine Eban, OxyContin: Purdue Pharma's Painful Medicine, FORTUNE, Nov. 9, 2011, http://for.tn/2DwlUnm; David Crow, Drugmakers Hooked on $10bn Opioid Habit, FIN. TIMES, Aug. 10, 2016, http://on.ft.com/2zeDbOG.
[26] See Katherine Eban, OxyContin: Purdue Pharma's Painful Medicine, FORTUNE, Nov. 9, 2011, http://for.tn/2DwlUnm; David Crow, Drugmakers Hooked on $10bn Opioid Habit, FIN. TIMES, Aug. 10, 2016, http://on.ft.com/2zeDbOG.
[27] Data for 2010. Ctrs. for Disease Control and Prevent, Vital Signs: Changes in Opioid Prescribing in the United States, 2006–2015, CDC (July 7, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.
[28] See Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.
[29] See Proclamation No. 9499, 81 Fed. Reg. 65,173 (Sept. 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week").

medically appropriate, and a blatant disregard for the law and the health and safety of consumers in favor of maximized profits.

176. Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used in the short-term. Accepted uses for opioids were to treat acute pain, such as from surgery, cancer, or other terminal illness. The medical community discouraged and prohibited the use of opioids for chronic pain, such as from arthritis or injury. There is insufficient evidence that opioids improve chronic-pain sufferers' ability to function. And there is abundant evidence that chronic-pain patients develop a tolerance over time, so opioids no longer alleviate their symptoms. The lack of benefit for prescribing opioids to sufferers of chronic pain, in other words, was easily outweighed by the serious risk of addiction that stems from persistent use of opioid painkillers.

177. But to improve sales and ensure their drugs reached a wider audience, the Opioid Manufacturers engaged in a marketing scheme designed to persuade doctors and patients that opioids could safely and beneficially be used to treat chronic pain. As part of this scheme, each Opioid Manufacturer spent millions of dollars on promotional activities and materials that falsely denied or trivialized the risks of opioids, while overstating the benefits of using them for chronic pain.

178. This misinformation scheme was wildly successful, to the widespread detriment of patients. Opioids are now the most prescribed class of drugs. In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught incorrectly–that opioids are not addictive when prescribed for legitimate pain."[30] This epidemic has resulted in a flood of prescription opioids available for illicit use (i.e., a supply spike), and a

[30] Letter from Vivek H. Murthy, U.S. Surgeon General (Aug. 2016), http://turnthetiderx.org/.

population of patients physically and psychologically dependent on them (i.e., a demand spike). And when those patients can no longer afford or obtain opioids from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

179. The Opioid Manufacturers used many of the same tactics as the tobacco industry in the late 1950s through the 1980s [31] to attract consumers and reassure the public of the effectiveness and safety of their product.

180. Once the public stopped believing these blatantly misleading ads, the tobacco industry touted "safer" formulations of cigarettes, such as filtered cigarettes, low-tar varieties, and light cigarettes.[32]

181. Lastly, the tobacco industry used indirect strategies to mask their role in crafting the message, as part of a decades-long conspiracy "revealed through analysis of the formerly secret internal documents of the industry," acquired in litigation.[33] The cigarette manufacturers "used front groups and artificially created 'grass roots' movements that create[d] the illusion of support" for cigarettes.[34] Most famously, the tobacco industry used the Tobacco Institute to release publications from a seemingly non-biased source to question the scientific consensus about cigarettes and fund scientific research attempting to show cigarettes were safe.

182. Similarly, the Opioid Manufacturers used direct advertisements to market opioids as safe and effective to treat chronic pain. As this false messaging became less effective, the Opioid Manufacturers introduced supposedly safer versions of their drugs, such as extended release and crush-resistant formulations, and versions that were only part opioid and part acetaminophen (Tylenol). These formulations were actually more dangerous, as drug abusers began overdosing

---

[31] Loddenkemper R, Kreuter M (eds), The Tobacco Epidemic, ed 2, rev. and ext. Prog. Respir Res. Basel, Karger, 2015, vol 42, pp. 14, http://bit.ly/2BKwB5x.

[32] *Id.*

[33] *Id.*

[34] *Id.*

on the Tylenol or the chemicals in the crush-resistant pill coating. The FDA recently capped the acetaminophen dose that can be used in opioid painkillers and forced Endo to remove its crush-resistant opioid, Opana ER, from the market. Lastly, the Opioid Manufacturers used indirect marketing tactics, hiring influential doctors to advocate that opioids were safe to use for chronic pain, and employing seemingly non-biased front groups to parrot their messages about opioids.

1. Direct Marketing

183. Each Opioid Manufacturer conducted advertising campaigns touting the purported benefits of their branded opioid drugs. For example, the Opioid Manufacturers spent more than $14 million in 2011 alone to advertise opioids in medical journals, nearly triple what they spent 10 years earlier.

184. Many of the Opioid Manufacturers' ads deceptively portrayed benefits of opioids for chronic pain. For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER as a chronic-pain treatment, with photographs depicting patients able to return to physically demanding jobs like construction worker, chef, and teacher, conveying the false message that opioids were a safe and effective way for chronic-pain sufferers to restore their former functionality.

185. Purdue created a promotional video in 1998 called "I got my life back," featuring seven patients whose lives were "turned around by the magic of OxyContin."[35] One patient, Lauren Cambra, was featured as saying that OxyContin had fixed her chronic pain and restored her ability to function.

186. In the ad, Lauren is featured as saying, "Since I've been on this new pain medication, I have not missed one day of work, and my boss really appreciates that: 'Lauren is there every day.' So, I'm able to be very productive. And one of the things … which I'm especially excited

[35] Jon Oliver, Opioids, Last Week Tonight (Oct. 23, 2016), https://www.youtube.com/watch?v=5pdPrQFjo2o.

about is just the fact that I'm able to spend time with my grandchildren. It's amazing just to be able to keep up with them and not have to always tell them: 'Grandma can't play now; grandma can't do this; … grandma's back hurts.'"[36] The video features heartwarming footage of Ms. Cambra playing with her grandkids.

187. In a follow-up study in 2012 by Physicians for Responsible Opioid Prescribing, entitled "OxyContin Poster Children 15 Years Later," Ms. Cambra said that she became addicted to OxyContin soon after she started taking it, with terrible consequences. She says, "I lost my house; I've lost cars; … I lost a lot to keep taking that drug; … I lost my job."[37] When Ms. Cambra lost her job, she also lost her health insurance. Cambra says, "Had I not lost my medical insurance, otherwise, I would [still] go to the mailbox once a month, and I would find a bottle of OxyContin in it, and I'd probably still be on it, [or] I'd probably be dead."

188. In 2012, the same year that "OxyContin Poster Children 15 Years Later" came out, Purdue ran another series of ads in medical journals. The ad campaign was called "Pain vignettes." These ads featured chronic pain patients and recommended OxyContin to treat their pain. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would allow the writer to work again without pain.

189. Unfortunately, well-meaning doctors who wanted to help their pain patients were duped into prescribing OxyContin for long-term pain management. David Juurlink, who runs the division of clinical pharmacology and toxicology at the University of Toronto, explains why these advertisements convinced so many physicians to prescribe OxyContin for chronic pain, "You've got a patient in pain, you've got a doctor who genuinely wants to help, and now

[36] Id.
[37] Id.

suddenly you have an intervention that—we are told—is safe and effective." [38] Keith Humphreys, a professor of psychiatry at Stanford, who served as a drug-policy adviser to the Obama Administration, says of Purdue's marketing efforts, "That's the real Greek tragedy of this—that so many well-meaning doctors got co-opted. The level of influence is just mind-boggling."[39]

190. In addition to marketing material, the Opioid Manufacturers promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices. The Opioid Manufacturers spent massive amounts to have detailers pitch opioids to physicians. In 2014 alone, the Opioid Manufacturers spent in excess of $168 million detailing branded opioids to doctors.

191. The Opioid Manufacturers' detailing to doctors has been effective. Numerous studies indicate that marketing affects prescribing habits, with face-to-face detailing having the greatest influence. Opioid Manufacturers use uniform sales material and train their salespeople at training seminars and using Power Point presentations – to parrot the company's branded messaging.

192. Opioid Manufacturers have been reprimanded for their deceptive detailing messages. In March 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimized the risks associated with Kadian and misleadingly suggested that Kadian is safer than has been demonstrated." Those materials in particular "fail to reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed."[40]

---

[38] Patrick Radden Keefe, The Family That Built an Empire of Pain, NEW YORKER (Oct. 30. 2017), http://bit.ly/2yHrgvM.
[39] *Id.*
[40] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

193. Purdue was another major culprit in fraudulent detailing. In its training materials, "Purdue instructed sales representatives to assure doctors—repeatedly and without evidence—that 'fewer than one per cent' of patients who took OxyContin became addicted," even though a 1999 Purdue-funded study of patients who used OxyContin for headaches found that "the addiction rate was thirteen per cent."[41]

**2. Indirect Marketing**

194. The Opioid Manufacturers indirectly marketed their respective branded opioids via unbranded advertising, paid speakers and "key opinion leaders," and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

195. The Opioid Manufacturers marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and is normally not reviewed by the FDA. The Opioid Manufacturers also used third-party, unbranded advertising to create the misconception that the false and deceptive messages came from independent and objective sources, rather than from the Opioid Manufacturers.

196. Some Opioid Manufacturers could only market through indirect means because they had entered into consent decrees that prohibited them from engaging in direct marketing. For example, a 2007 lawsuit against Purdue, brought by multiple States for Purdue's deceptive marketing and promotion of OxyContin, ended in a series of consent decrees restricting the tactics Purdue could use in its direct marketing of OxyContin in the future. To circumvent these restrictions, Purdue simply funneled its energies and funds into indirect marketing.

---

[41] *Id.*

197. Like the tobacco companies before them, the Opioid Manufacturers used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

**a. Key Opinion Leaders**

198. The concept of a "key opinion leader" was coined by sociologist Paul Lazarsfeld.[42] For Lazarsfeld and his progeny, a key opinion leader is someone held in high regard by those who accept his or her opinions. A key opinion leader might be a celebrity, politician, or doctor. In Lazardfeld's model, new ideas or products spread in a two-step process. A key opinion leader endorses or adopts the idea or product, and then others who hold the key opinion leader in high esteem follow suit.

199. In the 1950s, when studies definitively linked cigarettes to lung cancer, the tobacco industry paid key opinion leaders to say that smoking was still safe.[43] Big Tobacco "co-opted scientists … to the extent of being able to influence peer-reviewed scientific literature." [44]

200. The Opioid Manufacturers took a page from Big Tobacco's playbook, and "recruited their own traveling spokespeople, a group of opioid-pushing Pied Pipers known as [key opinion leaders]."[45] The Opioid Manufacturers made "large payments" to these physicians, "primarily intended … to purchase their influence on other physicians."[46] For example, one influential key opinion leader doctor was dubbed – due to his efforts advocating for wider opioid use – "The

[42] Sergio Sismondo, Ph.D., Key Opinion Leaders and the Corruption of Medical Knowledge: What the Sunshine Act Will and Won't Cast Light on, 41 J.L. MED. & ETHICS 635, 636 (2013).
[43] Loddenkemper, supra note 21.
[44] *Id.*
[45] Larry McShane, How Big Tobacco-style marketing propels U.S. opioid crisis — and powers $400B pharma industry, N.Y. DAILY NEWS (June 24, 2017), http://nydn.us/2sNRbND.
[46] Sismondo, supra note 2, at 635-36.

King of Pain" by Time magazine.[47] This individual was "on the payroll" of at least four different Opioid Manufacturers.[48]

201. The Opioid Manufacturers used their key opinion leaders to control the message about opioids conveyed in scientific literature, treatment guidelines, and continuing medical education programs, including medical conferences and seminars. For example, "Purdue had a speakers' bureau, and it paid several thousand clinicians to attend medical conferences [to] deliver presentations about the merits of" its opioid drug, OxyContin.[49] Paying these key opinion leaders to speak at conferences was "worth the investment" because "internal Purdue records indicate that doctors who attended these seminars … wrote OxyContin prescriptions more than twice as often as those who didn't."[50] To convince these doctors of the drug's safety, Purdue used studies that it had bought and paid for. The New Yorker says, "The marketing of OxyContin relied on an empirical circularity: [Purdue] convinced doctors of the drug's safety with literature that had been produced by doctors who were paid, or funded, by the company."[51]

202. Two prominent opioid advocates paid handsomely by the Opioid Manufacturers were Dr. Russell Portenoy and Dr. Lynn Webster.

**Dr. Russell Portenoy**

203. Dr. Russell Portenoy, a doctor at Beth Israel Medical Center in New York, was paid as a "consultant" by Teva and Purdue and received substantial speaking fees and research funding from Endo, Janssen, and Mallinckrodt (among others). The NY Daily News says that Dr. Portenoy "became a tireless shill" for the opioid industry.[52]

---

[47] McShane, supra note 35.
[48] *Id.*
[49] Keefe, supra note 28.
[50] *Id.*
[51] *Id.*
[52] McShane, supra note 35.

204. Portenoy was instrumental in spreading the falsehood that opioids were safe and effective for chronic pain. In 1986, he wrote a "seminal paper arguing that opioids could be used "not only in "cancer patients with terrible pain," but also in chronic-pain sufferers, such as those with arthritis.[53] Dr. Portenoy claimed that a patient with "knee and hip pain from arthritis" could be given opioids with "very, very low risk" of addiction.[54] Dr. Portenoy based his paper on a study he conducted on patients who were prescribed an opioid for chronic pain. The study looked at only 38 patients, many of whom were prescribed methadone, a milder opioid also used to treat heroin addiction.[55]

205. Dr. Portenoy frequently made media appearances to promote opioids, touting the claim that "the likelihood that the treatment of pain using an opioid drug … will lead to addiction is extremely low." He appeared on Good Morning America in 2010 to discuss the use of opioids to treat chronic pain and asserted: "Addiction, when treating pain, is distinctly uncommon."

206. Dr. Portenoy was chiefly responsible for the widespread falsehood that "less than 1%" of opioid users ever become addicted.[56] Dr. Portenoy repeatedly cited a "study" by Dr. Hershel Jick,[57] even though the study was merely a five-sentence letter-to-the-editor published in a medical journal in 1980. [58] Although Portenoy claimed that Dr. Jick's analysis showed that opioids were safe for long-term use, "Jick's analysis proved no such thing. The "study" analyzed a database of hospitalized patients at Boston University Medical Center who were given small

---

[53] Thomas Catan and Evan Perez, A Pain-Drug Champion Has Second Thoughts, WALL STREET J. (Dec. 17, 2012), http://on.wsj.com/2p9B2nI.
[54] Assuming the patient has no personal or family history of substance abuse or mental illness, Health.com, Dr. Russell Portenoy, a Leader in Pain Medicine, Answers Critical Questions About Using Opioids for Chronic Pain (Mar. 17, 2017), http://www.health.com/health/condition-article/0,,20189630,00.html.
[55] See Portenoy RK and Foley KM, Chronic use of opioid analgesics in non-malignant pain, Pain, 1986 May;25(2):171-86, https://www.ncbi.nlm.nih.gov/pubmed/2873550.
[56] Harrison Jacobs, This one-paragraph letter may have launched the opioid epidemic, Business Insider (May 26, 2016), http://read.bi/2BPnXmb.
[57] *Id.*
[58] *Id.*

doses of opioids in a controlled [inpatient] setting to ease suffering from acute pain. These patients were not given long-term opioid prescriptions, which they'd be free to administer at home."[59] Although the "study" had nothing to do with long-term use outside the confines of a hospital, Portenoy asserted that the Jick analysis proved that opioids were safe for long-term use.

207. Portenoy took steps to ensure that his 1% statistic would be widely publicized and cited. In the 1990s, he pushed this statistic during his lectures and through the American Pain Society, of which he was president.[60] Citing his 1% statistic, "Dr. Portenoy helped write a landmark 1996 consensus statement by two professional pain societies that said there was little risk of addiction or overdose among pain patients."[61] As a result of Dr. Portenoy's efforts, the Jick analysis has been cited in 901 academic publications.[62] A 1990 article in Scientific American cited the Jick analysis as an "extensive study."[63] A 2001 Time magazine article said it was a "landmark study" that proved that the "exaggerated fear that patients would become addicted" to opioids was "basically unwarranted."[64]

208. Portenoy's 1% statistic from the Jick letter was one of the "primary justifications" that doctors used for more liberally prescribing opioids starting in the early 1990s.[65] When investigative journalist Sam Quinones dug into the causes of the opioid crisis, including interviewing doctors and other medical professionals, the "Jick letter was referenced repeatedly to justify the increase in liberal prescriptions of opioid painkillers."[66] "Over time, the … Jick

---

[59] *Id.*
[60] Catan, supra note 51.
[61] *Id.*
[62] Jacobs, supra note 54.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*

letter, and its claim that 'less than 1%' of opioid users became addicted, became 'gospel' for medical professionals, Dr. Marsha Stanton told Quinones."[67] Dr. Stanton continued, "I used [the Jick letter] in lectures all the time. Everybody did. It didn't matter whether you were a physician, a pharmacist, or a nurse; you used it. No one disputed it. Should we have? Of course we should have."[68]

209. "Today, even proponents of opioid use say that figure was wrong," says the Wall Street Journal. One opioid advocate said, "It's obviously crazy to think that only 1% of the population is at risk for opioid addiction." Modern studies put the rate much higher. A 2015 metastudy found that up to 29% of chronic-pain patients started abusing opioids, and up to 12% became addicted during the study period.[69]

210. In recent years, Dr. Portenoy reversed his position on the safety of opioids.[70] In a 2011 interview, "Portenoy admitted that he used the … Jick letter, along with other similar studies on opioid use, to encourage more liberal prescribing of opioids."[71] Portenoy admitted, "None of [those studies] represented real evidence, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information and feel more comfort about opioids in a way they hadn't before. In essence this was education to destigmatize [opioids] … and because the primary goal was to destigmatize, we often left evidence behind."[72] Portenoy now admits that he "gave innumerable lectures in the late 1980s and '90s about

---

[67] *Id.*
[68] *Id.*
[69] Vowles et al., Rates of opioid misuse, abuse, and addiction in chronic pain: a systematic review and data synthesis, Pain, NCBI (Apr. 2015), https://www.ncbi.nlm.nih.gov/pubmed/25785523.
[70] Catan, supra note 51.
[71] Jacobs, supra note 54.
[72] *Id.*

addiction that weren't true."[73] These lectures falsely claimed that less than 1% of patients would become addicted to opioids. Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? . . . I guess I did."[74] Portenoy says it's "quite scary" to think about how he "contributed to soaring rates of addiction and overdose deaths." [75] Portenoy said that his opioid advocacy "was clearly the wrong thing to do."[76]

**Dr. Lynn Webster**

211. Another key opinion leader paid by the opioid industry was Dr. Lynn Webster, Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President of the American Academy of Pain Medicine in 2013. Dr. Webster was the author of numerous continuing medical education courses sponsored by Teva, Endo, and Purdue. He received significant funding from the Opioid Manufacturers, including nearly $2 million from Teva.

212. During a portion of his time as a key opinion leader, Dr. Webster was under investigation by the Drug Enforcement Administration (DEA) for overprescribing opioids. The DEA raided his clinic in 2010. More than twenty of Dr. Webster's former patients have died of opioid overdoses.

213. Dr. Webster created and promoted an Opioid Risk Tool,[77] a five question, one minute screening tool that purportedly allows doctors to pre-screen patients for addiction risk factors. Dr. Webster claimed the tool could identify patients likely to become addicted, so doctors could

---

[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] Opioid Risk Tool, DRUGABUSE.GOV, https://www.drugabuse.gov/sites/default/files/files/OpioidRiskTool.pdf (last visited Feb. 21, 2018).

avoid prescribing opioids to these patients. The Tool is supposed to give doctors confidence in prescribing opioids to individuals that the Tool identifies as low risk. The Tool has been touted by a variety of industry-supported publications, and appears or is linked to on websites run by Endo, Janssen, and Purdue. In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended use of his Opioid Risk Tool to prevent "overuse of prescriptions" and "overdose deaths.".[78]

214. The Tool is inaccurate. It correctly identifies individuals with heightened risk of opioid addiction only 45% of the time—worse than a coin flip.[79] Clinical interviews with patients and more robust screening tools are 1.71 and 1.62 times more accurate, respectively.[80]

215. Unaware of the flawed science and industry bias behind the tool, certain states and public entities have incorporated the Opioid Risk Tool into their own opioid guidelines, relying on representations about its accuracy made by the Opioid Manufacturers and their paid key opinion leaders.

216. Dr. Webster also popularized the perplexing concept of "pseudo addiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two is to increase a patient's dose of opioids. He and co-author Beth Dove wrote in their 2007 publication Avoiding Opioid Abuse While Managing Pain that when a doctor sees signs of aberrant behavior in a patient, increasing

---

[78] See Emerging Solutions in Pain, Managing Patient's Opioid Use: Balancing the Need and the Risk, http://bit.ly/2zeYZtK (last visited Feb. 21, 2018).

[79] Rene Claxton, MD, and Robert Arnold, MD, Screening for Opioid Misuse and Abuse, Palliative Care Network of Wisconsin, http://bit.ly/2kVfwh6 (noting that the Opioid Risk Tool has a "sensitivity" of 45%). Sensitivity is a measure of the true positive rate of a diagnostic test (i.e., the opposite of the rate of false positives).

[80] Id. (Clinical interviews have a sensitivity of 77% and the Screener and Opioid Assessment of Pain Patients (SOAPP), a 14-question screening tool, had a sensitivity of 73%).

their opioid dose "in most cases . . . should be the clinician's first response."[81] Endo distributed this publication to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudo addiction] obviously became too much of an excuse to give patients more medication."[82]

217. Pro-opioid key opinion leaders, like Dr. Portenoy and Dr. Webster, are one of the most important avenues that the Opioid Manufacturers used to spread their false and deceptive statements about the risks and benefits of long-term opioid use. The Opioid Manufacturers knew that doctors rely heavily and less critically on their peers for guidance, and key opinion leaders provide the false appearance of unbiased and reliable support for use of opioids to treat chronic pain.

**b. Front Groups**

218. The Opioid Manufacturers also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of the Opioid Manufacturers, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that promoted chronic opioid therapy. As the Tobacco Institute did for the tobacco industry, these Front Groups assisted the Opioid Manufacturers by responding to negative articles, advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and conducting outreach to vulnerable patient populations who Opioid Manufacturers wanted to target.

219. These Front Groups depended on the Opioid Manufacturers for funding and, in some cases, for survival. The Opioid Manufacturers also controlled the programs and materials put out

---

[81] Lynn Webster & Beth Dove, Avoiding Opioid Abuse While Managing Pain (2007).
[82] John Fauber, Painkiller Boom Fueled by Networking, MILWAUKEE WISC. J. SENTINEL, Feb. 18, 2012, http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by- networking-dp3p2rn139609053.html.

by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, the Opioid Manufacturers made sure that the Front Groups would generate only the messages that the Opioid Manufacturers wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members whether patients suffering from pain or doctors treating those patients.

220. The Opioid Manufacturers utilized many different Front Groups. Several of the most prominent are described below, but there are many others.

**American Pain Foundation**

221. The most prominent of the Opioid Manufacturers' Front Groups was the American Pain Foundation, which received more than $10 million in funding from the Opioid Manufacturers, primarily Endo and Purdue, from 2007 until it closed its doors in May 2012. The American Pain Foundation issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. American Pain Foundation also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death among returning soldiers. American Pain Foundation also engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach citizens of the State.

222. In 2009 and 2010, more than 80% of American Pain Foundation's operating budget came from pharmaceutical industry sources.[83] By 2011, American Pain Foundation was entirely

[83] Including industry grants for specific projects, American Pain Foundation received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million.

dependent on incoming grants from Purdue, Teva, Endo, and other Opioid Manufacturers to avoid going into debt.

223. American Pain Foundation held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. It was often called upon to provide "patient representatives" for the Opioid Manufacturers' promotional activities, including for Janssen's Let's Talk Pain and Purdue's Partners Against Pain initiatives. Janssen's Let's Talk Pain initiative was a coalition of three Front Groups and Janssen that used patient stories and testimonials to convince doctors and other patients that there was need for more liberal prescribing of opioids for pain.[84] Let's Talk Pain's catch-phrase acknowledged that non-pain suffers might have doubts about the need for prescribing opioids: "To hear about pain is to have doubt; to experience pain is to have certainty."[85] Similarly, Purdue's Partners Against Pain initiative used literature and audiotapes aimed at physicians and videos aimed at patients to claim that OxyContin changed lives, and "that the risk of addiction from OxyContin was extremely small."[86]

224. Although American Pain Foundation fronted as a patient advocacy group, American Pain Foundation functioned largely as an advocate for the interests of the Opioid Manufacturers, not patients.

225. On several occasions, representatives of the Opioid Manufacturers, often at informal meetings at conferences, suggested activities and publications for American Pain Foundation to pursue. American Pain Foundation then submitted grant proposals seeking funding for these

---

[84] See Partners Against Pain (Nov. 26, 2011), http://bit.ly/2pchqPP.

[85] *Id.*

[86] Art Van Zee, MD, The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy, AM J PUBLIC HEALTH. 2009 February; 99(2): 221–227, http://bit.ly/2DyLMPs.

activities, knowing that the drug companies would support the proposed initiatives or publication projects.

226. The U.S. Senate Finance Committee began looking into American Pain Foundation in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to American Pain Foundation's credibility as an objective and neutral third party, and the Opioid Manufacturers stopped funding it. Within days of being targeted by the Senate investigation, American Pain Foundation's board voted to dissolve the organization "due to irreparable economic circumstances." American Pain Foundation "cease[d] to exist, effective immediately."[87]

**American Academy of Pain Medicine**

227. Another front group for the Opioid Manufacturers was the American Academy of Pain Medicine. With the assistance, prompting, involvement, and funding of the Opioid Manufacturers, the American Academy of Pain Medicine issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Opioid Manufacturers' deceptive marketing of chronic opioid therapy.

228. American Academy of Pain Medicine received substantial funding from opioid manufacturers. For example, American Academy of Pain Medicine maintained a corporate relations council, membership on which cost a substantial sum. The benefits of membership included allowing Opioid Manufacturer employees to present educational programs at off-site dinner symposia in connection with American Academy of Pain Medicine's marquee event – its annual meeting typically held in Palm Springs, California. American Academy of Pain Medicine

[87] Charles Ornstein & Tracy Weber, Senate Panel Investigates Drug Companies' Ties to Pain Groups, WASH. POST, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companiesties-to-pain groups/2012/05/08/ gIQA2X4qBU_ story.html.

describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allowed drug company executives and marketing staff to meet with American Academy of Pain Medicine executive committee members in small settings. Defendants Endo, Purdue, and Teva—and Mallinckrodt's then-parent, Covidien PLLC—were members of the council and presented deceptive programs to doctors who attended this annual event. Endo not only attended American Academy of Pain Medicine conferences, but also funded its continuing medical education programs and distributed its publications.

229. American Academy of Pain Medicine's conferences heavily emphasized sessions on opioids, rather than other pain management options. At one conference alone, 37 out of roughly 40 sessions were on opioids. American Academy of Pain Medicine's presidents have included top industry-supported key opinion leaders like Dr. Perry Fine and Lynn Webster. Dr. Webster was even elected president of American Academy of Pain Medicine while under a DEA investigation for overprescribing opioids to his patients.

230. The Opioid Manufacturers were able to influence American Academy of Pain Medicine through their membership on its council, their significant and regular funding, and the election of pro-opioid key opinion leaders to top leadership positions within the organization.

231. In 2016, the American Academy of Pain Medicine changed their name to the Academy of Integrative Pain Management.

232. In 1996, American Academy of Pain Medicine and the American Pain Society, another front group, jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patient's addiction to opioids was low. Dr. David Haddox, who co-authored the American

Academy of Pain Medicine/American Pain Society statement, was a paid speaker for Purdue at the time (and currently serves as a vice president at Perdue). The other co-author, Dr. Portenoy, was a paid consultant for Purdue and Teva. The consensus statement remained on American Academy of Pain Medicine's website until 2011, when a doctor complained that it had been debunked, and it was taken down.[88]

233. American Academy of Pain Medicine and American Pain Society issued their own guidelines in 2009 and continued to recommend the use of opioids to treat chronic pain.[89]

234. Treatment guidelines are widely relied upon by doctors, especially the general practitioners and family doctors targeted by the Opioid Manufacturers. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payers in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discuss treatment guidelines with doctors during individual sales visits.

235. At least fourteen of the 21 panel members who drafted the American Academy of Pain Medicine/American Pain Society guidelines, including key opinion leaders Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Teva, Endo, and Purdue. The 2009 guidelines promoted opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and concluded that the risk of addiction is manageable for patients regardless of past abuse histories.[90] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 guidelines

---

[88] The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society, 13 CLINICAL J. PAIN 6 (1997).
[89] Roger Chou et al., Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain, 10 J. PAIN 113 (2009).
[90] *Id.*

were influenced by contributions that drug companies, including Opioid Manufacturers, made to the sponsoring organizations and committee members.

236. The 2009 American Academy of Pain Medicine/American Pain Society guidelines have been a particularly effective channel of deception and have not only influenced treating physicians, but also manipulated the body of scientific evidence on opioids; the guidelines have been cited hundreds of times in academic literature, were disseminated in the State during the relevant time period, are still available online, and were reprinted in the Journal of Pain. The Opioid Manufacturers widely referenced and promoted the 2009 guidelines without disclosing the lack of evidence to support them or the Opioid Manufacturers' financial support to members of the panel.

**Federation of State Medical Boards**

237. The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians.

238. The FSMB finances opioid- and pain-specific programs through grants from Defendants.

239. Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies." The 1998 Guidelines that the pharmaceutical companies helped author taught not that opioids could be appropriate in only limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

240. A 2004 iteration of the 1998 Guidelines and the 2007 book, Responsible Opioid Prescribing, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including in Plaintiff's Community.

241. FSMB's 2007 publication Responsible Opioid Prescribing was backed largely by drug manufacturers, including Purdue, Endo and Cephalon. The publication also received support from the American Pain Foundation and the AAPM. The publication was written by Dr. Fishman, and Dr. Fine served on the Board of Advisors. In all, 163,131 copies of Responsible Opioid Prescribing were distributed by state medical boards (and through the boards, to practicing doctors). The FSMB website describes the book as "the leading continuing medical education (CME) activity for prescribers of opioid medications." This publication asserted that opioid therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins; that pain is under-treated, and that patients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient.

242. The Manufacturer Defendants relied on the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

**The Alliance for Patient Access**

243. Founded in 2006, the Alliance for Patient Access ("APA") is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care." It is run by Woodberry Associates LLC, a lobbying firm that was also established in 2006. As of June 2017, the APA listed 30 "Associate Members and Financial Supporters." The list includes J&J (parent of Janssen), Endo, Mallinckrodt, Purdue, and Cephalon. References herein to APA include two affiliated groups: The Global Alliance for Patient Access and the Institute for Patient Access.

244. APA's board members have also directly received substantial funding from pharmaceutical companies. For instance, board vice president Dr. Srinivas Nalamachu ("Dr. Nalamachu"), who practices in Kansas, received more than $800,000 from 2013 through 2015 from pharmaceutical companies—nearly all of it from manufacturers of opioids or drugs that treat opioids' side effects, including from defendants Endo, Insys, Purdue, and Cephalon. Dr. Nalamachu's clinic was raided by FBI agents in connection with an investigation of Insys and its payment of kickbacks to physicians who prescribed Subsys. Other board members include Dr. Robert A. Yapundich from North Carolina, who received $215,000 from 2013 through 2015 from pharmaceutical companies, including payments by defendants Cephalon and Mallinckrodt; Dr. Jack D. Schim from California, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, Mallinckrodt and Cephalon; Dr. Howard Hoffberg from Maryland, who received $153,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, Purdue, Insys, Mallinckrodt and Cephalon; and Dr. Robin K. Dore from California, who received $700,000 between 2013 and 2015 from pharmaceutical companies.

245. Among its activities, APA issued a "white paper" titled "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse." Among other things, the white paper criticizes prescription monitoring programs, purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether. This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.
>
> ....
>
> In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for their patients are subject to fines; those who repeatedly fail to consult the databases face loss of their professional licensure. Such penalties seem excessive and may inadvertently target older physicians in rural areas who may not be facile with computers and may not have the requisite office staff. Moreover, threatening and fining physicians in an attempt to induce compliance with prescription monitoring programs represents a system based on punishment as opposed to incentives ....
>
> We cannot merely assume that these programs will reduce prescription pain medication use and abuse.

246. The white paper also purports to express concern about policies that have been enacted in response to the prevalence of pill mills:

> Although well intentioned, many of the policies designed to address this problem have made it difficult for legitimate pain management centers to operate. For instance, in some states, [pain management centers] must be owned by physicians or professional corporations, must have a Board-certified medical director, may need to pay for annual inspections, and are subject to increased record keeping and reporting requirements .... [I]t is not even certain that the regulations are helping prevent abuses.

247. In addition, in an echo of earlier industry efforts to push back against what they termed "opiophobia," the white paper laments the stigma associated with prescribing and taking pain medication:

> Both pain patients and physicians can face negative perceptions and outright stigma. When patients with chronic pain can't get their prescriptions for pain medication filled at a pharmacy, they may feel like they are doing something wrong—or even criminal ....

> Physicians can face similar stigma from peers. Physicians in non-pain specialty areas often look down on those who specialize in pain management—a situation fueled by the numerous regulations and fines that surround prescription pain medications.

248. In conclusion, the white paper states that "[p]rescription pain medications, and specifically the opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that does not adequately respond to over-the-counter drugs."

249. The APA also issues "Patient Access Champion" financial awards to members of Congress, including 50 such awards in 2015. The awards were funded by a $7.8 million donation from unnamed donors. While the awards are ostensibly given for protecting patients' access to Medicare and are thus touted by their recipients as demonstrating a commitment to protecting the rights of senior citizens and the middle class, they appear to be given to provide cover to and reward members of Congress who have supported the APA's agenda.

250. The APA also lobbies Congress directly. In 2015, the APA signed onto a letter supporting legislation proposed to limit the ability of the DEA to police pill mills by enforcing the "suspicious orders" provision of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §801 et seq. ("CSA" or "Controlled Substances Act"). The AAPM is also a signatory to this letter. An internal U.S. Department of Justice ("DOJ") memo stated that the proposed bill "'could actually result in increased diversion, abuse, and public health and safety consequences'" and, according to DEA chief administrative law judge John J. Mulrooney ("Mulrooney"), the law would make it "all but logically impossible" to prosecute manufacturers and distributors, like the defendants here, in the federal courts. The law passed both houses of Congress and was signed into law in 2016.

**The U.S. Pain Foundation**

251. The U.S. Pain Foundation ("USPF") was another Front Group with systematic connections and interpersonal relationships with the Manufacturer Defendants. The USPF was one of the largest recipients of contributions from the Manufacturer Defendants, collecting nearly $3 million in payments between 2012 and 2015 alone. The USPF was also a critical component of the Manufacturer Defendants' lobbying efforts to reduce the limits on over prescription. The U.S. Pain Foundation advertises its ties to the Manufacturer Defendants, listing opioid manufacturers like Pfizer, Teva, Depomed, Endo, Purdue, McNeil (i.e. Janssen), and Mallinckrodt as "Platinum," "Gold," and "Basic" corporate members. Industry Front Groups like the American Academy of Pain Management, the AAPM, the APS, and PhRMA are also members of varying levels in the USPF.

**American Geriatrics Society**

252. The American Geriatrics Society ("AGS") was another Front Group with systematic connections and interpersonal relationships with the Manufacturer Defendants. The AGS was a large recipient of contributions from the Manufacturer Defendants, including Endo, Purdue and Janssen. AGS contracted with Purdue, Endo and Janssen to disseminate guidelines regarding the use of opioids for chronic pain in 2002 (The Management of Persistent Pain in Older Persons, hereinafter "2002 AGS Guidelines") and 2009 (Pharmacological Management of Persistent Pain in Older Persons, hereinafter "2009 AGS Guidelines"). According to news reports, AGS has received at least $344,000 in funding from opioid manufacturers since 2009. AGS's complicity in the common purpose with the Manufacturer Defendants is evidenced by the fact that AGS internal discussions in August 2009 reveal that it did not want to receive-up front funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate pro-opioid publications.

253. The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain … should be considered for opioid therapy." The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable for patients, even with a prior history of drug abuse. These Guidelines further recommended that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." These recommendations are not supported by any study or other reliable scientific evidence. Nevertheless, they have been cited over 1,833 times in Google Scholar (which allows users to search scholarly publications that would be have been relied on by researchers and prescribers) since their 2009 publication and as recently as this year.

254. Representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities, lobbying efforts and publications for AGS to pursue. AGS then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

255. Members of AGS Board of Directors were doctors who were on the Manufacturer Defendants' payrolls, either as consultants or speakers at medical events. As described below, many of the KOLs also served in leadership positions within the AGS.

256. The Opioid Manufacturers worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, they combined their efforts through the Pain Care Forum, which began in 2004 as an American Pain Foundation project. Pain Care Forum is comprised of representatives from opioid manufacturers (including Teva, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Opioid Manufacturers. Among other projects, Pain Care Forum worked to ensure that an FDA-mandated physician education project on opioids was not

overly negative and did not have mandatory participation, which the Opioid Manufacturers determined would reduce opioid prescribing.

257. The above-described Front Groups were some of the most prominent, but other groups utilized by the Opioid Manufacturers include: American Chronic Pain Association, the Center for Practical Bioethics, and the Pain & Policy Studies Group.

### C. Opioid Manufacturers' Specific Misconduct and Misrepresentations, Which Created the Opioid Epidemic.

258. The Opioid Manufacturers embarked upon a campaign of false and deceptive assurances grossly understating and misstating the dangerous addiction risks of their opioid drugs, while exaggerating the benefits of opioids for those suffering from chronic pain in order to harm the Plaintiff.

259. In order to accomplish a fundamental shift in perception that was key to successfully marketing their opioids, the Manufacturer Defendants designed and implemented a sophisticated and deceptive marketing strategy. Lacking legitimate scientific research to support their claims, the Manufacturer Defendants turned to the marketing techniques first pioneered by Arthur Sackler to create a series of misperceptions in the medical community and ultimately reverse the long-settled understanding of the relative risks and benefits of opioids.

260. The Manufacturer Defendants promoted, and profited from, their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their marketing was false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned Manufacturer Defendants of these risks. The Manufacturer Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction,

hospitalization, and deaths—all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC issued pronouncements based on existing medical evidence that conclusively expose the known falsity of these Defendants' misrepresentations.

261. The marketing scheme to increase opioid prescriptions centered around numerous misrepresentations, which are discussed in detail below. The Manufacturer Defendants disseminated these misrepresentations through various channels, including through advertising, sales representatives, purportedly independent organizations these defendants funded and controlled ("Front Groups"), KOLs, and CME programs discussed below.

262. Using both direct and indirect marketing to convince physicians and patients that opioids were safe, the Opioid Manufacturers trivialized the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been debunked by the FDA and CDC. These misrepresentations reinforced each other and created the dangerously misleading impression that opioid addiction was rare, preventable, or easily managed.

### 1. Misrepresentation: Low Risk of Addiction

263. The Opioid Manufacturers expended significant funds to foster the belief among doctors and patients that opioids were low risk because most patients would not become addicted, or because those at greatest risk for addiction could be identified and managed.

264. When it launched OxyContin, Purdue knew it would need data to overcome decades of wariness regarding opioid use. It needed some sort of research to back up its messaging. But Purdue had not conducted any studies about abuse potential or addiction risk as part of its application for FDA approval for OxyContin. Purdue (and, later, the other Defendants) found

this "research" in the form of a one-paragraph letter to the editor published in the New England Journal of Medicine (NEJM) in 1980.

265. A letter, by Dr. Hershel Jick and Jane Porter, declared the incidence of addiction "rare" for patients treated with opioids. They had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. Porter and Jick considered a patient not addicted if there was no sign of addiction noted in patients' records.

266. Dr. Jick explained to a journalist years later, he submitted the statistics to NEJM as a letter because the data were not robust enough to be published as a study.

267. Purdue nonetheless began repeatedly citing this letter in promotional and educational materials as evidence of the low risk of addiction, while failing to disclose that its source was a letter to the editor, not a peer-reviewed paper. Citation of the letter, which was largely ignored for more than a decade, significantly increased after the introduction of OxyContin. While first Purdue and then other Manufacturer Defendants used it to assert that their opioids were not addictive, "that's not in any shape or form what we suggested in our letter," according to Dr. Jick.

268. Purdue specifically used the Porter and Jick letter in its 1998 promotional video "I got my life back," in which Dr. Alan Spanos says, "In fact, the rate of addiction amongst pain patients who are treated by doctors is much less than 1%." Purdue trained its sales representatives to tell prescribers that fewer than 1% of patients who took OxyContin became addicted. In 1999, a Purdue-funded study of patients who used OxyContin for headaches found that the addiction rate was thirteen per cent, but that finding was not included by Purdue in any of its advertising, marketing, or promotional or sales material; nor was it otherwise provided by Purdue to physicians.

269. Purdue's promotional video featured seven patients whose chronic pain was alleviated when they started taking OxyContin. The video took its title from a quote by one of the patients, Johnny Sullivan, who said that he "got his life back" and was able to return to work by taking OxyContin.[91] Purdue distributed the video to 15,000 doctors across the country.[92]

270. Two years later, Purdue produced and distributed a follow-up video, "I got my life back – Part II," featuring six of the previous patients, saying they were still doing well.[93] The video also featured clips of North Carolina pain specialist Dr. Alan Spanos, reassuring other physicians that opioids were safe and effective.[94] Spanos was on Purdue's payroll at the time as a paid speaker.[95] In the video, Spanos says, "We doctors were wrong in thinking that opioids can't be used long term. They can be and they should be. We used to think they'd stop working, or the patients would become addicts …These six cases show how wrong those views were."[96] Spanos reiterates again, at the end of the video, "What did we learn from these six patients? Most importantly, they refute the myth that long-term opioid use would inevitably lead to addiction . . ."[97]

271. But, for Johnny Sullivan, who inspired the video's title, OxyContin did not turn out to be the "wonder drug" that Purdue promoted it as.[98] Fifteen years after the original video was filmed, Physicians for Responsible Opioid Prescribing followed up with Johnny's widow, Mary Lou Sullivan. She said, "When Johnny first started taking OxyContin, he actually thought he felt

---

[91] Physicians for Responsible Opioid Prescribing, OxyContin Poster Children 15 Years Later (Sept. 9, 2012), http://bit.ly/2phvsQa.
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] John Fauber and Ellen Gabler, What happened to the poster children of OxyContin?, MILWAUKEE JOURNALSENTINEL (Sept. 8, 2012), http://bit.ly/2kNdmkp.
[96] Physicians for Responsible Opioid Prescribing, supra note 89.
[97] *Id.*
[98] *Id.*

pretty good."[99] But, Johnny soon became addicted to OxyContin, and as he built a tolerance to the drug, he had to start taking larger and larger doses. Ms. Sullivan says, "When he was on high doses of pain medicine, it was just like night and day. It was like a part of him was gone. It got to the point where I hated to even go out to eat with him because he would fall asleep right in the middle of eating. People would be looking and wondering: what in the world is wrong with him."[100] started experienced extreme drowsiness, a common side effect of opioids.

272. Ms. Sullivan says that OxyContin was so powerful that Johnny couldn't control his addiction. She says, "Yes, Johnny had chronic pain, but he was also highly addicted to the medicine. The medicine was overpowering him. I mean, he was losing control."[101] He twice overdosed, and had to go to the emergency room.[102]

273. Things only got worse from there. Ms. Sullivan continued, "He came home one day and his whole windshield was busted. His mirror was knocked off the side. He fell asleep; he hit a mailbox; he knocked a mirror off. Two or three times that happened where he fell asleep driving."[103] But, he was too addicted to ever stop taking the medication. "I told my sons one day, I said, 'That medicine is going to kill him.'"[104] Ms. Sullivan continues, "He might have said he got his life back, but it took his life in the end."[105] Johnny fell asleep at the wheel and was killed in a car wreck on March 2, 2008 – ten years after making the original "I got my life back" video.

274. The original video also featured a back-pain patient, Lauren Cambra, discussed above in Section (B)(1). Ms. Cambra also got addicted to OxyContin, and as her body built up a tolerance, she had to start taking stronger and stronger doses. Ms. Cambra says, "Your body gets used to it,

---

[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] *Id.*

so we got it increased. We got it increased again; and we got it increased again."[106] After her repeated dosage increases, she was so doped up on the drug that she could hardly move. She explains, "You couldn't have gotten me to go out in the yard and play with my grandkids. I didn't do it."[107] After she lost her house, car, job, and health insurance, she quit taking OxyContin – not by choice, but because she couldn't afford it anymore.[108] It took her six to eight months before the extreme cravings stopped. When asked if she would ever take OxyContin again, she said absolutely not: "It's a synthetic heroin. I mean, good God – who would just knowingly want to just addict themselves to heroin."[109]

275. In addition, Actavis's predecessor distributed a patient education brochure, Managing Chronic Back Pain, beginning in 2003 that falsely claimed opioid addiction is "less likely if you have never had an addiction problem." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009 and beyond.

276. Other Defendants relied on and disseminated the same distorted messaging. The enormous impact of Defendants' misleading amplification of this letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and, in some cases, "grossly misrepresented." In particular, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the Journal in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy . . .

[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*

277. "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."

278. Alongside its use of the Porter and Jick letter, Purdue also crafted its own materials and spread its deceptive message through numerous additional channels.

279. According to interviews with prescribers and former Purdue sales representatives, Purdue has continued to distort or omit the risk of addiction while failing to correct its earlier misrepresentations, leaving many doctors with the false impression that pain patients will only rarely become addicted to opioids.

280. With regard to addiction, Purdue's label for OxyContin has not sufficiently disclosed the true risks to, and experience of, its patients. Until 2014, the OxyContin label stated in a black-box warning that opioids have "abuse potential" and that the "risk of abuse is increased in patients with a personal or famiiy history of substance abuse."

281. However, the FDA made clear to Purdue as early as 2001 that the disclosures in its OxyContin label were insufficient.

282. In 2001, Purdue revised the indication and warnings for OxyContin. In the United States, Purdue ceased distributing the 160 mg tablet of OxyContin.

283. In the end, Purdue narrowed the recommended use of OxyContin to situations when "a continuous, around-the-clock analgesic is needed for an extended period of time" and added a warning that "[t]aking broken, chewed, or crushed OxyContin tablets" could lead to a "potentially fatal dose." However, Purdue did not, until 2014, change the label to indicate that OxyContin should not be the first therapy, or even the first opioid, used, and did not disclose the

incidence or risk of overdose and death even when OxyContin was not abused. Purdue announced the label changes in a letter to health care providers.

284. Purdue was aware that there was a perception that oxycodone is safer than morphine but did not attempt to correct that misunderstanding and instead exploited it.

285. Teva and Purdue sponsored the American Pain Foundation's Treatment Options: A Guide for People Living with Pain (2007), which suggested that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft.[110]

286. Endo sponsored a website, "Pain knowledge," which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

287. Endo distributed a pamphlet with the Endo logo entitled Living with Someone with Chronic Pain, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

288. Janssen reviewed, edited, approved, and distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

---

[110] Am. Pain Found., Treatment Options: A Guide for People Living in Pain (2007) [hereinafter American Pain Foundation, Treatment Options], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

289. Janssen runs a website, Prescriberesponsibly.com[111] that claims that concerns about opioid addiction are "overestimated."

290. Purdue sponsored American Pain Foundation's A Policymaker's Guide to Understanding Pain & Its Management, which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "[m]isconceptions about opioid addiction."[112]

291. Teva sponsored and facilitated the development of a guidebook, Opioid Medications and REMS: A Patient's Guide, which included claims that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids." Similarly, Teva sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.

292. For example, a 2003 Teva-sponsored CME presentation titled Pharmacologic Management of Breakthrough or Incident Pain, posted on Medscape in February 2003, teaches:

> [C]hronic pain is often undertreated, particularly in the noncancer patient population .... The continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to undertreatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.

---

[111] Prescribe Responsibly, http://www.prescriberesponsibly.com/ (last visited Feb. 21, 2018).

[112] Am. Pain Found., A Policymaker's Guide to Understanding Pain and Its Management 6 (2011) [hereinafter American Pain Foundation, Policymaker's Guide], http://s3.documentcloud.org/documents/277603/apfpolicymakers-guide.pdf.

293. Through its "Learn More about customized pain control with Kadian," material, Actavis claimed that it is possible to become addicted to morphine-based drugs like Kadian, but that it is "less likely" to happen in those who "have never had an addiction problem." The piece goes on to advise that a need for a "dose adjustment" is the result of tolerance, and "not addiction."

294. Training for Actavis sales representatives deceptively minimizes the risk of addiction by: (i) attributing addiction to "predisposing factors" like family history of addiction or psychiatric disorders; (ii) repeatedly emphasizing the difference between substance dependence and substance abuse; and (iii) using the term pseudo addiction, which, as described below, dismisses evidence of addiction as the undertreatment of pain and, dangerously, counsels doctors to respond to its signs with more opioids.

295. Actavis conducted a market study on takeaways from prescribers' interactions with Kadian sales representatives. The doctors had a strong recollection of the sales representatives' discussion of the low-abuse potential. Actavis' sales representatives' misstatements on the low-abuse potential was considered an important factor to doctors and was most likely repeated and reinforced to their patients. Additionally, doctors reviewed visual aids that the Kadian sales representatives use during the visits, and Actavis noted that doctors associate Kadian with less abuse and no highs, in comparison to other opioids. Numerous marketing surveys of doctors in 2010 and 2012, for example, confirmed Actavis's messaging about Kadian's purported low addiction potential, and that it had less abuse potential than other similar opioids.

296. A guide for prescribers under Actavis's copyright deceptively represents that Kadian is more difficult to abuse and less addictive than other opioids. The guide includes the following statements: (i) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and (ii) KADIAN may be less

likely to be abused by health care providers and illicit users" because of "Slow onset of action," "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine," "Long duration of action," and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state." These statements falsely convey both that (i) Kadian does not cause euphoria and therefore is less addictive and that (ii) Kadian is less prone to tampering and abuse, even though Kadian was not approved by the FDA as abuse deterrent, and Actavis had no studies to suggest it was.

297. In 2010, Mallinckrodt sponsored an initiative, Collaborating and Acting Responsibly to Ensure Safety (C.A.R.E.S.), through which it published and promoted the book "Defeat Chronic Pain Now!" aimed at chronic pain patients. The book, which remains available for purchase and is promoted online at www.defeatchronicpainnow.com, advises those considering whether to take opioid drugs that "[o]nly rarely does opioid medication cause a true addiction."[113] Further, the book advises that even the issue of tolerance is "overblown," because "[o]nly a minority of chronic pain patients who are taking long-term opioids develop tolerance." In response to a hypothetical question from a chronic back pain patient who expresses a fear of becoming addicted, the book advises that "[i]t is very uncommon for a person with chronic pain to become 'addicted' to narcotics IF (1) he doesn't have a prior history of any addiction and (2) he only takes the medication to treat pain."

298. These claims are contrary to longstanding scientific evidence. A meta-analysis of 38 previously-performed studies concluded that on average, the studies found that 21% to 29% of patients will start abusing opioids, and another 8 to 12% will become addicted.[114] A Perdue-funded study in 1999 found that 13% of OxyContin users became addicted.

---

[113] Charles E. Argoff & Bradley S. Galer, Defeat Chronic Pain Now! (2010).
[114] Vowles, supra note 67.

299. The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for [opioid addiction]."[115]Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non- addictive" or "that most patients who take opioids do not become addicted" in New York. Endo remains free, however, to make those statements in this State.

300. The CDC has issued guidelines for prescribing opioids that note that there is "[e]xtensive evidence" that opioids are addictive.[116]

301. The FDA has stated that: because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed.[117]

**2. Misrepresentation: Pseudo addiction**

---

[115] Assurance of Discontinuance, In re Endo Health Solutions Inc. and Endo Pharm. Inc. (Assurance No. 15-228), at 16, https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

[116] Deborah Dowell et al., CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016, MORBIDITY & MORTALITY WKLY. REP., Mar. 18, 2016, at 15 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[117] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Andrew Koldny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), https://www.regulations.gov/contentStreamer?documentId=FDA- 2012-P-08180793&attachmentNumber=1&contentType=pdf.; Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan and Becker, LLP (Mar. 22, 2016), https://www.regulations.gov/contentStreamer?documentId=FDA-2014-P-02050006&attachmentNumber=1&contentType=pdf.

302. In addition to mischaracterizing the highly addictive nature of the drugs they were pushing, the Opioid Manufacturers also fostered a fundamental misunderstanding of the signs of addiction. Specifically, the Opioid Manufacturers misrepresented, to doctors and patients, that warning signs and symptoms of addiction were, instead, signs of undertreated pain (i.e., pseudo addiction), and instructed doctors to increase the opioid prescription dose for patients who were already in danger.

303. One of Purdue's employees, Dr. David Haddox, invented the concept of "pseudo addiction," and key opinion leader Dr. Webster popularized the term.

304. Teva and Purdue sponsored Responsible Opioid Prescribing (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding are all signs of pseudo addiction, rather than true addiction.[118] The 2012 edition of Responsible Opioid Prescribing, which remains available online, continues to teach that pseudo addiction is real.[119]

305. Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudo addiction . . . refers to patient behaviors that may occur when pain is under-treated . . . . Pseudo addiction is different from true addiction because such behaviors can be resolved with effective pain management."

306. Endo sponsored a National Initiative on Pain Control continuing medical education program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which promoted pseudo addiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled National Initiative on

---

[118] Scott M. Fishman, M.D., Responsible Opioid Prescribing: A Physician's Guide (2007) at 62.
[119] See Scott M. Fishman, M.D., Responsible Opioid Prescribing: A Physician's Guide (2d ed. 2012).

Pain Control by funding National Initiative on Pain Control projects; developing, specifying, and reviewing content; and distributing National Initiative on Pain Control materials.

307. Purdue published a pamphlet in 2011 entitled Providing Relief, Preventing Abuse, which described pseudo addiction as a concept that “emerged in the literature” to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated.”

308. Purdue sponsored a continuing medical education program titled “Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse.” In a dramatic rendering, a chronic pain patient with a history of drug abuse is depicted telling his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudo addiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or “overindulges in unapproved escalating doses.” The doctor treats this patient by prescribing a high dose, long-acting opioid—the perfect recipe for addiction.

309. Mallinckrodt’s “Defeat Chronic Pain Now!” book, which is still available, and is promoted online at www.defeatchronicpainnow.com, teaches laypeople that “pseudo addiction” is “caused by their doctor not appropriately prescribing the opioid medication.” It teaches that “[p]seudoaddiction happens when a patient’s opioid medication is not being prescribed in doses strong enough to provide good pain relief, or if the drug is not being prescribed often enough throughout the day. . . When a pseudo addicted patient is prescribed the proper amount of opioid medication, he or she doesn’t take any extra pills because his or her pain is relieved.”

310. In its 2016 guidelines on opioid prescribing, the CDC rejects pseudo addiction as a fictitious invention of the Opioid Manufacturers to push more opioid drugs onto already addicted patients.

### 3. Misrepresentation: Screening and Risk-Mitigation Tools Are Accurate and Effective in Preventing Opioid Misuse

311. In addition to misstating the addiction risk and inventing the pseudo addiction falsehood, the Opioid Manufacturers created false guidelines stating that addiction risk screening tools, patient contracts, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. The Opioid Manufacturers' misrepresentations made doctors more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain.

312. Endo paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of Endo's speakers' bureau in 2010. The supplement, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

313. Purdue sponsored a 2011 webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

314. As recently as 2015, Purdue has represented in scientific conferences that "bad apple" patients, and not opioids, are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

315. The 2016 CDC guidelines on opioid prescribing confirm the falsity of these claims. The guidelines explain that there are no studies assessing the effectiveness of risk mitigation strategies "for improving outcomes related to overdose, addiction, abuse or misuse."

### 4. Misrepresentation: Opioid Addiction Is Easy to Treat

316. A fourth category of deceptive messaging regarding dangerous opioids is the Opioid Manufacturers' false assurances regarding the alleged ease of eliminating opioid dependence. The Opioid Manufacturers falsely claimed that opioid dependence can easily be addressed by tapering off the medication and that opioid withdrawal is not a problem, but they failed to disclose that cessation of opioid use becomes more difficult the longer the patient takes the drug.

317. The Opioid Manufacturers also downplayed the severity of opioid detoxification. For example, a continuing medical education sponsored by Endo, entitled Persistent Pain in the Older Adult, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days. Similarly, in the 2010 Mallinckrodt/C.A.R.E.S. publication "Defeat Chronic Pain Now!," potential opioid users are advised that tolerance to opioids is "easily remedied," and that "[a]ll patients can be safely taken off opioid medication if the dose is slowly tapered down by their doctor."

318. In reality, tapering is not a panacea. Clinical guidelines on Tapering Opioid Pain Medication note that opioid-addicted patients have a very high recidivism rate, meaning they often relapse after being tapered off opioids.[120]

### 5. Misrepresentation: Higher Doses Are Not Higher Risk

319. A fifth category of false and deceptive statements the Opioid Manufacturers made to sell more drugs is that opioid dosages could be increased indefinitely without added risk. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat

[120] Intermountain Healthcare, Tapering Opioid Pain Medication (Aug. 2015), http://bit.ly/2lfxUBl.

chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. In reality, the higher the opioid dose, the greater the risk of overdose and death.

320. Teva and Purdue sponsored American Pain Foundation's Treatment Options: A Guide for People Living with Pain (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and insinuated that they are therefore the most appropriate treatment for severe pain.

321. Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis appears to have continued to use these materials in 2009 and beyond.

322. Endo sponsored a website, "Pain Knowledge," which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

323. Endo distributed a pamphlet edited by a key opinion leader entitled Understanding Your Pain: Taking Oral Opioid Analgesics (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. You won't 'run out' of pain relief."[121]

324. Janssen sponsored a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

[121] Margo McCaffery & Chris Pasero, Endo Pharm., Understanding Your Pain: Taking Oral Opioid Analgesics (Russell K Portenoy, M.D., ed., 2004).

325. Purdue, according to its own internal documents, found that doctors had the false understanding that the company's prescription opioid, OxyContin, was "less potent than morphine."[122] It was not. Purdue officials actively exploited this "misperception."[123]

326. Purdue's In the Face of Pain website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

327. Purdue sponsored American Pain Foundation's A Policymaker's Guide to Understanding Pain & Its Management, which taught that dosage escalations are "sometimes necessary," and that "the need for higher doses of medication is not necessarily indicative of addiction," but inaccurately downplayed the risks from high opioid dosages.

328. In 2007, Purdue sponsored a continuing medical education entitled "Overview of Management Options" that was available for continuing medical education credit and available until at least 2012. The continuing medical education was edited by a key opinion leader and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

329. Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose.[124]

330. In the 2010 Mallinckrodt/C.A.R.E.S. publication "Defeat Chronic Pain Now!" potential opioid users are warned about of the risk of "[p]seudoaddiction [b]ecause of a [l]ow [d]ose," and advised that this condition may be corrected through the prescription of a higher dose. Similarly, the book recommends that for chronic pain patients, the opioid dose should be "gradually

[122] Keefe, supra note 28.
[123] *Id.*
[124] The College on Problems of Drug Dependence, About the College, http://cpdd.org.

increased to find the best daily dose, as is done with all the other oral drugs." The book discusses the risks of NSAIDs and other drugs at higher doses, but does not explain this risk for opioids.

331. Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Opioid Manufacturers' Front Groups American Pain Foundation and National Pain Foundation argued in an amicus brief to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.

332. CDC guidelines on opioid prescribing note that there is "an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC also states that there is an increased risk "for opioid [addiction], respiratory depression, and death at higher dosages." That is why the CDC advises doctors to "avoid increasing dosage" to above 90 morphine milligram equivalents per day.

333. Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours—a fact that Purdue has known at all times relevant to this action. Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly

increasing the amount of drug they are taking and spurring growing dependence. Frequent higher doses are the perfect recipe for an overdose.

334. Purdue's competitors were aware of this problem. For example, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours. Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours. Front Groups supported by Purdue echoed these representations.

### 6. Misrepresentation: Abuse-deterrent Opioid Formulations Are Effective for Preventing Abuse

335. Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can prevent addiction and abuse.

336. For example, Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. This claim was false. The FDA warned in a 2013 letter that Opana ER Extended-Release Tablets' "extended-release features can be compromised, causing the medication to 'dose dump,' when subject to . . . forms of manipulation such as cutting, grinding, or chewing, followed by swallowing."[125] Also troubling, Opana ER can be prepared for snorting using commonly available methods and "readily prepared for injection."[126] The letter discussed "the troubling possibility that a higher (and rising) percentage of [Opana ER Extended-Release Tablet] abuse is occurring via injection."[127] Endo's own studies, which it failed to disclose, showed that Opana

---

[125] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Barto, Vice President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 5.

[126] *Id.* at 6.

[127] Id. at 6 n.21.

ER could still be ground and chewed. In June 2017, the FDA requested that Opana ER be removed from the market.

**7. Misrepresentation: Opioids Are Effective for The Treatment of Chronic Pain**

337. To convince doctors and patients that opioids should be used to treat chronic pain, the Opioid Manufacturers also had to persuade them that there was a significant upside to long-term opioid use. But as the CDC guidelines on opioid prescribing make clear, "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.[128] The FDA, too, has recognized the lack of evidence to support long- term opioid use. Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

338. For example, Actavis distributed an advertisement claiming that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

339. Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

340. Janssen sponsored and edited a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

[128] Id. at 15.

341. Janssen promoted Ultracet for everyday chronic pain and distributed posters, for display in doctors' offices, of patients in active professions; the caption read, "Pain doesn't fit into their schedules."

342. Sponsored and distributed by Teva, Endo, and Purdue, the guidelines Responsible Opioid Prescribing (2007) taught prescribers that relief of pain by opioids is effective at improving patients' functioning.

343. Teva and Purdue sponsored American Pain Foundation's Treatment Options: A Guide for People Living with Pain (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve." This publication is still available online.

344. Endo's National Initiative on Pain Control website, "PainKnowledge.org," claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated National Initiative on Pain Control's intent to make misleading claims about function, and Endo closely tracked visits to the site.

345. Endo was the sole sponsor, through National Initiative on Pain Control, of a series of continuing medical education programs entitled "Persistent Pain in the Older Patient."[129] One continuing medical education, disseminated via webcast, claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

346. Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain." One feature of the campaign was to complain that patients were under-treated. In

[129] E.g., NIPC, Persistent Pain and the Older Patient (2007), https://www.painedu.org/Downloads/NIPC/Activities/B173_Providence_RI_%20Invite.pdf.

2009, a Janssen-sponsored website, part of the "Let's Talk Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

347. Purdue sponsored the development and distribution of American Pain Foundation's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[m]ultiple clinical studies" have shown that opioids are effective in improving "[d]aily function," "[p]sychological health," and "[o]verall health-related quality of life for chronic pain." The Policymaker's Guide was originally published in 2011.

348. Purdue's, Teva's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

349. As the FDA and other agencies have made clear for years, these claims have no support in the scientific literature.

350. In 2010, the FDA warned Actavis, in response to its advertising of Kadian, that "we are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life." And in 2008, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

### 8. Misrepresentation: Alternatives Are As Risky As or More Risky Than Opioids

351. The Opioid Manufacturers also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs, which are used to treat pain and inflammation, in

order to steer doctors and patients to look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by the Opioid Manufacturers contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for extended release and long-acting opioids in 2013 and immediate release opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options," like non-opioid drugs, "are inadequate." And the CDC opioid prescribing guidelines state that NSAIDs – not opioids – should be the first-line treatment for chronic pain, particularly arthritis and lower-back pain.

**9. Misrepresentation: Fentanyl Is Safe for Chronic Pain**

352. Fentanyl is an extremely strong opioid that is indicated only to treat cancer patients with severe pain for whom other opioids have ceased being effective. Fentanyl is "100 times more powerful than morphine."[130]

353. Teva deceptively marketed its brand-name fentanyl opioids, Actiq and Fentora, for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid-tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based immediate release opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Teva from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other

[130] Rich Lord et al., Overdosed: How Doctors Wrote the Script for An Epidemic, PITTSBURGH POST-GAZETTE (May 22, 2016), http://bit.ly/2wkVP6y.

conditions, such as migraines, post-operative pain, or pain due to injury.[131] Specifically, the FDA advised that Fentora "is only approved for breakthrough cancer pain in patients who arc opioid-tolerant."[132]

354. Despite this, Teva conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, and for which it is not safe. As part of this campaign, Teva used continuing medical education programs, speaker programs, key opinion leaders, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain.

355. For example, Teva paid to have a continuing medical education it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The continuing medical education instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

356. Teva's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of noncancer pain.

357. In December 2011, Teva widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News and Pain Medicine News – two publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

---

[131] See U.S. Food & Drug Admin., Public Health Advisory: Important Information for the Safe Use of Fentora (fentanyl buccal tablets) (Sept. 26, 2007), http://bit.ly/2leUcDp.
[132] *Id.*

358. Teva's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

### 10. Opioid Manufacturers Cover Up That Their Drugs Are Being Diverted to The Illegal Market

359. Purdue unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Purdue never reported these doctors to the DEA. In an interview with the Los Angeles Times, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs.

360. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report that a Los Angeles clinic prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described it internally as "an organized drug ring" until years after law enforcement had already shut the pharmacy down. In doing so, Purdue protected its own profits at the expense of public health and safety.[133]

361. Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing, and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

[133] Harriet Ryan et al., More Than 1 Million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew, L.A. TIMES, July 10, 2016, http://www.latimes.com/projects/la-me-oxycontin-part2/.

### 11. Opioid Manufacturers Targeted Susceptible Prescribers and Vulnerable Patient Populations.

362. As a part of their deceptive marketing scheme, the Opioid Manufacturers identified and targeted susceptible prescribers and vulnerable patient populations in the U.S., including this State. For example, the Opioid Manufacturers focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and were therefore more likely to accept the Opioid Manufacturers' misrepresentations without question.

363. The Opioid Manufacturers also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. The Opioid Manufacturers targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the CDC has found that elderly patients who take opioids suffer from elevated fall and fracture risks, reduced renal function and medication clearance, and a smaller window between safe and unsafe dosages. The CDC states that there must be "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

## D. The Opioid Distributors Facilitated Diversion Of Prescription Opioids to The Illegal Market

### 1. Diversion of Opioids from Licensed Prescribers to The Illegal Market Is Fueling the Opioid Epidemic

364. A small minority of doctors are fueling a huge portion of the opioid epidemic. "U.S. Attorney David Hickton, co-chair of the National Heroin Task Force, placed some of the blame for an epidemic of related problems of heroin and opioid pill abuse on the small percentage of

doctors who we call drug dealers with white coats."[134] Doctors who are willing to write almost anyone a prescription for opioids are sometimes referred to as "script doctors" or "script docs."[135]

365. Despite being warned "time and again that pain pills can addict and kill, hundreds of doctors … wantonly prescribed painkillers, setting the stage for the worst drug epidemic in U.S. history as brand-name opioids joined with cheap heroin."[136] For example, the Pittsburg Post-Gazette reports, "Dr. Gary A. Shearer continued to prescribe painkillers, even as 14 of his patients died of drug overdoses …. Maryland psychiatrist Patricia A. Newton kept prescribing to a struggling addict … until that patient turned up, unconscious, in a Maryland hospital bathroom with a syringe and 545 pills. … Physician Michael B. Rosen was prescribing nearly 1,000 highly addictive pills per month to a patient who told a Pennsylvania detective that he 'did not have any serious pain,' but could get 'whatever he wanted' from 'Dr. Feel Good.'"[137]

366. The National Survey on Drug Use and Health (2006) found that 19.1% of recreational opioid users said they got their drugs from a single doctor who was willing to prescribe them.

367. In Kentucky, one of the hardest hit by the opioid crisis, 1.2% of doctors ultimately faced some sort of disciplinary action for overprescribing opioids, when the state cracked down, starting in 2011.[138] As a result of Kentucky's recent enforcement efforts, "Opioid prescribing in Kentucky dropped dramatically, and drug overdoses bucked the national trend by edging downward."[139] In contrast, Pennsylvania saw only a tiny drop in opioid prescribing in recent

---

[134] Lord, supra note 120.
[135] James A. Inciardi, PhD et al., Prescription Opioid Abuse and Diversion in an Urban Community: The Results of an Ultrarapid Assessment, Pain Medicine, Volume 10, Issue 3, 1 April 2009, Pages 537–548, http://bit.ly/2BFKg0U.
[136] Lord, supra note 120.
[137] *Id.*
[138] According to an analysis by the Pittsburgh Post-Gazette, looking at the years 2011 to 2015. See id.
[139] *Id.*

years, while opioid overdoses in the state "climbed relentlessly." [140] "Pennsylvania's medical licensing boards don't have access to data on how individual physicians are prescribing," and so they have taken little disciplinary action against doctors who overprescribed opioids.[141] The Pittsburgh Post Gazette compared enforcement efforts across various states and found: when it comes to reducing opioid abuse, "Getting tough on doctors works."[142]

368. In a study of opioid overdose deaths in Utah in 2013, the decedent's healthcare provider was the primary source of the opioids in 92% of the deaths.[143]

### 2. Problem Pharmacies Are Also Complicit in Fueling the Opioid Epidemic

369. Certain bad-actor pharmacies or pharmacy employees are responsible for diverting substantial amounts of opioids from the lawful market to the black market.

370. Pharmacy employees who are willing to break the law to sell high-value pills on the black market use a variety of methods to illegally acquire pills from their employer. Some pharmacists or pharmacy technicians are subtle, and skim a few pills each time a patient fills an opioid prescription.[144] The patient will be unlikely to notice if only one or two pills are missing. Bolder pharmacy employees steal entire bottles from the pharmacy inventory.[145]Pharmacists may also create fake pharmacy accounts in the name of deceased patients or via identity theft, and use the fake accounts to fill prescriptions for opioids.[146]

---

[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] Johnson EM, Lanier WA, Merrill RM, Unintentional prescription opioid-related overdose deaths: description of decedents by next of kin or best contact, Utah, 2008-2009. J. Gen Intern Med. (Apr. 2013), 28(4):522-9.
[144] Jamie Almond, Detective, Pharmacy Crimes, (Feb. 2014), http://bit.ly/2BsgiJK.
[145] *Id.*
[146] *Id.*

371. Sometimes entire pharmacies are just "fronts for criminal drug rings."[147] For example, two brothers who owned a Los Angeles pharmacy, Global Compounding, were found guilty in 2017 of operating "a years-long narcotic drug trafficking … conspiracy that illegally sold prescription narcotics to black market customers across the United States."[148] "These defendants used their pharmacy as a front for drug dealing, and they used multiple bank accounts to conceal their illicit proceeds," said United States Attorney Eileen M. Decker.[149] The brothers were caught after years of shipping thousands of oxycodone pills to organized crime operations in Columbus, Ohio.[150] To conceal these black market drugs sales, the brothers "used their pharmacy to generate records that falsely indicated that prescriptions had been filled in the names of identity theft victims."[151] The brothers' pharmacy ordered nearly 100,000 oxycodone pills from legitimate prescription drug distributors, yet "reported only half of those pills to state authorities who track prescription drug sales."[152] And there was "a 15-month period with no reporting at all."[153] Although the pharmacy concealed many of its suspicious orders from state regulators, the drug distributors had all the data and knew exactly how many pills the pharmacy was ordering.

372. The Pharmacy Defendants failed to track and report suspicious sales as required by Florida Law.

373. Florida law imposes duties and requirements on the conduct of the Pharmacy Defendants. These requirements establish a standard of care for pharmacy conduct.

---

[147] Bill Whitaker, Whistleblowers: DEA Attorneys Went Easy on McKesson, The Country's Largest Drug Distributor, CBS NEWS (Dec. 17, 2017), http://cbsn.ws/2B2ddno.
[148] Department of Justice, Owners of West L.A. Pharmacy Found Guilty in Sweeping Scheme to Illegally Distribute Prescription Narcotics (Jan. 23, 2017), http://bit.ly/2D0XEZF.
[149] *Id.*
[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] *Id.*

374. In Florida, the Comprehensive Drug Abuse Prevention and Control Act "CSA" law requires pharmacists to review each controlled substance prescription and, prior to dispensing medication, make a professional determination that the prescription is effective and valid. See FL Stat. 893.06.

375. Furthermore, FL. Stat. 893.04 states that pharmacists are required to ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

376. Under Florida law, pharmacy registrants are required to provide effective controls and procedures to guard against theft and diversion of controlled substances and maintain and file complete and accurate inventory records with the appropriate state and federal regulators. See FL. Stat. 893.07.

377. In addition, pharmacists "shall inform the Drug Control Unit of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."

378. On information and belief, the Pharmacy Defendants failed to provide effective controls and procedures to guard against diversion of prescription opioids, failed to maintain complete and accurate inventory records, and failed to report suspicious orders.

379. On information and belief, the Pharmacy Defendants regularly filled opioid prescriptions that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

380. On information and belief, the Pharmacy Defendants have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid prescriptions, or protect against corruption or theft by employees or others.

381. On information and belief, the Pharmacy Defendants utilize monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed. This type of compensation creates economic disincentives within the companies to change their practices. For example, there have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of the red flags presented.

382. The Pharmacy Defendants have violated a voluntarily-undertaken duty to the public which they have assumed by their own words and actions. In news reports and other public documents, it has been reported that the Pharmacy Defendants, through their words or actions, have assured the public that issues affecting public health and safety are the highest priority for the defendants.

383. For example, in 2015, CVS publicly stated that, "the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities. Pharmacists have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose."

384. In failing to take adequate measures to prevent substantial opioid-related addiction, the Pharmacy Defendants have breached their duties under the "reasonable care" standard, professional duties under the relevant standards of professional practice, and requirements established by the laws of the State of Florida.

385. It is foreseeable to the Pharmacy Defendants that filling invalid or suspicious prescriptions for opioids would cause harm to individual pharmacy customers, who may use the wrongfully-dispensed opioids, and the Plaintiff itself.

386. It is reasonably foreseeable to the Pharmacy Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including overdoses and death. It is also reasonably foreseeable many of these injuries will be suffered by the healthcare providers treating opioid addicts.

387. At all relevant times, the Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing full well they could take measures to substantially eliminate their complicity in opioid diversion.

388. At all relevant times, the Pharmacy Defendants engaged in these activities, and continue to do so, knowing full well that the Plaintiff, in its role of providing addiction treatment, would be ill-equipped and lack financial resources to appropriately treat opioid addiction.

389. It is reasonably foreseeable to the Pharmacy Defendants that the Plaintiff healthcare provider would be forced to bear substantial expenses as a result of the Pharmacy Defendants' acts.

390. The Pharmacy Defendants were on notice of their ongoing negligence or intentional misconduct towards the Plaintiff in part because of their history of promoting non-addictive attributes of opioids which in turn made insurance providers deny coverage for opioid addiction.

### 3. Drug Distributors Have a Non-Delegable Duty to Prevent Shipment of Suspicious Orders of Opioids and Report Them to The DEA

391. The Controlled Substances Act ("CSA") is the "legal cornerstone" of the federal government's war against drug abuse.[154] To enforce the Controlled Substances Act, the Drug Enforcement Administration divides categories of drugs into tiers, called "schedules," with lower

[154] American Academy of Pediatrics, Understanding Drug Schedules, HEALTHYCHILDREN.ORG, (Nov. 21, 2015), http://bit.ly/2C09Dtv.

numbered schedules being more highly regulated.[155] In deciding which drugs should be in which "schedule," the DEA considers four factors: the drug's "(1) potential for abuse, (2) safety, (3) addictive potential and (4) whether or not it has any legitimate medical applications."[156]

392. Schedule I drugs are substances that have no federally-recognized medical use, high risk of abuse, and severe addictive potential, and are extremely dangerous.[157] Schedule I drugs include: heroin and ecstasy. [158]

393. Schedule II drugs are drugs that are slightly less dangerous and have slightly less abuse potential than Schedule I drugs.[159] Schedule II includes some drugs with federally-recognized medical applications. Drugs on Schedule II include: cocaine, methamphetamine ("meth"), and nearly all opioid medications.

394. Schedule III drugs are defined as having low to moderate abuse potential, such as anabolic steroids.[160] And Schedule IV drugs are defined as having low abuse and addictive potential, such as anti-anxiety medications (Xanax) and sleeping pills (Ambien).[161] Schedule V drugs are the least dangerous controlled substances, and include many cough syrups (such as Robitussin AC).

395. Schedule II drugs are the most highly regulated prescription drugs. Pharmacies are not permitted to dispense Schedule II drugs with any refills. Every time a patient asks for a refill, their doctor must write out a new prescription. In contrast, Schedule III and IV drugs may be dispensed with up to 5 refills.

---

[155] *Id.*
[156] *Id.*
[157] *Id.*
[158] *Id.*
[159] *Id.*
[160] *Id.*
[161] *Id.*

396. For all Schedule II substances, drug distributors must report to the DEA all purchases and shipments, and their current inventory of the drug.[162] This data is stored in the DEA's Automation of Reports and Consolidated Orders System (ARCOS) database.[163]

397. In addition, federal law requires distributors to have a system in place to identify and report "suspicious orders" to the DEA's Office of Diversion Control.[164]

398. "Suspicious orders" include orders of an unusual size or frequency, or deviating substantially from the pharmacy's normal ordering pattern.[165] The DEA has specified that "suspicious orders" include "[g]eographic anomalies," such as a town ordering more drugs that its population could possibly consume.[166] Orders are also "suspicious," says the DEA, if they have an unusual composition, such as "100 percent" of a pharmacy's orders being for opioid medications.[167]

399. In addition to reporting suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious or potentially suspicious.[168]

### 4. The Opioid Distributors Breached their Duties to Report and Not Fill Suspicious Orders

400. Because distributors ship such large volumes of controlled substances to pharmacies across the country, they are the first major line of defense in preventing the diversion of controlled substances from legitimate channels into the illicit market. In dereliction of their

---

[162] Department of Justice, ARCOS Questions & Answers, https://www.deadiversion.usdoj.gov/arcos/faq.htm (last visited Feb. 21, 2018).
[163] *Id.*
[164] 21 C.F.R. § 1301.74(b).
[165] See 21 CFR § 1301.74(b).
[166] Larry Cole, A Pharmacist's Obligation: Corresponding Responsibility and Red Flags of Diversion, Quarles & Brady (Aug. 11, 2013), http://bit.ly/2pjxXRY.
[167] See Southwood Pharmaceuticals, Inc.; Revocation of Registration, 72 FR 36487-01, 2007 WL 1886484 (July 2, 2007) (DEA enforcement action).
[168] See Southwood Pharm., Inc., 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); Masters Pharmaceutical, Inc. v. Drug Enforcement Administration, No. 15-11355 (D.C. Cir. June 30, 2017). The distributor may, however, ship a potentially suspicious order if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.

duties, the Opioid Distributors turned a blind eye to pharmacies that repeatedly placed suspicious orders and failed to report them to the DEA.

401. The Opioid Distributors should have flagged that something was wrong with orders going to certain locales due to the enormous number of pills that were shipped to these locations, relative to their population size. Vox reports, "Opioid distributors supplied a ton of these pills, even when they should have known they were going to people who were misusing the drugs. This is backed by data that shows that in some counties and states there were more prescribed bottles of painkillers than there were people — a sign that something was going very wrong."[169] For example, data for the Cherokee Nation shows that "845 million milligrams of opioids were distributed in the 14 counties that make up the Cherokee Nation."[170] "[I]f you assume an average pill size of 20 milligrams" and an average 30-day supply of pills, this quantity is enough for every tribal member living in the Cherokee Nation to consume nearly 8 bottles of opioid pills.[171] Although Cherokee tribe members make up only 4.5% of Oklahoma's population, "[a]lmost a third of the prescription painkillers distributed in that state went to the Cherokee Nation." [172]

402. The Opioid Distributors should have been tipped off to suspicious orders not only by huge order volumes relative to population size, but also by the high proportion of opioids ordered by certain pharmacies. For some pharmacies, all or almost all they ordered were opioids.

403. Opioid Distributors also should have known something was amiss with pharmacies that had enormous aggregate increases in order volume for opioids. For example, Unique Pain Management, a clinic in an Ohio town of 6,500, increased its monthly order volume for

---

[169] German Lopez, US officials are starting to treat opioid companies like Big Tobacco — and suing them, Vox (Aug. 9, 2017), http://bit.ly/2uq4M20.

[170] *Id.*

[171] *Id.; ; Nate Hegyi, Cherokee Nation Sues Wal-Mart, CVS, Walgreens Over Tribal Opioid Crisis, NPR (Aug. 25, 2017), http://n.pr/2BXkguV (177,000 tribal members live in the Cherokee Nation's 14 counties).*

[172] Hegyi, supra note 161.

oxycodone from 67,800 doses to 104,400 doses, over a short period.[173] Its distributor didn't even investigate this 54% increase.[174]

404. In the 1990s, the distributors weren't even reporting their drug shipment statistics correctly, let alone flagging suspicious orders for the DEA. A Washington Post investigation found that in the 1990s, the Opioid Distributors "had been reporting their drugs sales inconsistently or not at all."[175] Yet, they didn't face disciplinary action from the DEA. John J. Coleman, the third ranking administrator at the DEA in the mid-1990s, said in a recent interview that the distributors were "ignored for years and years and years."[176]

405. That changed in 2005, when a new director ascended to lead the DEA's Office of Diversion Control. Joe Rannazzisi, "a street-smart New Yorker who held degrees in pharmacy and law … had begun his career as a DEA street agent and then a supervisor in Detroit before working his way to the top of the diversion office."[177] Finding himself as the nation's chief drug enforcer as the nation faced an ever-expanding opioid epidemic, Rannazzisi decided to focus the DEA's attention on the distributors, who weren't fulfilling their obligation to report and not fill suspicious orders.[178] To Rannazzisi, the distributors were the key link in the supply chain that was fueling the opioid epidemic. While the Opioid Manufacturers were large companies with an obligation to monitor their sales to distributors, they often didn't know where their drugs went after the distributors took over. The distributors, as the middlemen that shipped the drugs to pharmacies all across the country, knew where the drugs went and who was ordering them.[179]

---

[173] Lenny Bernstein et al., How drugs intended for patients ended up in the hands of illegal users: 'No one was doing their job', WASH. POST (Oct. 22, 2016), http://wapo.st/2BsP31C.
[174] *Id.*
[175] Lenny Bernstein and Scott Higham, Investigation: The DEA slowed enforcement while the opioid epidemic grew out of control, WASH. POST (Oct. 22, 2016), http://wapo.st/2kMNO77.
[176] *Id.*
[177] *Id.*
[178] *Id.*
[179] *Id.*

And the three largest distributors, McKesson, Cardinal, and AmerisourceBergen supplied 85% of the national drug market.[180] These companies had the internal data to identify the problem pharmacies and prescribers and stop shipping to them.

406. In 2005, Rannazzisi launched the Office of Diversion Control's "Distributor Initiative," and in 2006, "the diversion office sent a letter to distributors across the country, reminding them that they were required by law to ensure that their drugs were not being diverted to the black market."[181] Rannazzisi was putting the distributors on notice that they needed "to monitor their sales in real time, withhold drug shipments if they detected suspicious activity and report those red flags to the DEA."[182]

407. Frank Younker, "the former DEA supervisor in Cincinnati, said the agency had no other choice" but to go after the Opioid Distributors.[183] 'The distributors could have stopped what was going on, but they didn't," he said. "They were doing the bare minimum. Why would you want to cut off a customer that's paying you $2 million a year? They have sales reps and sales quotas and bonus structures and employees of the month. Everyone was making a lot of money."[184]

408. In 2007, the DEA's diversion office brought "an enforcement case against McKesson — now the nation's largest drug distributor and the fifth-largest corporation in the country. The DEA accused the company of failing to report hundreds of suspicious orders from online pharmacies."[185] As a result of McKesson's actions, "millions of dosage units of controlled substances were diverted from legitimate channels of distribution," according to a Justice

---

[180] *Id.*
[181] *Id.*
[182] *Id.*
[183] Id.
[184] *Id.*
[185] *Id.*

Department statement in 2008.[186] McKesson settled the case, agreeing to pay a $13 million fine.[187]

409. Also in 2008, the DEA's diversion office "filed a case against Cardinal Health, another member of the Big Three wholesalers. DEA investigators alleged that the company was sending millions of doses of painkillers to online and retail pharmacies without alerting investigators to an obvious sign of illegal diversion."[188] Cardinal settled the allegations, agreeing to pay a $34 million fine.[189]

410. At the time, online pharmacies were a huge contributor to the opioid epidemic. But in 2009, "a federal law made it illegal to distribute controlled substances online and required doctors to see their patients face-to-face before writing prescriptions."[190]

411. "In late 2011, Rannazzisi's office filed warrants to yet again inspect the records of a Cardinal warehouse. Investigators alleged that the company was overlooking escalating oxycodone orders from pharmacies in Florida."[191] A Washington Post investigative report uncovered "an internal Cardinal email from 2010 showing that the company's own investigator had warned against selling narcotics to Gulf Coast Medical Pharmacy, an independent drugstore in Fort Myers, Fla., citing suspicions that the pills were winding up on the street. Despite the warning, Cardinal hadn't notified the DEA or cut off the supply of drugs. Instead, the company shipped increasing quantities of pain pills to Gulf Coast."[192] In 2011 alone, Cardinal sent more than 2 million doses of oxycodone to Gulf Coast.[193] Cardinal was sending pharmacies of a

---

[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] *Id.*

similar size an average of only 65,000 doses per year, according to Cardinal's own internal data.[194] "I had the case of my dreams" against Cardinal, Rannazzisi said.

412. After being tipped off about the DEA investigation, rather than fix the problem, Cardinal called in its lobbyists, who had contacts within the current Bush administration.[195] As Rannazzisi was getting ready to file an enforcement action to suspend Cardinal's license to distribute opioids and other drugs, he received a call from James M. Cole, the Deputy Attorney General at the Department of Justice, demanding that Rannazzisi come meet with Cole in Washington before taking any action.[196] After arriving in Cole's office, Rannazzisi said, "I've done hundreds of these cases, and I've never been called over to the Justice Department to explain myself."[197] Rannazzisi demanded to know why this case was any different.[198] From there, the meeting with Cole became "very adversarial."[199]

413. Undeterred, Rannazzisi decided to file against Cardinal anyway.[200] Cardinal Health settled the case, agreeing to pay a $44 million fine for failure to report suspicious opioid orders.[201]

414. Between 2012 – the year Rannazzisi filed against Cardinal – and 2015, Cardinal Health increased its lobbying spending by 82% compared to the previous four-year period.[202] Jon Giacomin, the CEO of Cardinal Health, is chairman of the board of directors at Healthcare Distribution Alliance, a pro-distributor lobbyist organization.[203] Between 2012 and 2014,

---

194 *Id.*
195 *Id.*
196 *Id.*
197 *Id.*
198 *Id.*
199 *Id.*
200 *Id.*
201 Lenny Bernstein and Scott Higham, Cardinal Health fined $44 million for opioid reporting violations, WASH. POST (Jan. 11, 2017), http://wapo.st/2kMED6y.
202 See Center for Responsive Politics, Cardinal Health Summary, http://bit.ly/2C0G7Sh (last visited Feb. 21, 2018) (Cardinal's spending increased from $4.757 million to $8.655 million).

Healthcare Distribution Alliance increased its lobbying spending by 40% compared to the previous period.[204] Both Cardinal and Healthcare Distribution Alliance heavily lobbied Congress to make it more difficult for the DEA to bring enforcement actions against distributors.[205]

415. In September 2014, Congressman Tom Marino, one of the distributor's top advocates in Congress, pressured the DEA Administrator, the head of the entire agency, to take action against Rannazzisi, who Marino saw as too aggressive against industry.[206] Facing increasing pressure over the course of the next year, the DEA Administrator removed Rannazzisi as chief of the agency's Office of Diversion Control in August 2015.[207]

416. President Trump nominated Tom Marino to be his drug czar in 2017 to lead the fight against opioid abuse. Marino was forced to withdraw his name "in the wake of reports that as a congressman he did the bidding of the pharmaceutical industry."[208]

417. While Rannazzisi was still at the DEA's diversion enforcement office, the agency was building a huge case against McKesson, the nation's largest distributor. "By 2014, [DEA] investigators said they could show that the company had failed to report suspicious orders involving millions of highly addictive painkillers sent to drugstores from Sacramento, Calif., to Lakeland, Fla. Some of those went to corrupt pharmacies that supplied drug rings."[209] David Schiller, who led the McKesson investigation, "and members of his team wanted to fine the company more than $1 billion. More than anything else, they wanted to bring the first-ever

---

[203] Healthcare Distribution Alliance, http://bit.ly/2pnuwtv (last visited Feb. 21, 2018).

[204] Center for Responsive Politics, Healthcare Distribution Alliance, http://bit.ly/2BINZed (last visited Feb. 21, 2018).

[205] Bernstein, Investigation: The DEA slowed enforcement while the opioid epidemic grew out of control, supra note 166.

[206] Scott Highman and Lenny Bernstein, The drug industry's triumph over the DEA, CHICAGO TRIBUNE (Oct. 15, 2017), http://trib.in/2B7CnNL.

[207] Bernstein, Investigation: The DEA slowed enforcement while the opioid epidemic grew out of control, supra note 166.

[208] Peter Baker, Tom Marino, Drug Czar Nominee, Withdraws in Latest Setback for Trump's Opioid Fight, N.Y. TIMES (Oct. 17, 2017), http://nyti.ms/2gMOJT9.

[209] Lenny Bernstein, 'We feel like our system was hijacked': DEA agents say a huge opioid case ended in a whimper, WASH. POST (Dec. 17, 2017), http://wapo.st/2BBbmpa.

criminal case against a drug distribution company, maybe even walk an executive in handcuffs out of McKesson's towering San Francisco headquarters to send a message to the rest of the industry."[210] Schiller said, "This is the best case we've ever had against a major distributor in the history of the Drug Enforcement Administration."[211]

418. "DEA investigators, agents and supervisors who worked on the McKesson case said the company paid little or no attention to the unusually large and frequent orders placed by pharmacies, some of them knowingly supplying drug rings."[212] To avoid its obligation to report suspicious orders to the DEA, McKesson defined a "suspicious order" as one where a pharmacy's order volume went over the pharmacy's drug quota by a certain percentage. These quotas, or "thresholds," were numbers assigned to each pharmacy internally by McKesson. To ensure opioid orders wouldn't go over the threshold, McKesson just kept raising the pharmacies' thresholds. A DEA investigator told 60 Minutes that "to get around reporting suspiciously large orders, at the time, McKesson would simply raise the limit a pharmacy was allowed. No order, no matter how large, was ever reported as suspicious."[213]

419. For example, Jeffrey Clawson, a pharmacist in Brighton, Colorado, repeatedly bumped up against his thresholds, so McKesson just kept raising them. Brighton is a small town with a population of only 38,000, yet Clawson was selling as many as 2,000 opioid pills per day.[214] "[T]he DEA's Denver field division began a criminal investigation into Clawson, making undercover buys and monitoring the size of his drug purchases. Most of the drugs came from McKesson's warehouse in Aurora, northeast of Denver, records show. Under federal law, McKesson is required to notify the DEA about any orders of unusual size, frequency or pattern

---

210 *Id.*
211 Id.
212 *Id.*
213 Bill Whitaker, Whistleblowers: DEA Attorneys Went Easy on McKesson, supra note 137. 213
214 Lenny Bernstein, 'We feel like our system was hijacked', supra note 200.

and hold off on shipping the drugs until those issues are resolved."[215] Yet, McKesson never reported Clawson to the DEA nor did they stop shipping to Clawson[216] The DEA investigator who worked Clawson's case says, "We … have a pharmacy in a small town out in Colorado, 200 miles from Denver that is getting the same number of pills or perhaps exceeding a pharmacy that is located next to a medical center in the city of Denver…. There was no legitimate reason for that pharmacy in that little town in remote Colorado to be getting hundreds of thousands of pills over a several year period. None. There was no justifiable reason."[217] "Clawson ordered so much oxycodone that he repeatedly bumped up against thresholds McKesson had set for his pharmacy. The company raised those limits and sent him more …" [218] One DEA investigator said that McKesson "would raise thresholds so pharmacies could order more pills without setting off suspicious monitoring alarms inside the company."[219]

420. Clawson's order volume should have set off numerous red flags. A grand jury, in indicting Clawson, found, "From 2008-2011, the percentage increase for oxycodone 30 mg orders supplied by McKesson to [Clawson] was approximately 1,469%."[220]

421. Beyond Colorado, DEA "investigators found that McKesson warehouses in Livonia, Mich., and Washington Court House, Ohio, were supplying pharmacies that sold to criminal drug rings."[221] The DEA diversion office, helmed by Rannazzisi, demanded in 2014 that McKesson surrender its licenses to distribute drugs for five of its warehouses, which were implicated in supplying criminal drug rings.[222] McKesson refused.

---

215 *Id.*
216 *Id.*
217 *Id.*
218 *Id.*
219 *Id.*
220 *Id.*
221 *Id.*
222 *Id.*

422. In September 2015, one month after Rannazzisi was removed as chief of the DEA's diversion enforcement office, McKesson reached a settlement with the government that did not require it to surrender its warehouse licenses.[223] McKesson agreed to pay a fine of $150 million which fell far short of the $1 billion that the DEA had wanted to seek while headed by Rannazzisi.[224]

423. McKesson earns $200 billion per year in revenue, so a fine of only $150 million is relatively trivial for McKesson to pay.[225] Schilling, the lead investigator for the DEA, says that McKesson received a level of special treatment that he'd never seen before in his 30-year career, and pointed out that "the $150 million fine was only about $50 million more than McKesson CEO, John Hammergren's compensation last year."[226] New Hampshire senator, Maggie Hassan, says that if our country wants to end the opioid epidemic, "one of the things we have to do is begin to hold the pharmaceutical companies accountable for this. And right now, when you see a fine for the McKesson Company of $150 million when they make a $100 million a week in profits, that isn't gonna do it."[227]

**E. Consequences of the Defendants' Actions**

424. As the Opioid Manufacturers successfully convinced more and more doctors and patients that opioids were safe and effective for chronic pain, the number of prescriptions for opioids in the United States rose dramatically.

425. Plaintiff's unreimbursed opioid addiction treatment rose with the addiction rates.

426. The concomitant rates of opioid abuse and addiction rose as well. Certain doctors and pharmacies sought to exploit this increasing demand for prescription opioids. The DEA and

---

[223] *Id.*
[224] *Id.*
[225] *Id.*
[226] Bill Whitaker, Whistleblowers: DEA Attorneys Went Easy on McKesson, supra note 137.
[227] *Id.*

Plaintiff's police force could not keep pace with the rising rates of drug trafficking and diversion of opioids from legitimate sources. Despite knowing about many suspicious orders, the Opioid Distributors did not report suspicious patterns of opioid orders to the DEA or Plaintiff's police force, continuing to profit from these large volume buyers who were clearly diverting drugs to the black market.

427. As a result of the wide availability of prescription opioids, addiction rates skyrocketed.

**1. Dramatic Expansion of Opioid Prescription and Use**

428. The Manufacturer Defendants necessarily expected a return on the enormous investment they made in their deceptive marketing scheme, and worked to measure and expand their success. Their own documents show that they knew they were influencing prescribers and increasing prescriptions. Studies also show that in doing so, they fueled an epidemic of addiction and abuse.

429. Endo, for example directed the majority of its marketing budget to sales representatives—with good results: 84% of its prescriptions were from the doctors they detailed. Moreover, as of 2008, cancer and post-operative pain accounted for only 10% of Opana ER's uses; virtually all of Endo's opioid sales—and profits—were from a market that did not exist ten years earlier. Internal emails from Endo staff attributed increases in Opana ER sales to the aggressiveness and persistence of sales representatives.

430. Teva also recognized the return of its efforts to market Actiq and Fentora off-label for chronic pain. In 2000, Actiq generated $15 million in sales. By 2002, Actiq sales had increased by 92%, which Cephalon attributed to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists." Actiq became Cephalon's second bestselling

drug. By the end of 2006, Actiq's sales had exceeded $500 million. Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists. One measure suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."

431. Upon information and belief, each of the Manufacturer Defendants tracked the impact of their marketing efforts to measure their impact in changing doctors' perceptions and prescribing of their drugs. They purchased prescribing and survey data that allowed them to closely monitor these trends, and they did actively monitor them. For instance, they monitored doctors' prescribing before and after detailing visits, and at various levels of detailing intensity, and before and after speaker programs. Defendants invested in their aggressive and deceptive marketing for one reason: it worked. As described in this Complaint, both in specific instances and more generally, Defendants' marketing changed prescribers' willingness to prescribe opioids, led them to prescribe more of their opioids, and persuaded them to continue prescribing opioids or to switch to supposedly "safer" opioids, such as ADF.

432. This success would have come as no surprise. Drug company marketing materially impacts doctors' prescribing behavior. The effects of sales calls on prescribers' behavior is well documented in the literature, including a 2017 study that found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers. The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures. Another study examined four practices, including visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales

representatives have the strongest effect on drug utilization. An additional study found that doctor meetings with sales representatives are related to changes in both prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

433. Manufacturer Defendants spent millions of dollars to market their drugs to prescribers and patients and meticulously tracked their return on that investment. In one recent survey published by the AMA, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities, 88% of the respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for chronic non-cancer pain. These results are directly due to the Manufacturer Defendants' fraudulent marketing campaign focused on several misrepresentations.

434. Thus, both independent studies and Manufacturer Defendants' own behavior confirm that Defendants' marketing scheme dramatically increased their sales.

435. Independent research demonstrates a close link between opioid prescriptions and opioid abuse. For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse." It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

436. There is a parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes. The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."

437. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving

opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

### 2. Defendants Throughout the Supply Chain Deliberately Disregarded Their Duties to Maintain Effective Controls and to Identify, Report, and Take Steps to Halt Suspicious Orders

438. The Manufacturer Defendants created a vastly and dangerously larger market for opioids. They and the Distributor Defendants compounded this harm by facilitating the supply of far more opioids that could have been justified to serve that market. The failure of the Defendants to maintain effective controls, and to investigate, report, and take steps halt orders that they knew or should have known were suspicious breached both their statutory and common law duties.

439. Manufacturer Defendants' scheme was resoundingly successful. Chronic opioid therapy—the prescribing of opioids long-term to treat chronic pain—has become a commonplace, and often first-line, treatment. Manufacturing Defendants' deceptive marketing caused prescribing not only of their opioids, but of opioids as a class, to skyrocket. According to the CDC opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. While previously a small minority of opioid sales, today between 80% and 90% of opioids (measured by weight) used are for chronic pain. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids. Opioids are the most common treatment for chronic pain, and 20% of office visits now include the prescription of an opioid.

440. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving

opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

441. As the Manufacturer Defendants increased the demand for opioids, all the Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, Defendants are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers. Rather, as described below, Defendants are subject to various duties to report the quantity of Schedule II controlled substances in order to monitor such substances and prevent oversupply and diversion into the illicit market.

442. Manufacturer Defendants and Distributor Defendants have a duty to report suspicious orders and not to ship those orders unless due diligence disproves their suspicions. Multiple sources impose these duties on the Defendants.

443. First, under the common law, the Defendants had a duty to exercise reasonable care in delivering dangerous narcotic substances. By flooding the market, including Plaintiff's Community, with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.

444. Second, each of the Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

445. Third, each of the Manufacturer Defendants and Distributor Defendants was required to register with the DEA to manufacture and/or distribute Schedule II controlled substances. See 21

U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100. As registrants, these Defendants were required to "maint[ain] … effective controls against diversion" and to "design and operate a system to disclose … suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. These Defendants were further required to take steps to halt suspicious orders. These Defendants violated their obligations under federal law.

446. Controlled substances manufacturers and distributors are required to register with the state and are also required to maintain effective security measures to the identification, reporting, and prevention of diversion. These regulations track Federal requirements. They are also subject to labeling requirements.

447. At all relevant times, the Distributor Defendants purchased prescription opioid drugs from manufacturers, and sold them to pharmacies and other health care providers nationally and Plaintiff's Community.

448. The Distributor Defendants dominate 85% of the market share for the distribution of prescription opioids. On information and belief, most or neatly all the prescription opioids that were sold to health care providers within Plaintiff's Community were purchased from the Distributor Defendants.

449. Under the relevant Florida statutes, the Distributor Defendants have a duty to establish effective controls against suspicious orders to prevent prescription drugs from being diverted into the community.

450. Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970 ("CSA"). The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals. Congress

specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.

451. Congress was concerned with the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market." Moreover, the closed system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants – which includes all manufacturers and distributors of controlled substances must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion. When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of addiction that has occurred.

452. The CSA requires manufacturers and distributors of Schedule II substances like opioids to: (a) limit sales within a quota set by the DEA for the overall production of Schedule II substances like opioids; (b) register to manufacture or distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; and (d) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

453. Central to the closed-system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs." When evaluating production quotas, the DEA was instructed to consider the following information:

• Information provided by the Department of Health and Human Services;

• Total net disposal of the basic class of each drug by all manufacturers;

• Trends in the national rate of disposal of the basic class of drug;

• An applicant's production cycle and current inventory position;

• Total actual or estimated inventories of the class of drug and of all substances manufactured from the class and trends in inventory accumulation; and

• Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.

454. It is unlawful to manufacture a controlled substance in Schedule II, like prescription opioids, in excess of a quota assigned to that class of controlled substances by the DEA.

455. To ensure that even drugs produced within quota are not diverted, federal regulations issued under the CSA mandate that all registrants, manufacturers and distributors alike, "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Registrants are not entitled to be passive observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." Id. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. Id. Other red flags may include, for example, "[o]rdering the same controlled substance from multiple distributors."

456. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a distributor or manufacturer need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an

order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

457. In sum, these Defendants have several responsibilities under state and federal law with respect to control of the supply chain of opioids. First, they must set up a system to prevent diversion, including excessive volume and other suspicious orders. That would include reviewing their own data, relying on their observations of prescribers and pharmacies, and following up on reports or concerns of potential diversion. All suspicious orders must be reported to relevant enforcement authorities. Further, they must also stop shipment of any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, they can determine that the order is not likely to be diverted into illegal channels.

458. State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent manufacturers and distributors would not fall. Together, these laws and industry guidelines make clear that Distributor Defendants and Manufacturer Defendants alike possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when the supply chain is not properly controlled.

459. Further, these laws and industry guidelines make clear that the Distributor Defendants and Manufacturer Defendants alike have a duty and responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

460. The FTC has recognized the unique role of distributors. Since their inception, Distributor Defendants have continued to integrate vertically by acquiring businesses that are related to the distribution of pharmaceutical products and health care supplies. In addition to the actual distribution of pharmaceuticals, as wholesalers, Distributor Defendants also offer their pharmacy, or dispensing, customers a broad range of added services. For example, Distributor Defendants offer their pharmacies sophisticated ordering systems and access to an inventory management system and distribution facility that allows customers to reduce inventory carrying costs. Distributor Defendants are also able to use the combined purchase volume of their customers to negotiate the cost of goods with manufacturers and offer services that include software assistance and other database management support. See Fed. Trade Comm'n v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 41 (D.D.C. 1998) (granting the FTC's motion for preliminary injunction and holding that the potential benefits to customers did not outweigh the potential anti-competitive effect of a proposed merger between Cardinal Health, Inc. and Bergen Brunswig Corp.). As a result of their acquisition of a diverse assortment of related businesses within the pharmaceutical industry, as well as the assortment of additional services they offer, Distributor Defendants have a unique insight into the ordering patterns and activities of their dispensing customers.

461. Manufacturer Defendants also have specialized and detailed knowledge of the potential suspicious prescribing and dispensing of opioids through their regular visits to doctors' offices

and pharmacies, and from their purchase of data from commercial sources, such as IMS Health. Their extensive boots-on-the-ground through their sales force, allows Marking Defendants to observe the signs of suspicious prescribing and dispensing discussed elsewhere in this Complaint—lines of seemingly healthy patients, out-of-state license plates, and cash transactions, to name only a few. In addition, Manufacturer Defendants regularly mined data, including, upon information, chargeback data, which allowed them to monitor the volume and type of prescribing of doctors, including sudden increases in prescribing and unusual high dose prescribing, which would have alerted them, independent of their sales representatives, to suspicious prescribing. These information points gave Manufacturer Defendants insight into prescribing and dispensing conduct that enabled them to play a valuable role in the preventing diversion and fulfilling their obligations under the CSA.

462. Defendants have a duty to be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

463. Defendants breached their duties by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious problems of overuse of opioids.

### 3. Defendants' Knowledge of Their Duties to Prevent Diversion and Report Suspicious Orders

464. The reason for the reporting rules is to create a "closed" system intended to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. Both because distributors handle such large volumes of controlled

substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical. Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

465. Defendants were aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

466. Recently, Mallinckrodt, a prescription opioid manufacturer, admitted in a settlement with DEA that "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to DEA." Mallinckrodt further stated that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and agreed that it would "design and operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product." Mallinckrodt specifically agreed "to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."

467. Trade organizations to which Defendants belong have acknowledged that wholesale distributors have been responsible for reporting suspicious orders for more than 40 years. The Healthcare Distribution Alliance ("HDA"), formerly known as the Healthcare Distribution Management Association ("HDMA"), a trade association of pharmaceutical distributors to which

Distributor Defendants belong, has long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society." Guidelines established by the HDA also explain that distributors, "[a]t the center of a sophisticated supply chain … are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."

468. The DEA also repeatedly reminded the Defendants of their obligations to report and decline to fill suspicious orders. Responding to the proliferation of pharmacies operating on the internet that arranged illicit sales of enormous volumes of opioids to drug dealers and customers, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses and educate them on how to meet these obligations. Since 2007, the DEA has hosted at least five conferences that provided registrants with updated information about diversion trends and regulatory changes. Each of the Distributor Defendants attended at least one of these conferences. The DEA has also briefed wholesalers regarding legal, regulatory, and due diligence responsibilities since 2006. During these briefings, the DEA pointed out the red flags wholesale distributors should look for to identify potential diversion.

469. The DEA also advised in a September 27, 2006 letter to every commercial entity registered to distribute controlled substances that they are "one of the key components of the distribution chain. If the closed system is to function properly … distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as … the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people." The DEA's September 27, 2006 letter also expressly reminded them that

registrants, in addition to reporting suspicious orders, have a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels." The same letter reminds distributors of the importance of their obligation to "be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes," and warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."

470. The DEA sent another letter to Defendants on December 27, 2007, reminding them that, as registered manufacturers and distributors of controlled substances, they share, and must each abide by, statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances." The DEA's December 27, 2007 letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (e.g., by specifically identifying an order as suspicious, not merely transmitting data to the DEA). Finally, the letter references the Revocation of Registration issued in Southwood Pharmaceuticals, Inc., 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."

**4. Defendants Conspired to Inflate Quotas of Opioids They Could Distribute**

471. Finding it impossible to legally achieve their ever-increasing sales ambitions Defendants engaged in the common purpose of increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and distribution of their prescription opioids.

472. Wholesale distributors such as the Distributor Defendants had close financial relationships with both Manufacturer Defendants and customers, for whom they provide a broad

range of value-added services that render them uniquely positioned to obtain information and control against diversion. These services often otherwise would not be provided by manufacturers to their dispensing customers and would be difficult and costly for the dispenser to reproduce. For example, wholesalers have sophisticated ordering systems that allow customers to electronically order and confirm their purchases, as well as to confirm the availability and prices of wholesalers' stock. Through their generic source programs, wholesalers are also able to combine the purchase volumes of customers and negotiate the cost of goods with manufacturers. Wholesalers typically also offer marketing programs, patient services, and other software to assist their dispensing customers.

473. Distributor Defendants had financial incentives from the Manufacturer Defendants to distribute higher volumes, and thus to refrain from reporting or declining to fill suspicious orders. Wholesale drug distributors acquire pharmaceuticals, including opioids, from manufacturers at an established wholesale acquisition cost. Discounts and rebates from this cost may be offered by manufacturers based on market share and volume. As a result, higher volumes may decrease the cost per pill to distributors. Decreased cost per pill in turn, allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit. Either way, the increased sales volumes result in increased profits.

474. The Manufacturer Defendants engaged in the practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids to help them boost sales and better target their marketing efforts. The Washington Post has described the practice as industry-wide, and the HDA includes a "Contracts and Chargebacks Working Group," suggesting a standard practice. Further, in a recent settlement with the DEA, Mallinckrodt, a prescription opioid manufacturer, acknowledged that "[a]s part of their business model

Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors)." The transaction information contains data relating to the direct customer sales of controlled substances to 'downstream' registrants," meaning pharmacies or other dispensaries, such as hospitals. Manufacturer Defendants buy data from pharmacies as well. This exchange of information, upon information, and belief, would have opened channels providing for the exchange of information revealing suspicious orders as well.

475. The contractual relationships among the Defendants also include vault security programs. Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates. The manufacturers negotiated agreements whereby the Manufacturer Defendants installed security vaults for the Distributor Defendants in exchange for agreements to maintain minimum sales performance thresholds. These agreements were used by the Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

476. In addition, Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF") and the HDA.

477. The Pain Care Forum ("PCF") has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

478. The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse." Specifically, PCF members spent over $740 million

lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.

479. The Defendants who stood to profit from expanded prescription opioid use are members of and/or participant in the PCF. In 2012, membership and participating organizations included Endo, Purdue, Actavis and Cephalon. Each of the Manufacturer Defendants worked together through the PCF. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA. For example, he Executive Committee of the HDA currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation. The Distributor Defendants participated directly in the PCF as well.

480. Additionally, the HDA led to the formation of interpersonal relationships and an organization among the Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants including Actavis, Endo, Purdue, Mallinckrodt and Cephalon were members of the HDA. Additionally, the HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating for the many benefits of members, including "strengthen[ing] … alliances."

481. Beyond strengthening alliances, the benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA

committees, task forces and working groups with peers and trading partners," and "make connections." Clearly, the HDA and the Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships and "alliances" between the Marketing and Distributor Defendants.

482. The application for manufacturer membership in the HDA further indicates the level of connection among the Defendants and the level of insight that they had into each other's businesses. For example, the manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company.

483. The HDA application also requests that the manufacturer identify its current distribution information, including the facility name and contact information. Manufacturer members were also asked to identify their "most recent year end net sales" through wholesale distributors, including the Distributor Defendants AmerisourceBergen, Cardinal Health, and Kesson and their subsidiaries.

484. The closed meetings of the HDA's councils, committees, task forces and working groups provided the Marketing and Distributor Defendants with the opportunity to work closely together, confidentially, to develop and further the common purpose and interests of the enterprise.

485. The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers … to hold strategic business discussions on the most pressing industry issues." The conferences also gave the Marketing and Distributor Defendants

"unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry." The HDA and its conferences were significant opportunities for the Marketing and Distributor Defendants to interact at a high-level of leadership. It is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.

486. After becoming members of HDA, Defendants were eligible to participate on councils, committees, task forces and working groups, including:

- Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."
- Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributor and manufacturer members.
- Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributor and manufacturer members.
- Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed

include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.

- Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation in this group includes manufacturer and distributor members.

487. The Distributor Defendants and Manufacturer Defendants also participated, through the HDA, in Webinars and other meetings designed to exchange detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices. For example, on April 27, 2011, the HDA offered a Webinar to "accurately and effectively exchange business transactions between distributors and manufacturers…" The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell prescription opioids.

488. Taken together, the interaction and length of the relationships between and among the Marketing and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Marketing and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

489. The HDA and the PCF are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the Defendants were in communication and cooperation.

490. Publications and guidelines issued by the HDA confirm that the Defendants utilized their membership in the HDA to form agreements. Specifically, in the fall of 2008, the HDA published the Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances (the "Industry Compliance Guidelines") regarding diversion. As the HDA explained in an amicus brief, the Industry Compliance Guidelines were the result of "[a] committee of HDMA members contribut[ing] to the development of this publication" beginning in late 2007.

491. This statement by the HDA and the Industry Compliance Guidelines show that Defendants utilized the HDA to form agreements about their approach to their duties under the CSA. As John M. Gray, President/CEO of the HDA stated to the Energy and Commerce Subcommittee on Health in April 2014, is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications." Here, it is apparent that all the Defendants found the same balance—an overwhelming pattern and practice of failing to identify, report, or halt suspicious orders and to prevent diversion.

492. The Defendants' scheme had a decision-making structure driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the state and federal government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal

to maintain effective controls against diversion, and identify suspicious orders and report them to the DEA.

493. The Defendants worked together to control the flow of information and influence state and federal governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution. The Marketing and Distributor Defendants did this through their participation in the PCF and HDA.

494. The Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had no basis for refusing to increase or decrease production quotas due to diversion.

495. The Defendants also had reciprocal obligations under the CSA to report suspicious orders of other parties if they became aware of them. Defendants were thus collectively responsible for each other's compliance with their reporting obligations.

496. Defendants thus knew that their own conduct could be reported by other distributors or manufacturers and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting of suspicious orders to ensure consistency in their dealings with DEA.

497. The desired consistency was achieved. None of the Defendants reported suspicious orders and the flood of opioids continued unimpeded.

### 5. Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement

498. When a manufacturer or distributor does not report or stop suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse

them or who sell them to others to abuse. This, in turn, fuels and expands the illegal market and results in opioid-related overdoses. Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action—or may not know to take action at all.

499. After being caught failing to comply with particular obligations at particular facilities, Distributor Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens. As part of McKesson's 2008 Settlement with the DEA, McKesson claimed to have "taken steps to prevent such conduct from occurring in the future," including specific measures delineated in a "Compliance Addendum" to the Settlement. Yet, in 2017, McKesson paid $150 million to resolve an investigation by the U.S. DOJ for again failing to report suspicious orders of certain drugs, including opioids. Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

500. More generally, the Distributor Defendants publicly portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs. For example, Defendant Cardinal claims that: "We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen in compliance with all regulatory requirements and with a belief that doing 'the right thing' serves everyone." Defendant Cardinal likewise claims to "lead [its] industry in anti-diversion strategies to help prevent opioids from being diverted for misuse or abuse." Along the same lines, it claims to "maintain a sophisticated, state-of-the-art program to identify, block and report to regulators

those orders of prescription controlled medications that do not meet [its] strict criteria." Defendant Cardinal also promotes funding it provides for "Generation Rx," which funds grants related to prescription drug misuse. A Cardinal executive recently claimed that Cardinal uses "advanced analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

501. Defendant McKesson publicly claims that its "customized analytics solutions track pharmaceutical product storage, handling and dispensing in real time at every step of the supply chain process," creating the impression that McKesson uses this tracking to help prevent diversion. Defendant McKesson has also publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."

502. Defendant AmerisourceBergen, too, has taken the public position that it is "work[ing] diligently to combat diversion and [is] working closely with regulatory agencies and other partners in pharmaceutical and healthcare delivery to help find solutions that will support appropriate access while limiting misuse of controlled substances." A company spokeswoman also provided assurance that: "At AmerisourceBergen, we are committed to the safe and efficient delivery of controlled substances to meet the medical needs of patients."

503. Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Defendants, through their trade associations, not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct followed those obligations.

504. Defendant Mallinckrodt similarly claims to be "committed … to fighting opioid misuse and abuse," and further asserts that: "In key areas, our initiatives go beyond what is required by law. We address diversion and abuse through a multidimensional approach that includes educational efforts, monitoring for suspicious orders of controlled substances …."

505. Other Manufacturer Defendants also misrepresented their compliance with their legal duties and their cooperation with law enforcement. Purdue serves as a hallmark example of such wrongful conduct. Purdue deceptively and unfairly failed to report to authorities illicit or suspicious prescribing of its opioids, even as it has publicly and repeatedly touted its "constructive role in the fight against opioid abuse," including its commitment to ADF opioids and its "strong record of coordination with law enforcement."

506. At the heart of Purdue's public outreach is the claim that it works hand-in-glove with law enforcement and government agencies to combat opioid abuse and diversion. Purdue has consistently trumpeted this partnership since at least 2008, and the message of close cooperation is in virtually all of Purdue's recent pronouncements in response to the opioid abuse.

507. Touting the benefits of ADF opioids, Purdue's website asserts: "[W]e are acutely aware of the public health risks these powerful medications create …. That's why we work with health experts, law enforcement, and government agencies on efforts to reduce the risks of opioid abuse and misuse …." Purdue's statement on "Opioids Corporate Responsibility" likewise states that "[f]or many years, Purdue has committed substantial resources to combat opioid abuse by partnering with … communities, law enforcement, and government." And, responding to criticism of Purdue's failure to report suspicious prescribing to government regulatory and enforcement authorities, the website similarly proclaims that Purdue "ha[s] a long record of close coordination with the DEA and other law enforcement stakeholders to detect and reduce drug

diversion." Contrary to its public statements, Purdue worked behind the scenes to push back against law enforcement.

508. These public pronouncements create the misimpression that Purdue is proactively working with law enforcement and government authorities nationwide to root out drug diversion, including the illicit prescribing that can lead to diversion. It aims to distance Purdue from its past conduct in deceptively marketing opioids and make its current marketing seem more trustworthy and truthful.

509. Public statements by the Defendants and their associates created the false and misleading impression to regulators, prescribers, and the public that the Defendants rigorously carried out their legal duties, including their duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact.

**6. The Role of the Sackler Defendants**

510. At all relevant times, the Sackler Families – in particular, as detailed below, Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Beverly Sackler, Theresa Sackler, Ilene Sackler Lefcourt, David Sackler, and Raymond Sackler Trust ("Sackler Defendants") – controlled Purdue and its associated companies. They were aided and abetted by Stuart D. Baker. Purdue is part of a complex web of entities which the Sackler Families own and control. PPI is the managing general partner of PPLP and of many of the various Purdue-related entities. Its status as managing general partner of the various entities ensures PPI's control of those entities. In turn, at all relevant times, all the members of the board of PPI have been members of the Sackler Families or Sackler-family retainers.

511. Because the Sackler Families control of the board of PPI, the officers of PPI and PPLP reported to them. This ensured Sackler control of PPI and PPLP, even when the officers of those entities were not themselves members of the Sackler Families. Defendant Stuart D. Baker was also instrumental in conspiring with the Sackler's to control Purdue and to ensure that the profits from the opioid epidemic continued to flow to the Sackler's.

512. At relevant times, Rhodes Tech or its predecessor has manufactured and supplied PPLP with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations.

513. At relevant times, Rhodes Tech Inc. has manufactured and supplied PPLP with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations or has managed Rhodes Tech or its predecessor in doing so.

514. At all relevant times, Rhodes Pharma has marketed a generic form of OxyContin which is manufactured by Purdue Pharmaceuticals L.P. ("PPNC"), a Delaware limited partnership, which is a subsidiary of PPLP and which owns and operates a pharmaceutical manufacturing facility in Wilson, North Carolina.

515. At all relevant times, Rhodes Pharma Inc. has marketed a generic form of OxyContin which is manufactured by PPNC.

516. At relevant times, PF Labs engaged in the business of manufacturing OxyContin for PPLP.

517. The Sackler Defendants made the decision that the Sackler Families should enter the generic market for OxyContin in or about 2008 and that it should do so through Rhodes Pharma, a Sackler-owned entity created for that purpose. This was, not coincidentally, around the time

that Purdue pleaded guilty for misleading doctors and patients about opioids and entered into a settlement for its wrong doing with respect to opioids.

518. The Sackler Defendants caused Purdue and other associated companies that they beneficially owned and controlled to distribute to the Sackler Families hundreds of millions of dollars of profits earned by Purdue and its associated companies from the sale of opioids.

519. Each of the Sackler Defendants named herein has served on the board of directors of, or as an officer of, Purdue and one or more Purdue-related entities.

520. The Sackler Defendants beneficially own and control all of the entities owned by the Sackler Families, including PF Labs and the Rhodes Defendants, in substantially the same way as they control PPLP and its affiliates, although they may do so using different holding companies and trusts than those used to control PPLP. The Purdue-related entities that are not controlled by the Sackler Defendants through PPI are controlled by them through different entities unknown to Plaintiff.

521. At all relevant times, Richard Sackler played an active and central role in the management of Purdue and the Purdue-related Defendants. He began working for Purdue as Assistant to the President (his father, Raymond) in the 1970s. He later served as Vice President of Marketing and Sales. In the early 1990s he became Senior Vice President, which was the position he held at the time OxyContin was launched in 1996. In 1999, he became President, and he served in that position until 2003.

522. Richard Sackler resigned as President in 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve, with his uncle Mortimer, as Co-Chair of the Board of Purdue. In

that way, among others, the family maintained control over their family-owned business, even though they were no longer officers, because the officers reported to them.

523. As a senior executive of Purdue, Richard Sackler was actively involved in the invention, development, marketing, promotion, and sale of Purdue's opioid products, including OxyContin. He worked tirelessly to make OxyContin a blockbuster, telling colleagues how devoted he was to the drug's success. Along with his father (Raymond) and his uncle (Mortimer), he launched OxyContin with one of the biggest and most deceptive pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by his uncle Arthur. Within five years of its introduction, OxyContin was generating a billion dollars a year. When OxyContin met with resistance, Richard participated in Purdue's efforts to counter that resistance.

524. At all relevant times, Richard Sackler served as a trustee of one or more trusts that beneficially own and control Purdue.

525. Richard Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and its affiliates from the sale of opioids.

526. In July of 2011, Richard Sackler, at that time still a board member of Purdue, went into the field with sales representatives to promote opioids to doctors. He later contacted Purdue's vice-president for sales and argued that a required warning for opioids was unnecessary.[228]

527. Jonathan Sackler was a Vice President of Purdue in 1991, and by 2000 he was a Senior Vice President. Like his brother Richard, he resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the board of Purdue.

528. At all relevant times, Jonathan Sackler served as a trustee or one or more trusts that beneficially owns and control Purdue.

[228] https://www.nytimes.com/2019/04/01/health/sacklers-oxycontin-lawsuits.html (last visited May 1, 2019).

529. Jonathan Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and its affiliates from the sale of opioids.

530. Mortimer D.A. Sackler served as a Vice President of Purdue during the period of the development, launch, and promotion of OxyContin. He resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the Board of Purdue.

531. Mortimer D.A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and its affiliates from the sale of opioids.

532. Kathe A. Sackler was a Vice President of Purdue in 1991, and by 2000 she was a Senior Vice President. She resigned that position in or about 2003 due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

533. Kathe A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and its affiliates from the sale of opioids.

534. Ilene Sackler Lefcourt served as Vice President of Purdue during the period of the development, launch, and promotion of OxyContin. She resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

535. Ilene Sackler Lefcourt is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and its affiliates from the sale of opioids.

536. At all relevant times, Beverly Sackler served as a trustee of one or more trusts that beneficially own and control Purdue and to which 50% of the profits of Purdue and its affiliates

from the sale of opioids has been conveyed. She has also served as a member of the board of directors of Purdue since the 1990s.

537. Beverly Sackler is the direct or indirect beneficiary of some portion of 50% of the profits earned by Purdue and its affiliates from the sale of opioids.

538. Theresa Sackler is the direct or indirect beneficiary of 50% of the profits earned by Purdue and its affiliates from the sale of opioids. She has also served as a member of the board of directors of Purdue since the 1990s.

539. David A. Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and its affiliates from the sale of opioids. He has also served as a member of the board of directors of Purdue since 2012.

540. The Sackler's recognized the harm they were doing and, rather than trying to put a stop to it, decided to make even more profits from it by entering the addiction treatment market. The Sackler's created "Project Tango" which recognized the link between pain treatment and addiction and sought to make money at both ends of the spectrum by continuing to push their opioids, which they knew led to addiction, while also adding profits from selling treatment options for the very addiction they were creating. Kathe Sackler instructed employees to devote their attention to this goal.[229]

541. Stuart Baker joined Purdue in 1994 as Executive Vice President of PPLP and as Vice President of PF Co. He served as legal counsel to the entire Purdue organization and the Sackler Families. He also served as an officer of other Sackler-owned, Purdue-related entities. He served as a trustee of one or more trusts that beneficially own and control Purdue and its affiliates. He served as Corporate Secretary for Purdue, and as such he gained direct knowledge of the wrongdoing alleged in the Complaint. In his capacity as an officer, director, and lawyer, he

[229] See https://www.nytimes.com/2019/04/01/health/sacklers-oxycontin-lawsuits.html (last visited May 1, 2019).

knowingly aided, abetted, participated in, and benefitted from the wrongdoing of Purdue as alleged in the Complaint and knowingly aided and abetted the Sackler Families, and the Purdue-Related Additional Defendants, to structure their personal affairs and the personal and business organizations they beneficially owned and controlled in such a way as to attempt to evade personal liability for the wrongdoing in which he knew they had engaged and in which he knew they intended to continue to engage.

542. The allegations herein are brought against the above Defendants both in their individual capacities and in their capacities as trustees.

543. The Sackler Families are the sole beneficial owners of Purdue and its associated companies. All of Purdue's and its associated companies' profits go to Sackler-family trusts and entities.

544. The members of the board of Purdue were intimately involved in the activities of the entities that they managed, often on a weekly or even daily basis.

545. Purdue and the Sackler Families launched OxyContin with one of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by Arthur Sackler. They trained and armed a force of approximately 1,000 sales representatives with charts showing OxyContin's purported benefits. A major thrust of the sales campaign was that OxyContin should be prescribed not merely for the kind of severe short-term pain associated with surgery or for cancer pain but also for less acute, longer-lasting pain, such as arthritis, back pain, sports injuries, fibromyalgia. The number of conditions that OxyContin could treat seemed almost unlimited.

546. The training included "training in 'overcoming objections' from clinicians." "If a doctor inquired about addiction," the representative was instructed to respond thus: "'The delivery

system is believed to reduce the abuse liability of the drug.'" Another sales representative said that Purdue executives "told us to say things like it is 'virtually' non-addicting."

547. Purdue sales representatives were provided with studies and literature provided by other physicians. Purdue had a speakers' bureau through which it paid several thousand doctors to attend medical conferences and deliver presentations about OxyContin's merits. Doctors were offered all-expenses-paid trips to pain-management seminars in places like Boca Raton. Doctors who attended these seminars wrote OxyContin prescriptions more than twice as often as those who did not.

548. Purdue also advertised in medical journals and produced promotional videos featuring not just satisfied patients but also doctor's testimonials. The marketing of OxyContin relied on an empirical circularity: the company convinced doctors of the drug's safety with literature that had been produced by doctors who were paid, or funded, by the company.

549. According to a former OxyContin sales representative, Richard Sackler was "'the dude that made it happen.'" Richard Sackler himself was tireless in his dedication to OxyContin's success. When benefit plans began citing OxyContin abuse as an excuse not to pay, Richard Sackler sent an email to sales representatives stating that, for insurers, "'addiction' may be a convenient way to just say 'NO.'"

550. Members of the Sackler family were daily on site at Purdue's headquarters, controlling the management of their family-owned business and all its employees.

551. Richard Sackler is named as inventor on some 50 patents relating to oxycodone and other pain medications, including several patents apparently issued as late as 2016. Virtually all such patents invented by Richard Sackler were assigned to Purdue.

552. In 1997, both Richard and Kathe Sackler were part of a conspiracy to deceive physicians into believing that oxycodone was half as strong as morphine, when in fact the opposite was true; this deception was known by Purdue to ease the fears of well-meaning and careful physicians about prescribing OxyContin for non-cancer pain uses.

553. In the late 1990s Richard, Jonathan and Kathe Sackler participated in an unlawful attempt to deceive European drug regulators into classifying OxyContin as totally uncontrolled, i.e., capable of being obtained without a prescription, even though all of these family members were by then well aware of the abuse liability of the drug in the U.S.

554. In 2001, Kathe Sackler attended a talk given by the chief medical officer of Sikorsky Aircraft, in which the speaker expressed grave concern about the risks associated with OxyContin; instead of acknowledging this fact to the medical officer, Kathe Sackler remained silent and returned to the Purdue headquarters, where employees were directed to find ways to undercut and deflect the Sikorsky medical officer's concerns.

555. In the period around 1999-2003, Purdue developed a method to cause company emails to self-destruct at a pre-determined time; this was an attempt to create a system where potentially incriminating documents would automatically self-destruct, even after receipt by unrelated third-parties. Richard, Jonathan and Kathe Sackler all were directly aware and supportive of this project.

556. That prescription opioids would lead to addiction, and specifically that OxyContin could be, and was being, abused has been known to Purdue and to the members of the Sackler Families since at least the summer of 1999.

557. In summer of 1999, a Purdue sales representative wrote to the President of Purdue reporting widespread abuse of OxyContin. As a result of that memo, a secretary at Purdue, Maureen Sara, was tasked with doing research on the Internet to learn about the nature and scope of the abuse, specifically to learn about how recreational drug users were misusing OxyContin.

558. In order to carry out her assignment, Ms. Sara began visiting drug-user Internet "news groups" or "chat rooms" daily. Two groups in particular that Ms. Sara visited were alt.drugs and alt.drugs.hard. For a period, in the late summer and early fall of 1999, Ms. Sara would forward screen shots from these news groups on a daily basis to Howard Udell, then General Counsel of Purdue.

559. In October or November, 1999, Ms. Sara prepared a memo summarizing her research into misuse of OxyContin. The memo described how users would remove the coating on the OxyContin pills, crush them, and snort or shoot them. Ms. Sara sent the memo containing the details of OxyContin abuse by drug users not only to the President of Purdue and to its General Counsel, but also to Purdue's then-medical director, and directly to members of the Sackler Families involved in the management of the company, including Richard Sackler, Jonathan Sackler, and Kathe Sackler.

560. Purdue, Richard Sackler, Jonathan Sackler, and Kathe Sackler were thus all aware of the risk and abuse potential and reality of OxyContin long before Purdue acknowledged the same to government, the healthcare community or the public. In sworn testimony before the U.S. House of Representatives in 2001, Purdue President Michael Friedman, in the presence of Purdue General Counsel Howard R. Udell, swore that the first the companies knew of widespread abuse of OxyContin was in the year 2000. This was, of course, patently inconsistent with what the members of the Sackler Families knew from the Sara memo they had received in 1999. No

member of the Sackler Families at any time tried to correct the false narrative promulgated far and wide about the abuse liability of OxyContin, nor corrected the false statement about when Purdue became aware of this problem with the drug.

561. Richard Sackler, Kathe Sackler, Jonathan Sackler, Theresa Sackler, Mortimer D.A. Sackler, and Ilene Sackler have been aware since at least 1999 of potential liability for Purdue and those acting in concert with Purdue. With the intention of shielding from creditors the proceeds of their wrongdoing, they have stripped out of Purdue and the Purdue-related Defendants hundreds of millions of dollars of profits from the sales of OxyContin and other opioid-containing medications, including a generic form of OxyContin sold by Rhodes Pharma. All such transfers were and are fraudulent within the meaning of applicable fraudulent transfer statutes and case law; all such transfers unjustly enriched the recipients; and all such transferred funds should be clawed back from the Sackler Defendants in order to satisfy the opioid-related liabilities of the companies from which they were transferred.

562. The Sackler's continued to oversee Purdue's wrongdoing even after being fined and warned about their conduct. From 2001 to 2007, Purdue was investigated by 26 states and the U.S. Department of Justice. Beginning in or about 2003, advised by Baker, who served as legal counsel to the entire Purdue organization and the Sackler Families, all of the Sackler's who served as executive officers of Purdue resigned out of concern that they might be held personally liable for conduct on behalf of Purdue in which they had previously engaged and in which they expected and intended to continue to engage after their respective resignations.

563. In 2007, PF Co. agreed to pay nearly $700 million and pleaded guilty to a felony for misleading doctors and patients about opioids. Purdue admitted that its supervisors and employees, "with the intent to defraud or mislead, marketed and promoted OxyContin as less

addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." At the same time, Purdue executive officers Michael Friedman (the CEO), Howard Udell (Vice President and General Counsel), and Paul Goldenheim (Chief Medical Officer) pleaded guilty to criminal charges that they let Purdue deceive doctors and patients about its opioids.

564. As part of the plea agreement in 2007, Purdue agreed to a detailed Corporate Integrity Agreement with the U.S. government. The Agreement required Purdue to appoint a Compliance Officer who would "be a member of senior management of Purdue," "make periodic (at least quarterly) reports regarding compliance matters directly to the Board of Directors," and "be authorized to report on such matters to the Board of Directors at any time." The Corporate Integrity Agreement was built on the idea that the directors would ensure that Purdue never deceived doctors and patients again.

565. The Corporate Integrity Agreement included the directors as "Covered Persons" from 2007 through 2012. All Covered Persons, including the directors and CEO, were required to comply with rules that prohibit deception about Purdue opioids. The directors were required to undergo hours of training to ensure that they understood the rules. The directors were required to report all violations of the rules. The directors were warned that they could face consequences if they failed to comply with the rules. The directors certified that they had read and understood the rules and would comply with them.

566. The directors were aware of their obligations under the Corporate Integrity Agreement because in 2009 Purdue had to report to the Inspector General of the U.S. Department of Health and Human Services that it had not immediately trained a new director on the Agreement. Purdue reported: "a new Director was appointed to Purdue's Board of Directors, without timely

notice to either Corporate Compliance or the Office of General Counsel, as otherwise required by policy, resulting in failure to timely launch the training assignment to this new Board member." Purdue assured the U.S. government that it had trained the new director: "Relevant personnel were reminded of existing policy to notify Corporate Compliance and the Office of General Counsel of changes to the Board of Directors. In both instances, these individuals completed their training assignments within 1 day of Corporate Compliance learning of this issue." Purdue promised the government that the director's training had addressed "the proper methods of promoting, marketing, selling, and disseminating information about Purdue's products," so Purdue would never deceive doctors and patients again.

567. Every year since the 2007 guilty plea and Corporate Integrity Agreement, Purdue's directors received warning signs about Purdue's ongoing misconduct and opportunities to stop it.

568. In 2008, more Americans died from opioid overdoses than ever before.

569. In 2009, the American Journal of Public Health published an article about Purdue's opioid marketing entitled, "The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy." The article detailed Purdue's use of sales representatives, targeting of high-prescribers, and deception about addiction. That same year, CDC reported that deaths from opioids had recently tripled.

570. In 2010, Time magazine published a story about Purdue's opioids entitled, "The New Drug Crisis: Addiction by Prescription." Overdoses were the leading cause of accidental death in 15 states. By the spring of 2010, Purdue's directors had been told that Purdue could not get product liability insurance to cover OxyContin.

571. In 2011, the White House announced that prescription drug abuse was the nation's fastest-growing drug problem and called for "educating healthcare providers about prescription

drug abuse … so they will not over-prescribe[.]" The CDC announced that prescription opioid overdoses had reached epidemic levels and called out Purdue's opioids by name. That same year, Fortune magazine interviewed Purdue executives, including Vice President Alan Must. Fortune published a story about Purdue, the Sackler Families, and evidence that they profited from opioid addiction. Mr. Must admitted that Purdue was "well aware" of concerns about its conduct: "We are well aware of detractors. For those individuals who think we're evil … I don't think there's anything we can do that is going to change their opinion."

572. In 2012, the U.S. Senate launched an investigation into whether Purdue was deceiving doctors and patients about opioids. In a letter to the CEO of Purdue, the Senators warned of "an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers." The Senate letter warned Purdue specifically of the danger of patients taking higher doses: "over the last decade, the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks while data suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses." The Senate letter also warned about Purdue misleading doctors and patients: "There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic by promoting misleading information about the drugs' safety and effectiveness." The Senate put the directors on notice that they were under scrutiny, demanding that Purdue produce to investigators a set of "presentations, reports, and communications to Purdue's management team or board of directors from 2007 to the present."

573. In 2013, the Los Angeles Times revealed that Purdue had been compiling a list for the past decade of 1,800 doctors suspected of recklessly prescribing its opioids, but Purdue had reported only 8% of them to authorities. Purdue attorney Robin Abrams gave multiple interviews

to the newspaper. Abrams was a Vice President of Purdue, and she had signed Purdue's 2007 settlement agreement. In 2013, she admitted that Purdue had the list, and said Purdue would not agree to disclose it to authorities because, "I don't really want to open up an opportunity for folks come in here and start looking and second-guessing."

574. Abrams and Purdue's directors knew they had reason to fear scrutiny. The state of Kentucky was prosecuting a lawsuit against Purdue for deceiving doctors and patients about opioids. Purdue's lawyers surveyed residents who could be on the jury. One-third knew someone who overdosed or was seriously hurt taking a Purdue opioid, and 29 percent knew someone who died. Purdue itself filed those statistics in court.

575. In 2014, Edward Mahony, the Executive Vice President, CFO, and Treasurer of Purdue stated that the Kentucky lawsuit was so significant that it could "jeopardize Purdue's long-term viability." That same year, the Governor of Massachusetts declared the opioid crisis a public health emergency.

576. In 2016, the CDC published the CDC Guideline for Prescribing Opioids for Chronic Pain to try to stop dangerous opioid prescribing.

577. In 2017, the President of the United States declared the opioid crisis a national public health emergency.

578. PPI's directors knew or should have known about these warnings and many others.

579. The directors knew about, allowed, and directed Purdue's deception. They oversaw Purdue's scheme to send sales representatives to visit doctors thousands of times. They oversaw Purdue's scheme to hire top prescribers to promote its opioids. They oversaw Purdue's effort to get more patients on higher doses of opioids for longer periods. They were aware of, allowed and directed the content of the messages conveyed in Purdue's marketing.

580. The directors of PPI controlled PPLP. The quarterly reports distributed to the directors of PPI demonstrate that the directors in fact controlled both PPI and PPLP. The reports and minutes make clear that the directors of PPI were kept fully informed of the activities of Purdue in the areas "Finance," "Sales & Marketing," "Manufacturing & Supply Chain," "Quality," "Research & Development," "Discovery Research," "Licensing & Business Development," "Corporate Compliance," "External Affairs," "Health Policy," "Human Resources," and "Information Technology" — all of which were overseen by the directors.

581. The directors oversaw Purdue's sales representatives. Richard Sackler testified that the sales representatives were the main way that Purdue promoted its opioids. He testified that the key to getting doctors to prescribe and keep prescribing Purdue opioids was regular visits from the sales force. The board tracked the exact number of sales representatives and the exact number of visits they made to urge doctors to prescribe Purdue opioids. The board knew which drugs were promoted; how many visits sales representatives averaged per workday; how much each visit cost Purdue; and the company's plan for sales visits in each upcoming quarter. The Board approved specific plans to hire new sales representatives, hire and promote new District and Regional managers, and create sales "territories" in which representatives would target doctors.

582. The directors oversaw the tactics that sales representatives used to push opioids. A board report analyzed a Purdue initiative to use iPads during sales visits, which increased the average length of the sales meeting with the doctor to "16.7 minutes in front of the customer."

583. The directors oversaw promotional claims that representatives presented to doctors during sales visits. They received reports, for example, that a "review of call notes" recorded by Purdue sales representatives "suggested potential comparative claims of superiority of Purdue products relative to competitors," and deceptive promotion of opioids as treatment for "minor

pain," including hundreds of examples of deceptive marketing that required "extensive remedial actions."

584. The directors oversaw Purdue's research, including research that contradicted its marketing. The board received reports about studies of Purdue opioids in "opioid-naïve" patients and patients with osteoarthritis, down to the details of the strategy behind the studies and the enrollment of the first patients.

585. The directors oversaw Purdue's improper response to signs of "abuse and diversion" by high-prescribing doctors. The board was told exactly how many "Reports Of Concern" Purdue sales representatives submitted to the company about doctors they visited to promote opioids (572 Reports Of Concern in the July 2007 board report); and how many "field inquiries" Purdue had decided to conduct in response to the reports (21 inquiries in response to 572 Reports Of Concern).

586. The directors even monitored sales representatives' emails. Purdue held thousands of face-to-face sales meetings with doctors, but the company prohibited its sales representatives from writing emails to doctors, which could create evidence of Purdue's misconduct. When Purdue found that some sales representatives had emailed doctors, the company conducted an "investigation" and reported to the board that sales representatives had been disciplined and that their emails would be discussed at the board meeting.

587. The directors also oversaw Purdue's strategy to pay high prescribers to promote Purdue opioids. A report for the board listed the exact number of conferences and dinner meetings, with attendance figures, and assured the directors: "We are tracking the prescribing trends of these attendees following the programs and will report the results in future reports." The board was told the amounts paid to certain doctors, and they received detailed reports on the Return on

Investment that Purdue gained from paying doctors to promote its drugs. The board was told that Purdue would allow a "spending limit for gifts" of $750 per doctor per year; and that the directors should personally report when they gave money, meals, or gifts to doctors to promote Purdue drugs. The board was told explicitly that paying doctors to promote opioids was "a high risk activity, in view of the potential for off-label or other improper promotional conduct by third parties during such activities." When Congress required disclosure of drug company payments to doctors, the board was told there were "significant compliance implications" for Purdue.

588. The directors also oversaw Purdue's strategy to push patients to higher doses of opioids — which are more dangerous, more addictive, and more profitable. The board routinely received reports on Purdue's efforts to push patients to higher doses. A report alerted the board that "Net sales of the 40 and 80 mg strengths of OxyContin" had fallen below Purdue's targets in the fall of 2010 and were $85 million below budget. By summer, the board learned that income was $500 million below budget "mainly due to declining sales in 40 mg and 80 mg strengths. By fall, the board reviewed an assessment that Purdue had lost more than $800 million in revenue because patients weren't taking enough 40 mg and 80 mg doses. The board dug into the issue. Multiple reports to the board identified as a "threat" an initiative by public health authorities to save lives by requiring doctors to consult with pain specialists before prescribing opioid doses higher than 80mg/day. The CEO and directors oversaw Purdue's effort to push back against that public health initiative. Executives were pleased to report to the directors in 2013 that "initiatives to validate increased total daily doses are having impact in the field."

589. The directors also oversaw Purdue's scheme to use higher doses of opioids to keep patients on drugs for longer periods of time. The board received detailed reports of how many patients stayed on Purdue's opioids for long periods (for example, longer than 35 days), along

with Purdue's internal research showing that getting patients on higher doses keeps them on the drugs longer — all of which puts patients at greater risk of addiction and death. The board received the confidential results of a study of 57,000 patients that Purdue performed explicitly to determine how opioid dose "influences patient length of therapy." The results showed that patients on the highest doses "are the most persistent." The "Recommended Actions" presented to the board included "additional workshops for the sales force" and "specific direction" to the sales representatives about using higher doses to keep patients on drugs longer.

590. The board was told in writing that encouraging higher doses "is a focal point of our promotion," and that sales representatives would "emphasize the importance" of increasing patients' opioid doses, as soon as 3 days after starting treatment. The board even tracked specific sales materials, such as "two new patient profiles designed to improve patient identification and titration" – to get more opioid-naïve and elderly patients on higher doses of opioids for longer periods of time. The board was told the exact research behind the sales strategy: higher doses would keep patients on drugs longer because Purdue had found that "83% of patients who discontinued were never titrated to higher doses." The directors knew or should have known that Purdue's sales strategy was deceptive and that putting patients on opioids at higher doses and for longer periods increased the risk of addiction, overdose, and death.

591. The directors also oversaw Purdue's strategy of using "savings cards" to get patients on Purdue opioids for longer periods. The board knew how many thousands of cards were used each quarter, how the company calculated the Return On Investment, and that the explicit goal of the program was to hook patients to "remain on therapy longer."

592. The directors also oversaw Purdue's strategy to target prescribers who did not have special training in opioids (primary care doctors, nurse practitioners, and physician assistants)

because they "show the highest responsiveness" to Purdue's sales push. Purdue continued that strategy even though the DEA had expressed concern that Purdue was promoting opioids to clinicians who were not adequately trained in pain management. The directors also oversaw Purdue's strategy to target elderly patients by promotion "targeted to HCPs that practice in the long term care setting," even down to the details of advertising that "leverages images of older patients." The directors knew or should have known that Purdue's sales strategy was deceptive and that targeting primary care doctors and elderly patients increased the risk of addiction, overdose, and death.

593. The directors also oversaw Purdue's push to steer patients away from safer alternatives. They tracked the company's effort to emphasize "the true risk and cost consequence of acetaminophen-related liver toxicity." The board even oversaw Purdue's deceptive websites, and received reports about the specific section that was found to be deceptive by the New York Attorney General.

594. The directors also oversaw Purdue's response to signs that patients were being harmed. Reports of harm came in by the hundreds and even thousands. One board report explained that "in excess of 5,000 cases with alleged adverse events have already been received and processed by Drug Safety and the Litigation Support group" during a single quarter.

595. Each of the reports described above was sent to every Sackler Defendant on the board at the time they were prepared. Stuart Baker also received all the reports described above.

596. Plaintiff brings claims against the Sackler's both in their individual capacity and in their capacity as trustees.

**7. Dramatic Rise in Opioid Addiction**

597. A recent study found that between 2010 and 2016 alone, the rate of opioid addiction in the United States increased by 493%.[230]

### 8. Overdose deaths

598. In 2011, a statement by the CDC noted that the death toll from overdoses of prescription opioids had more than tripled in the past decade.

599. Prescription opioids account for approximately 70% of fatal prescription drug overdoses.[231]

600. Ninety-one Americans die every day from an opioid overdose.[232]

601. The N.Y. Times reports, "The current opioid epidemic is the deadliest drug crisis in American history. Overdoses, fueled by opioids, are the leading cause of death for Americans under 50 years old — killing roughly 64,000 people [per] year, more than guns or car accidents…"[233] "If nothing is done, we can expect a lot of people to die: A forecast by STAT concluded that as many as 650,000 people will die over the next 10 years from opioid overdoses — more than the entire city of Baltimore. The US risks losing the equivalent of a whole American city in just one decade."[234]

602. For every fatal opioid overdose, there are approximately 30 nonfatal overdoses.[235] These nonfatal overdoses require prompt medical intervention by first responders and emergency treatment at hospitals. Typically, the initial treatment at the scene of the overdose is the

---

[230] Nadia Kounang, Opioid addiction rates continue to skyrocket, CNN (June 29, 2017), http://cnn.it/2sW83DJ.

[231] Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple Cause of Death 19992013 on CDC WONDER Online Database, released 2015. 2015. Available at: http://wonder-cdc.gov/mcdicd10.html.

[232] CDC, Opioid Overdose: Opioid Basics: Understanding the Epidemic, https://www.cdc.gov/drugoverdose/epidemic/index.html.

[233] Maya Salam, The Opioid Epidemic: A Crisis Years in the Making, N.Y. TIMES (Oct. 26, 2017), http://nyti.ms/2zJXHr7.

[234] German Lopez, The opioid epidemic, explained, VOX (Dec. 21, 2017), http://bit.ly/2wpP8jp.

[235] Frazier W, et al., Medication-Assisted Treatment and Opioid Use Before and After Overdose in Pennsylvania Medicaid, JAMA (Aug. 22, 2017), 318(8):750-752.

administration of naloxone or Narcan, which blocks the effects of an opioid overdose, giving the first responders time to get the patient to a hospital. The rates of hospitalization due to opioid overdose have increased dramatically in the U.S. from 1993 to 2012, growing from 116.7 inpatient stays per 100,000 people to 295.6 inpatient stays per 100,000, an increase of 153%.[236]

603. Alarmingly, even after a nonfatal overdose, opioids continue to be prescribed. For example, a 2000-2012 study[237] reported high rates of opioid prescribing for patients even after they had sustained a nonfatal opioid overdose.

**9. Increased heroin addiction and overdose**

604. Opioids are a gateway to heroin use. The CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are forty times more likely to become addicted to heroin.[238]

605. The Pittsburgh Post-Gazette reports, "When Valerie Mack found her brother, Sammy, 50, dead on the floor of his bedroom, she knew that he likely wouldn't have found his way to heroin if he hadn't been injured months earlier in a motorcycle accident and been prescribed [opioid] painkillers."[239] The Post-Gazette notes, "The heroin problem wouldn't be one-tenth as bad if we hadn't primed the pump with prescription opioids."[240]

606. Prescription opioids are pharmacologically similar to heroin, and people who get hooked on opioids often switch to the cheaper drug, heroin, as their addiction becomes harder to fund. "Research suggests that misuse of [prescription opioid] drugs may open the door to heroin use.

---

[236] Owens, P. L., M. L. Barrett, A. J. Weiss, et al. 2014. Hospital inpatient utilization related to opioid overuse among adults, 1993–2012 (Statistical Brief #177). http://www.hcup-us.ahrq.gov/reports/statbriefs/sb177Hospitalizations-for-Opioid-Overuse.pdf.
[237] Larochelle MR, Liebschutz JM, Zhang F, et al., Opioid prescribing after nonfatal overdose and association with repeated overdose: a cohort study. Ann Intern. Med. (2016), 164(1):1-9.
[238] See Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Today's Heroin Epidemic, https://www.cdc.gov/vitalsigns/heroin/index.html (last updated July 7, 2015).
[239] Lord, supra note 128.
[240] *Id.*

Nearly 80 percent of Americans using heroin (including those in treatment) reported misusing prescription opioids first."[241]

607. The number of heroin users in the United States increased by 145% from 2007 to 2014.[242] Heroin overdoses in the U.S. quintupled from 2000 to 2014.[243]

**10. Increased prevalence of needle-borne illnesses (HIV, Hepatitis)**

608. People who abuse prescription opioids are 40 times more likely than the general population to use an injectable for either a synthetic opioid or heroin.[244]

609. On January 23, 2015, the Indiana Department of Health began investigating an outbreak of HIV in one of the state's rural community.[245] The investigation found that the majority of HIV cases were due to residents of the community sharing syringes when injecting the prescription opioid oxymorphone.

610. Needle-sharing can spread not only HIV, but also Hepatitis C. Data from the last 10 years reveals a nationwide increase in Hepatitis C infection among young adults.[246] In May 2017, the CDC released data showing that new Hepatitis C infections have nearly tripled in the past 5 years, largely as a result of opioid-related injection drug use.[247]

> "These new infections are most frequently among young people who transition from taking prescription pills to injecting heroin, which has become cheaper and more easily available in some cases…[I]n turn many -- most, in some community -- people who

[241] National Institute of Drug Abuse, Heroin (July 2017), http://bit.ly/1NpA0Ij.
[242] Center for Behavioral Health Statistics and Quality. 2014 National Survey on Drug Use and Health: detailed tables. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2015.
[243] CDC, Wide-ranging Online Data for Epidemiologic Research (WONDER), Multiple-Cause-of-Death file, 20002014. 2015, http://bit.ly/1Z1ZFdF.
[244] Jones CM, Heroin use and heroin use risk behaviors among nonmedical users of prescription opioid pain relievers—United States, 2002–2004 and 2008–2010. Drug Alcohol Depend. (2013), 132:95–100, https://doi.org/10.1016/j.drugalcdep.2013.01.007.
[245] Community Outbreak of HIV Infection Linked to Injection Drug Use of Oxymorphone — Indiana, 2015, CDC (May 1, 2015), https://www.cdc.gov/mmWr/preview/mmwrhtml/mm6416a4.htm.
[246] Theresa Watts, MPH, et al., Increased Risk for Mother-to-Infant Transmission of Hepatitis C Virus Among Medicaid Recipients, Morbidity and Mortality Weekly Reports, CDC (Oct. 27, 2017), http://bit.ly/2lhn79Z.
[247] https://www.cdc.gov/mmwr/volumes/66/wr/mm6618a1.htm?s_cid=mm6618a1_w.

inject drugs become infected with hepatitis C," according to the CDC's study lead author, Dr. John Ward.[248]

611. Hepatitis C commonly infects and replicates inside the liver. Up to 70% of people infected with Hepatitis C will develop chronic liver disease.[249]

**11. Increase in asthma-related ER visits and deaths**

612. Opioids depress the central nervous system, so large doses can substantially slow users' breathing rates. Overdose deaths from opioids often result from the person becoming so sedated that they can no longer regulate their own breathing.

613. Because people with asthma already struggle to get enough oxygen, opioids can exacerbate asthma symptoms.

614. Opioid-addicted patients with asthma are 600% more likely to be admitted to an emergency room for respiratory problems than non-addicted asthma sufferers.[250] In one study of inner-city patients admitted to an intensive care unit for asthma-related breathing problems, 56% of admissions appeared to be associated with opioid use.[251]

**12. Addiction and death in children**

615. Women who become pregnant while addicted to opioids find it difficult to stop taking the drug. Their babies are often born physically addicted to opioids. Every 25 minutes, an opioid addicted baby is born in America.[252]

616. While millions of opioid addicted adults around the nation avoid quitting cold- turkey

---

[248] *Id.*
[249] CDC, Hepatitis C FAQs for Health Professionals, http://bit.ly/2prWZyr.
[250] *Id.*
[251] Krantz A.J., Hershow R.C., Pruchand N., et al: Heroin insufflation as a trigger for patients with life-threatening asthma. Chest 2003; 123: pp. 510-517
[252] National institute of Drug Abuse. Dramatic Increases in Maternal Opioid Use and Neonatal Abstinence Syndrome, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/dramatic-increases-in-maternalopioid-use-neonatal-abstinence-syndrome (last visited Feb. 21 2018).

because of the intense withdrawal effects, newborn babies are left without that option. They are forced to endure painful, debilitating and, at times, life-threatening opioid withdrawal symptoms. These symptoms are known as "neonatal abstinence syndrome," which occurs in up to 94% of newborns whose mothers were addicted to or treated with opioids while pregnant.[253] [254]

617. The pain infants experience from neonatal abstinence syndrome is intense. "It's a panicked, high-pitched wail, almost desperate, a sound you don't forget," says Kimberly Nelson, a nurse in an intensive care unit, describing the cries of infants experiencing withdrawal.[255] Infants with neonatal abstinence syndrome are at increased risk for admission to the neonatal intensive care unit,[256] birth complications,[257] the need for pharmacologic treatment,[258] and a prolonged hospital stay.[259]

619. Prolonged hospitalization results in the use of a greater portion of health care resources for the care of infants with the neonatal abstinence syndrome[260] than for those without the syndrome. In 2012, a normal infant with no birth complications stayed in the hospital an average of 2.1 days, with a cost of $3,500, whereas an infant with neonatal abstinence syndrome had an

---

[253] Finnegan LP, Connaughton JF Jr, Kron RE, Emich JP, Neonatal abstinence syndrome: assessment and management, Addict. Dis. (1975), 2:141-158.

[254] Hudak ML, Tan RC, Committee on Drugs, Committee on Fetus and Newborn, Neonatal drug withdrawal. Pediatrics (2012), 129:e540-60.

[255] Duff Wilson and John Shiffman, Newborns die after being sent home with mothers struggling to kick drug addictions, REUTERS (Dec. 7, 2015), http://www.reuters.com/investigates/special-report/baby-opioids/.

[256] Tolia VN, Patrick SW, Bennett MM, et al., Increasing incidence of the neonatal abstinence syndrome in U.S. neonatal ICUs, N. ENGL. J. MED. (2015), 372:2118-2126; Uebel H, Wright IM, Burns L, et al, Reasons for rehospitalization in children who had neonatal abstinence syndrome, Pediatrics (2015), 136:e811-20. Cleary BJ, Donnelly JM, Strawbridge JD, et al., Methadone and perinatal outcomes: a retrospective cohort study, AM. J. OBSTET. GYNECOL. (2011), 204:139.e1-139.e9.

[257] Patrick SW, Davis MM, Lehmann CU, Lehman CU, Cooper WO, Increasing incidence and geographic distribution of neonatal abstinence syndrome: United States 2009 to 2012, J. Perinatol (2015), 35:650-655.

[258] Tolia VN, Patrick SW, Bennett MM, et al., supra note 246; Jansson LM, Velez ML, Infants of drug-dependent mothers, Pediatr. Rev. (2011), 32:5-12.

[259] Lee J, Hulman S, Musci M Jr, Stang E, Neonatal abstinence syndrome: influence of a combined inpatient/outpatient methadone treatment regimen on the average length of stay of a Medicaid NICU population, Popul. Health Manag. (2015), 18:392-397; Wachman EM, Newby PK, Vreeland J, et al., The relationship between maternal opioid agonists and psychiatric medications on length of hospitalization for neonatal abstinence syndrome, J. ADDICT. MED. (2011), 5:293-299.

[260] Patrick SW, Schumacher RE, Benneyworth BD, Krans EE, McAllister JM, Davis MM, Neonatal abstinence syndrome and associated health care expenditures:, United States, 2000-2009, JAMA (2012), 307:1934-1940.

average hospital stay of 16.9 days, with a cost of $66,700.[261] Aggregate hospital charges for all infants with neonatal abstinence syndrome in 2012 were estimated to be $1.5 billion; approximately 80% was financed by Medicaid programs.[262]

### 13. Financial Burden of Opioid Addiction

620. The societal costs of prescription drug abuse are "huge."[263] In total, the economic burden of prescription opioid misuse is $78.5 billion per year, including lost productivity, increased healthcare costs, addiction treatment costs, and increased criminal justice expenditures.[264] The aggregate societal cost of the associated heroin epidemic is $50 billion per year.[265]

### 14. Opioid Epidemic & Impact Upon Plaintiff

621. The abuse of prescription and non-prescription opioids that is a direct and foreseeable consequence of Defendants' conduct is a public health crisis in Florida.

622. In 2010, Florida providers wrote 89.7 opioid prescriptions per 100 people.[266]

623. Treatment centers in Florida have been inundated with heroin and opioid abuse cases.

624. Significant gaps between treatment need and capacity exist at the state and national levels.

Due to Defendants MAT marketing, there is a move to Expand Opioid Addiction-Medication Assisted Treatment. ("OA-MAT"). Congress passed the Drug Addiction Treatment Act of 2000, which permits qualified physicians to request a waiver (referred to in this article as a DATA

---

[261] Patrick SW, Davis MM, Lehmann CU, Cooper WO, Increasing incidence and geographic distribution of neonatal abstinence syndrome: United States 2009 to 2012, J. Perinatol (2015), 35:650–5, https://doi.org/10.1038/jp.2015.36.
[262] *Id.*
[263] See Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., Cardinal Health, Inc. v. United States Dept. Justice, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *10 [hereinafter Brief of HDMA].
[264] Id. (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, MED CARE (2016), 54(10):901-906, doi:10.1097/MLR.0000000000000625).
[265] Brian Snyder, Heroin Addiction Costs Us More Than $50 Billion Per Year, NEWSWEEK (June 17, 2017), http://bit.ly/2tGo8eg.
[266] https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/florida-opioid-summary

waiver) from the Controlled Substances Act to treat opioid addiction outside of an Opioid Treatment Program ("OTP"). Specifically, the law allows physicians to request a DATA waiver from the Substance Abuse and Mental Health Services Administration (SAMHSA) to prescribe certain Schedule III–V opioids approved by the US Food and Drug Administration for the treatment of opioid addiction. The Drug Enforcement Administration then assigns separate registration numbers to identify DATA-waived physicians. These physicians can initially prescribe to as many as 30 patients and has recently expanded the waiver to 100 patients per physician. [267]

625. Patient advocacy organizations and professional societies play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public. Even small organizations with "their large numbers and credibility with policymakers and the public"—have "extensive influence in specific disease areas."[268]

626. Nearly all health advocacy groups accept funding from the pharmaceutical industry. According to a recent study from PharmedOut—a Georgetown University Medical Center project focused on pharmaceutical marketing practices—only "a handful of 7,865 health advocacy groups in the U.S. are completely independent of pharmaceutical industry money." 8 As a result, "[t]he voices of independent groups that truly represent patients and consumers are

[267] Jones, C. M., Campopiano, M., Baldwin, G., & McCance-Katz, E. (2015). National and State Treatment Need and Capacity for Opioid Agonist Medication-Assisted Treatment. *American journal of public health*, *105*(8), e55–e63. doi:10.2105/AJPH.2015.302664

[268] https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-Exposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20Third%20Party%20Advocacy%20Groups.pdf

drowned out by the thousands of groups that take money from industry and push industry viewpoints."[269]

626. Neither pharmaceutical manufacturers nor advocacy groups fully or routinely disclose the extent of their financial relationships. In a special report published in the New England Journal of Medicine in March 2017, for example, researchers found that out of 104 organizations, "at least 83% received financial support from drug, device, and biotechnologies companies, and at least 39% have a current or former industry executive on the governing board." Full disclosure of these payments was limited, with only 57% of organizations disclosing amounts of donations; even then, this disclosure "was typically done with the use of broad ranges rather than exact figures." Moreover, only 12% of the organizations researchers examined "have published policies in place for managing institutional conflicts of interest.[270]

627. These financial relationships—and the lack of transparency surrounding them—have raised concerns regarding the information and initiatives patient advocacy organizations promote. In the JAMA study discussed above, 8% of respondents in the study "reported [that] pressure to conform their organizations' positions to the interests of industry funders is of concern."[271]

Without additional disclosure, "policy makers or patients are unable to make informed judgments about the motives of the information being given, and the credibility of the information.[272]

628. Between January 2012 and March 2017, five opioid manufacturers, Purdue Pharma L.P., Janssen Pharmaceuticals, Inc., Mylan N.V., Depomed, Inc., and Insys Therapeutics, Inc.,

---

[269] *Id.*
[270] *Id.*
[271] *Id.*
[272] *Id.*

contributed nearly $9 million to leading patient advocacy organizations and professional societies operating in the opioids policy area. For some groups, contributions from these manufacturers—alone—constituted significant portions of their total annual contributions and grants. Additionally, these five manufacturers also made substantial payments to individual group executives, staff members, board members, and advisory board members. Physicians affiliated with these groups accepted more than $1.6 million in payments from these five manufacturers. These same individuals received payments totaling over $10 million from all opioid manufacturers during this time period.[273]

629. Purdue, Janssen, Mylan, Depomed, and Insys provided at least $8,856,339.13 in funding to 14 outside groups working on chronic pain and other opioid-related issues between January 2012 and March 2017. Detailed information on these payments, including payment totals for each manufacturer and group and the contributions applicable to each relationship, appears below in Figure 1.[274]

FIGURE 1: Manufacturer Payments to Selected Groups, 2012-2017

| | Purdue 22 | Janssen 23 | Depomed | Insys | Mylan | Total |
|---|---|---|---|---|---|---|
| Academy of Integrative Pain Management | $1,091,024.86 | $128,000.00 | $43,491.95 | $3,050.00 24 | $0.00 | $1,265,566.81 |
| American Academy of Pain | $725,584.95 | $83,975.00 | $332,100.00 | $57,750.00 | $0.00 | $1,199,409.95 |

[273] *Id.*
[274] *Id.*

| | | | | | | |
|---|---|---|---|---|---|---|
| Medicine | | | | | | |
| AAPM Foundation | $0.00 | $0.00 | $304,605.00 | $0.00 | $0.00 | $304,605.00 |
| ACS Cancer Action Network | $168,500.00 [25] | $0.00 | $0.00 | $0.00 | $0.00 | $168,500.00 |
| American Chronic Pain Association | $312,470.00 | $50,000.00 | $54,670.00 | $0.00 | $0.00 | $417,140.00 |
| American Geriatrics Society | $11,785.00 [26] | $0.00 | $0.00 | $0.00 | $0.00 | $11,785.00 |
| American Pain Foundation | $25,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $25,000.00 |
| American Pain Society | $542,259.52 | $88,500.00 | $288,750.00 | $22,965.00 | $20,250.00 | $962,724.52 |
| American Society of Pain Educators | $30,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $30,000.00 |
| American Society of Pain Management Nursing | $242,535.00 | $55,177.85 [27] | $25,500.00 [28] | $0.00 | $0.00 | $323,212.85 |
| The Center for Practical | $145,095.00 | $18,000.00 | $0.00 | $0.00 | $0.00 | $163,095.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Bioethics | | | | | | |
| The National Pain Foundation 29 | $0.00 | $0.00 | $0.00 | $562,500.00 | $0.00 | $562,500.00 |
| U.S. Pain Foundation | $359,300.00 | $41,500.00 | $22,000.00 | $2,500,000.00 30 | $0.00 | $2,922,800.00 |
| Washington Legal Foundation | $500,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $500,000.00 |
| | $4,153,554.33 | $465,152.85 | $1,071,116.95 | $3,146,265.00 | $20,250.00 | $8,856,339.13 |

630. The American Academy of Pain Medicine, a non-profit that received $1.1 million in Opioid Manufacturer donations, released treatment guidelines that included titration of Methadone and Oxycodone for pain management. Methadone is a "MAT" approved drug that has also been recommended for use as pain management in conjunction with opioids.[275]

631. These treatment guidelines recommend starting Methadone at 15 mg per day and titrating up to 50 mg per day. The treatment algorithm also recommended prescribing an immediate release Oxycodone 5 mg every four hours to be used in conjunction with the Methadone for pain management. The prescribing guideline includes a StopBANG scoring assessment to monitor for patients at risk of respiratory suppression during drug titration.[276] Completely absent from the treatment guidelines is a risk assessment for opioid abuse and objective symptoms of pain.

632. The FDA approved methadone for both the treatment of pain and Opioid Use Disorder ("OUD"). When prescribed for pain management, methadone is covered as a prescription drug

[275] https://painmed.org/uploads/clinician/methadone-for-pain-management-improving-clinical-decision-making.pdf
[276] *Id.*

benefit, and dispensed in a pharmacy like any other type of controlled substance. When used for OUD treatment, methadone coverage is paid only if dispensed by a specially licensed Opioid Treatment Program ("OTP"). [277]

633. Although Methadone has been used for years to treat heroin addiction, Methadone is still a drug that can be addictive when not taken as prescribed.[278]

634. The opioid manufacturers have applied for FDA approval and garnered the support of the FDA to approve the following "MAT" drugs to treat opioid addiction:

**a. FDA-approved buprenorphine products approved for the treatment of opioid dependence include:**

Bunavail (buprenorphine and naloxone) buccal film
Cassipa (buprenorphine and naloxone) sublingual film
Probuphine (buprenorphine) implant for subdermal administration
Sublocade (buprenorphine extended□release) injection for subcutaneous use
Suboxone (buprenorphine and naloxone) sublingual film for sublingual or buccal use, or sublingual tablet.
Subutex (buprenorphine) sublingual tablet
Zubsolv (buprenorphine and naloxone) sublingual tablets

**b. FDA-approved methadone products approved for the treatment of opioid dependence include:**

Dolophine (methadone hydrochloride) tablets
Methadose (methadone hydrochloride) oral concentrate

**c. FDA-approved naltrexone products approved for the treatment of opioid dependence include:**

Vivitrol (naltrexone for extended-release injectable suspension) intramuscular[279]

635. By continuing to push for a "pill cure" for opioid addiction, the manufacturing defendants have created a second wave of profits for the opioid addiction they created through the Opioid Enterprise.

---

[277] https://www.healthaffairs.org/do/10.1377/hblog20190418.164447/full/
[278] https://www.samhsa.gov/medication-assisted-treatment/treatment/methadone
[279] https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat

636. There are four treatment options for Opioid Addiction:

1. DETOX- Outpatient detox ranges from $1,000 to $1,500 in total. Most inpatient rehabs include detox in the cost of a program. The exact cost of detox depends on whether it's part of an inpatient program and the type of drug addiction being treated. Substances with dangerous detox side effects require more careful monitoring, making the price higher.

2. INPATIENT REHAB- Some inpatient rehabs may cost around $6,000 for a 30-day program. Well-known centers often cost up to $20,000 for a 30-day program. For those requiring 60- or 90-day programs, the total average of costs could range anywhere from $12,000 to $60,000.

3. OUPATIENT REHAB- Outpatient programs for mild to moderate addictions are cheaper than inpatient rehab. Many cost $5,000 for a three-month program. Some outpatient programs, such as the program at Hazelden Betty Ford, cost $10,000.

4. MEDICATION "MAT"- The type of treatment and medications needed affects the price tag on rehab. Some people don't need medication for their addiction. Medications most often treat alcohol and opiate addiction. It can cost several thousand dollars a year. Year-long methadone treatment for heroin users costs around $4,700.[280]

637. The push to move the profit center to MAT therapy, is favored by insurance companies based on pricing more so than results or patient safety.

638. A 2016 Centers for Disease Control and Prevention study estimated the national economic impact of prescription opioid overdoses, abuse, and dependence to be $78.5 billion dollars annually. The study broke down the distribution of this impact further:

• Lost Productivity: $42 billion (53.3%)

• Health Insurance: $26.1 billion (33.3%)

• Criminal Justice: $7.6 billion (9.7%)

• Substance Abuse Treatment: $2.8 billion (3.6%)

[280] https://www.addictioncenter.com/rehab-questions/cost-of-drug-and-alcohol-treatment/

639. Treatment providers, such as Plaintiff are forced to provide patient financing for those patients who lack adequate insurance coverage and need behavioral counseling and treatment beyond the MAT treatment protocols.

640. Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiff seeks relief. These damages have been suffered, and continue to be suffered, directly by the Plaintiff.

641. Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct by obtaining funding for counseling services in addition to appropriate non-addictive MAT treatment.

## DEFENDANTS CONSPIRED TO ENGAGE IN THE WRONGFUL CONDUCT COMPLAINED OF HEREIN AND INTENDED TO BENEFIT BOTH INDEPENDENTLY AND JOINTLY FROM THEIR CONSPIRACY

### A. Conspiracy Among Manufacturer Defendants

642. The Manufacturer Defendants agreed among themselves to set up, develop, and fund an unbranded promotion and marketing network to promote the use of opioids for the management of pain in order to mislead physicians, patients, health care providers, and health care payors through misrepresentations and omissions regarding the appropriate uses, risks, and safety of opioids, to increase sales, revenue, and profit from their opioid products.

643. This interconnected and interrelated network relied on the Manufacturer Defendants' collective use of unbranded marketing materials, such as KOLs, scientific literature, CMEs, patient education materials, and Front Groups developed and funded collectively by the Manufacturer Defendants intended to mislead consumers and medical providers of the appropriate uses, risks, and safety of opioids.

644. The Manufacturer Defendants' collective marketing scheme to increase opioid prescriptions, sales, revenues and profits centered around the development, the dissemination, and reinforcement of nine false propositions: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition dubbed "pseudo addiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

645. The Manufacturer Defendants knew that none of these propositions is true and that there was no evidence to support them.

646. Each Manufacturing Defendant worked individually and collectively to develop and actively promulgate these nine false propositions in order to mislead physicians, patients, health care providers, and healthcare payors regarding the appropriate uses, risks, and safety of opioids.

647. What is particularly remarkable about the Manufacturer Defendants' effort is the seamless method in which the Manufacturer Defendants joined forces to achieve their collective goal: to persuade consumers and medical providers of the safety of opioids, and to hide their actual risks and dangers. In doing so, the Manufacturer Defendants effectively built a new – and extremely lucrative – opioid marketplace for their select group of industry players.

648. The Manufacturer Defendants' unbranded promotion and marketing network was a wildly successful marketing tool that achieved marketing goals that would have been impossible to have been met by a single or even a handful of the network's distinct corporate members.

649. For example, the network members pooled their vast marketing funds and dedicated them to expansive and normally cost-prohibitive marketing ventures, such as the creation of Front Groups. These collaborative networking tactics allowed each Manufacturing Defendant to diversify its marketing efforts, all the while sharing any risk and exposure, financial and/or legal, with other Manufacturer Defendants.

650. One of the most disturbing tactics utilized by the Manufacturer Defendants' network was their unabashed mimicry of the scientific method of citing "references" in their materials. In the scientific community, cited materials and references are rigorously vetted by objective unbiased and disinterested experts in the field, scientific method, and an unfounded theory or proposition would, or should, never gain traction.

651. Manufacturer Defendants put their own twist on the scientific method: they worked together to manufacture wide support for their unfounded theories and propositions involving opioids. Due to their sheer numbers and resources, the Manufacturer Defendants were able to create a false consensus through their materials and references.

652. An example of the Manufacturer Defendants' utilization of this tactic is the wide promulgation of the Porter & Jick Letter, which declared the incidence of addiction "rare" for patients treated with opioids. The authors had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. These patients were not given long-term opioid prescriptions or provided opioids to administer to themselves at home, nor was it known how frequently or infrequently and in what doses the patients were given their narcotics. Rather, it appears the patients were treated with opioids for short periods of time under in-hospital doctor supervision.

653. Nonetheless, Manufacturer Defendants widely and repeatedly cited this letter as proof of the low addiction risk in connection with taking opioids in connection with taking opioids despite its obvious shortcomings. Manufacturer Defendants' egregious misrepresentations based on this letter included claims that less than one percent of opioid users became addicted.

654. Manufacturer Defendants' collective misuse of the Porter & Jick Letter helped the opioid manufacturers convince patients and healthcare providers that opioids were not a concern. The enormous impact of Manufacturer Defendants' misleading amplification of this letter is well documented.

655. By knowingly misrepresenting the appropriate uses, risks, and safety of opioids, the Manufacturer Defendants committed overt acts in furtherance of their conspiracy.

**B. Conspiracy Among Manufacturer and Distributor Defendants**

656. In addition, and on an even broader level, Manufacturer Defendants and Distributor Defendants took advantage of the industry structure, including end-running its internal checks and balance, to their collective advantage. Manufacturer Defendants and Distributor Defendants agreed among themselves to increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and supply of prescription opioids. These Defendants did so to increase sales, revenue, and profit from their opioid products.

657. The interaction and length of the relationships between and among Manufacturer Defendants and Distributor Defendants reflects a deep level of interaction and cooperation between Defendants in a tightly knit industry. Manufacturer Defendants and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. These Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

658. Manufacturer Defendants and Distributor Defendants collaborated to expand the opioid market in an interconnected and interrelated network in the following ways, including, for example, membership in the Healthcare Distribution Alliance.

659. Manufacturer Defendants and Distributor Defendants utilized their membership in the HDA and other forms of collaboration to form agreements about their approach to their duties under the CSA to report suspicious orders. These Defendants overwhelmingly agreed on the same approach – to fail to identify, report or halt suspicious opioid orders, and fail to prevent diversion. These Defendants' agreement to restrict reporting provided an added layer of insulation from DEA scrutiny for the entire industry as these Defendants were thus collectively responsible for each other's compliance with their reporting obligations. These Defendants were aware, both individually and collectively aware of the suspicious orders that flowed directly from Defendants' facilities.

660. Manufacturer Defendants and Distributor Defendants knew that their own conduct could be reported by other Defendants and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, they had an incentive to communicate with each other about the reporting or suspicious orders to ensure consistency in their dealings with DEA.

661. Manufacturer Defendants and Distributor Defendants also worked together to ensure that the opioid quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had not basis for refusing to increase or decrease production quotas due to diversion.

662. Defendants also conspired to violate their common law and statutory duties and committed overt acts in furtherance of their conspiracy.

663. The desired consistency, and collective end goal was achieved. Manufacturer Defendants and Distributor Defendants achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

## NO STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIMS

### A. **Continuing Conduct**

664. Plaintiff contends it continues to suffer harm from the unlawful actions by the Defendants.

665. The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants have not ceased. The public nuisance remains unabated. The conduct causing the damages continues.

### B. **Equitable Estoppel**

666. To the extent any statute of limitations defense would apply, Defendants are equitably estopped from relying upon such a defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public and the P.aintiff, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status and to continue generating profits. Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the State, the Plaintiff, and Plaintiff's community, that they were working to curb the opioid epidemic.

667. For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain and assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

678. Similarly, McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."

679. Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Opioid Distributors, through their trade associations, HDMA and NACDS, filed an amicus brief in Masters Pharmaceuticals, which made the following statements:[281]

a. "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

b. "DEA regulations that have been in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders)."

c. "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that is available to them in the ordering process."

d. "A particular order or series of orders can raise red flags because of its unusual size, frequency, or departure from typical patterns with a given pharmacy."

e. "Distributors also monitor for and report abnormal behavior by pharmacies placing orders, such as refusing to provide business contact information or insisting on paying in cash."

680. Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Opioid

[281] Brief for HDMA and NACDS, supra note 257, 2016 WL 1321983, at *3-4, *25.

Distributors not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

681. The Opioid Distributors have also concealed and prevented discovery of information, including data from the ARCOS database, that will confirm their identities and the extent of their wrongful and illegal activities.

682. The Opioid Manufacturers distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Opioid Manufacturers invented "pseudo addiction" and promoted it to an unsuspecting medical community.

683. Opioid Manufacturers provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. Opioid Manufacturers recommended to the medical community that dosages be increased, without disclosing the risks. Opioid Manufacturers spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The medical community and consumers were duped by the Opioid Manufacturers' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the State and in Plaintiff's community.

**D. Fraudulent Concealment**

684. The Plaintiff's claims are further subject to equitable tolling, stemming from Defendants' knowingly and fraudulently concealing the facts alleged herein. As alleged herein, Defendants knew of the wrongful acts set forth above, and had material information pertinent to their discovery, and concealed them from the Plaintiff, and Plaintiff's community. The Plaintiff did not know, or could not have known through the exercise of reasonable diligence, of its causes of action, as a result of Defendants' conduct.

685. The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where the Plaintiff filed suit promptly upon discovering the facts essential to their claims, described herein, which Defendants knowingly concealed.

686. In light of their statements to the media, in legal filings, and settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

687. Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, the Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

### 1. The Opioid Distributors Have Misrepresented their Compliance with their Legal Duties

688. The Opioid Distributors have repeatedly misrepresented their compliance with their legal duties under federal and State law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Opioid Distributors' compliance with their legal duties.

689. Opioid Distributors have refused to recognize any duty beyond reporting suspicious orders. In Masters Pharmaceuticals, the HDMA, a trade association run the Opioid Distributors, and the NACDS submitted amicus briefs regarding the legal duty of wholesale distributors. Inaccurately denying the legal duties that the wholesale drug industry has been tragically recalcitrant in performing, they argued as follows:

- The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to investigate orders (e.g., by interrogating pharmacies and physicians) and take action to halt suspicious orders before they are filled."[282]

- The Associations argued that, "DEA now appears to have changed its position to require that distributors not only report suspicious orders, but investigate and halt suspicious orders. Such a change in agency position must be accompanied by an acknowledgment of the change and a reasoned explanation for it. In other words, an agency must display awareness that it is changing position and show that there are good reasons for the new policy. This is especially important here, because imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications."[283]

- The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious."[284]

- The Association complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that DEA has complied with the APA before attempting to impose such duties."[285]

- The Associations alleged (inaccurately) that "DEA's regulations [] sensibly impose[] a duty on distributors simply to report suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders."[286]

- Also inaccurately, the Associations argued that, "[i]mposing a duty on distributors– which lack the patient information and the necessary medical expertise – to investigate and halt orders may force distributors to take a shot-in-the-dark approach to complying with DEA's demands."[287]

690. The position taken by the trade groups is emblematic of the position taken by the Opioid Distributors in a futile attempt to deny their legal obligations to prevent diversion of the dangerous drugs.[288]

691. The Court of Appeals for the District of Columbia recently issued its opinion affirming that a wholesale drug distributor does, in fact, have duties beyond reporting.[289] The D.C. Circuit

---

[282] Brief for HDMA and NACDS, supra note 257, 2016 WL 1321983, at *4–5.
[283] Id. at *8 (citations and quotation marks omitted).
[284] Id. at *14.
[285] Id. at *22.
[286] Id. at *24–25.
[287] Id. at 26.
[288] See id. at *3 (arguing the wholesale distributor industry "does not know the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

Court upheld the revocation of Master Pharmaceutical's license and determined that DEA regulations require that in addition to reporting suspicious orders, distributors must "decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order."[290] Master Pharmaceutical was in violation of legal requirements because it failed to conduct necessary investigations and filled suspicious orders.[291] A distributor's investigation must dispel all the red flags giving rise to suspicious circumstance prior to shipping a suspicious order. Id. at 226. The Circuit Court also rejected the argument made by the HDMA and NACDS (quoted above), that, allegedly, the DEA had created or imposed new duties. Id. at 220.

692. Wholesale Distributor McKesson has recently been forced to specifically admit to breach of its duties to monitor, report, and prevent suspicious orders. Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[292]

693. Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their

[289] Masters Pharm., Inc. v. Drug Enf't Admin., 861 F.3d 206 (D.C. Cir. 2017).
[290] Id. at 212.
[291] Id. at 218–19, 226.
[292] See Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), https://www.justicc.gov/opa/press-release/file/928476/download.

professional practice, as required by 21 C.F.R § 1306.04(a)."[293] McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 et seq., at the McKesson Distribution Centers" including the McKesson Distribution Center located in "Washington Courthouse, Ohio."[294] Due to these violations, McKesson agreed that its authority to distribute controlled substances from the Washington Courthouse, Ohio facility (among other facilities) would be partially suspended.[295]

694. The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which McKesson also admitted failure to report suspicious orders of controlled substances to the DEA.[296] In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to DEA," but had failed to do so.[297] The 2017 Memorandum of Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations."[298] As a result of these violations, McKesson was fined and required to pay to the United States $150,000,000.[299]

695. Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though

---

[293] Id. at 4.
[294] *Id.*
[295] Id. at 6.
[296] Id. at 4.
[297] *Id.*
[298] Id.; see also Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter 2017 Settlement Agreement and Release] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), https://www.justice.gov/opa/press-release/file/928471/download.
[299] See 2017 Settlement Agreement and Release, at 6.

McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

696. Because of the Opioid Distributors' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.[300]The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[301] These actions include the following:

- On April 24, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

- On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

- On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

- On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

- On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Stafford, Texas Distribution Center

[300] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, The Drug Enforcement Administration's Adjudication of Registrant Actions 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.
[301] *Id.*

("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

- On May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

- On September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

- On February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

- On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

- On January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Sante Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

697. Rather than abide by their non-delegable duties under public safety laws, the Opioid Distributors, individually and collectively through trade groups in the industry, pressured the U.S.

Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act"

which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[302]

698. In addition to taking actions to limit regulatory prosecutions and suspensions, the Opioid Distributors undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Opioid Distributors attempted to assure the public they were working to curb the opioid epidemic.

699. For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[303] Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results.

700. Similarly, Defendant McKesson publicly stated that it has a "best-in- class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[304] Again, given McKesson's

---

[302] See Bernstein, Investigation: The DEA slowed enforcement while the opioid epidemic grew out of control, supra note 166; Lenny Bernstein & Scott Higham, Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis, WASH. POST, Mar. 6, 2017, https://www.washingtonpost.com/investigations/ussenator-calls-for-investigation- of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9a05d3c21f7cf_story.html; Eric Eyre, DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills, CHARLESTON GAZETTE-MAIL, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-noleadership- in-wv-amid-flood-of-pain-pills-.

[303] Lenny Bernstein et al., How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job", WASH. POST, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugsintended-for- patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e7939630a7-11e6-8ff7-7b6c1998b7a0_story.html.

[304] Scott Higham et al., Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse, WASH. POST, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sidesfrom- dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527- 949c5893595e_story.html.

historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

701. By misleading the public about the effectiveness of their controlled substance monitoring programs, the Opioid Distributors successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. The Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

702. Meanwhile, the opioid epidemic rages unabated in the United States.

703. The epidemic still rages because the fines and suspensions imposed by the DEA do not change the conduct of the industry. The distributors, including the Opioid Distributors, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

704. The wrongful actions and omissions of the Opioid Distributors which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations below.

705. The Opioid Distributors have abandoned their duties imposed under Federal and State law, taken advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in the State and Plaintiff's community.

### 2. The Opioid Manufacturers Fraudulently Concealed Their Misconduct

706. The Opioid Manufacturers, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain

even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience establish that opioids are highly addictive and are responsible for a long list of very serious adverse outcomes. The FDA warned the Opioid Manufacturers of this, and the Opioid Manufacturers had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and death – all of which clearly described the harm from long-term opioid use and that patients were suffering from addiction, overdose, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements, based on medical evidence, that conclusively expose the falsity of Opioid Manufacturers' misrepresentations, and Endo and Purdue have recently entered agreements in New York prohibiting them from making some of the same misrepresentations described in this Complaint.

707. At all times relevant to this Complaint, the Opioid Manufacturers took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Opioid Manufacturers disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and key opinion leaders. The Opioid Manufacturers purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Opioid Manufacturers' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain. The Opioid Manufacturers also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. The Opioid Manufacturers exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with key opinion leaders, Front Groups, and public relations companies that were not, and have not yet

become, public. For example, PainKnowledge.org, which is run by the National Initiative on Pain Control, did not disclose Endo's involvement. Other Opioid Manufacturers, such as Purdue and Janssen, ran similar websites that masked their own role.

708. Finally, the Opioid Manufacturers manipulated their promotional materials and the scientific literature to make it appear that these documents were accurate, truthful, and supported by objective evidence when they were not.

709. The Opioid Manufacturers distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Opioid Manufacturers invented "pseudo addiction" and promoted it to an unsuspecting medical community. The Opioid Manufacturers provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. The Opioid Manufacturers recommended to the medical community that dosages be increased, without disclosing the risks.

710. The Opioid Manufacturers spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The lack of support for the Opioid Manufacturers' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by the Plaintiff or Plaintiff's community. Thus, the Opioid Manufacturers successfully concealed from the medical community, patients, and health care payors facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. Plaintiff did not know of the existence or scope of the Opioid Manufacturers' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**LEGAL CAUSES OF ACTION COUNT I PUBLIC NUISANCE (Against all Defendants)**

711. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

712. Defendants' conduct has caused unreasonable and substantial interference with public health and comfortable enjoyment of life and property, such as by increasing opioid overdoses, serious injuries, death, addiction, HIV and Hepatitis C infections, and healthcare costs. Plaintiff is injured by being forced to pay for and finance these costs. Defendants' conduct is continuous and endlessly producing damage.

713. Defendants' conduct was a substantial factor in causing Plaintiff to pay these costs. The Opioid Manufacturers engaged in a decades-long misinformation campaign to convince the public and doctors that opioids were safe and effective for long-term pain, when in reality, opioids are extremely addictive and are ineffective in the long-term as patients build a tolerance. The Opioid Distributors covered up the sale of prescription opioids to suspicious buyers, rather than report these sales to authorities and stop shipment. Both the Opioid Manufacturers' and Distributors' conduct was a substantial factor in causing the opioid epidemic.

714. By causing dangerously addictive drugs to flood Plaintiff's community, the Defendants have injuriously affected rights common to the general public to adequate healthcare including addiction treatment.

715. The presence of diverted prescription opioids in Plaintiff's community, and the consequence of prescription opioids having been diverted in Plaintiff's community, is the direct and proximate result of the Defendants' failure to report suspicious orders to law enforcement and failure to stop shipment on orders that are suspicious or potentially suspicious.

716. Stemming the flow of illegally distributed prescription opioids and properly treating opioid addiction in evidence-based outcomes will help to alleviate this problem.

717. Plaintiff seeks an injunction and to recover the cost of abating the nuisance, as well as any other relief deemed appropriate and just.

**COUNT II FLORIDA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (Against All Defendants)**

718. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein.

719. Defendants are persons, within the meaning of RICO, because they hold a legal or beneficial interest in property (e.g., prescription drugs).

720. Defendants violated Florida RICO[305] by conducting or participating in the affairs of an enterprise that derived income from a pattern of racketeering activity, or by conspiring to do the same.

721. The Florida RICO Act defines "racketeering activity" as including, among other things, at least two incidents of bribery, extortion, and fraudulent practices, and drug abuse prevention and control as set forth in chapter 895 of Title 46 of the Florida Statutes.

**The Opioid Misinformation Enterprise**

722. The Opioid Manufacturers, and their key opinion leaders and Front Groups, were part of an associated-in-fact enterprise within the meaning of because they had a common purpose of, through unlawful means, engaging in a misinformation campaign to expand the market for opioids. There was a relationship between the Opioid Manufacturers as common sponsors of key opinion leaders, such as Dr. Russell Portenoy and Dr. Lynn Webster, and common members of and contributors to influential Front Groups, such as American Pain Foundation and American Academy of Pain Medicine. The duration of the enterprise spanned years, from the 1990s until the present time, providing more than sufficient time to pursue the enterprise's goals.

[305] Florida Rico Act FL. Stat. 895.01-09

723. Despite their association as part of an enterprise, the Opioid Manufacturers and their captured key opinion leaders and Front Groups are distinct entities with different organizational structures.

724. The enterprise engaged in interstate commerce by transacting business and marketing across state lines.

725. The Opioid Manufacturers participated in the conduct of the enterprise by knowingly implementing the enterprise's agenda of spreading misinformation about whether opioids should be used to treat long-term pain.

726. The Opioid Manufacturers knowingly participated in a scheme to obtain money or property through use of false or fraudulent pretenses. The scheme sought to convince doctors and patients that opioids were safe and effective for long-term pain, relatively non-addictive, and should be liberally prescribed for all types of pain. Through their common sponsorship and funding of key opinion leaders and Front Groups, the Opioid Manufacturers sought to spread the false messages that: opioids were safe and effective for treating chronic pain; opioids posed only a small (less than 1%) risk of addiction; drug-seeking behavior was actually a sign of under-treated pain, not of a substance abuse problem (i.e., the concept of pseudo addiction); and screening tools could accurately predict who was high or low risk for addiction, allowing doctors to prescribe opioids to low risk patients without fear.

727. In reality, as the medical community had long known and understood prior to the Opioid Manufacturers' misinformation campaign, prescription opioids are a highly addictive form of synthetic heroin that is not effective for treating chronic pain, as patients develop a tolerance over time, necessitating that patients take larger and larger doses to get the same effect. As the CDC has stated, the larger the dose, the higher the risk of addiction. The widely cited study

purporting to show that only 1% of long-term opioid patients become addicted was a complete fiction. The "study" was nothing more than a short letter to the editor discussing addiction to morphine and other opioids administered in an in-patient setting, such as after surgery. Use longer than the duration of the patient's hospital stay was not studied. Nevertheless, Dr. Russell Portenoy, as part of the opioid-misinformation enterprise, used the enterprise's funds to turn this 1% statistic into accepted medical gospel. Dr. Lynn Webster, likewise, as part of the enterprise, used funds from the enterprise to popularize the concept of pseudo addiction, instructing doctors that patients with drug seeking behavior were actually in need of more opioids, not less. In reality, pill-seeking behavior was just a classic sign of addiction. And screening tools are not an effective way to ensure that patients do not become addicted to opioids. Rather, one of the best ways to prevent addiction is to prescribe opioids carefully, only as a last resort, in limited circumstances, and for as short a duration as possible. With a 3-day supply of opioids, only 10% of patients are likely to become long-term users.[306] With a 10-day supply, the number doubles: 20% will become long-term users.[307] "The longer you use opioids, the greater the risks—and the risks rise fast."[308]

728. The above representations were material because they were capable of influencing a doctor of ordinary intelligence to prescribe opioids more freely to patients with chronic pain. Many doctors and health authorities rely on the manufacturers' guidelines for the medications in deciding how to prescribe them. And, many doctors rely on information they receive from other doctors, such as key opinion leaders, to inform how they prescribe. Patients relied on their doctors' advice, as well as the representations conveyed to them by the drug makers.

---

[306] Beth Mole, With a 10-day supply of opioids, 1 in 5 become long-term users, ARSTECHNICA (Mar. 18, 2017), http://bit.ly/2nDlCmL.
[307] *Id.*
[308] *Id.*

729. The Opioid Manufacturers intended to deceive doctors and patients about the safety and efficacy of opioids in order to substantially expand the market for opioids, opening up more profit potential for the Opioid Manufacturers' drugs.

730. In furtherance of the enterprise's agenda, the Opioid Manufacturers engaged in two or more predicate acts of mail and/or wire fraud.

731. The Opioid Manufacturers used the mail and/or interstate wire communications to deliver the enterprise's false and misleading representations. Sections B and C of the complaint contain numerous specific examples of misleading videos, audio, pamphlets, guidelines, or other material that the Opioid Manufacturers conveyed to doctors and their patients using the U.S. mail or public internet (i.e. interstate wires) in furtherance of the general scheme. For example, the American Pain Foundation, an Opioid Manufacturer front group, engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. And Dr. Portenoy's infamous consensus paper, which said opioids were safe to prescribe for chronic pain, with an addiction rate below 1%, was distributed through American Academy of Pain Medicine's website until 2011.

732. There is a pattern of two or more predicate acts because the acts were related and continuous. All mail and wire fraud were related to the same scheme to spread misinformation about opioids in order to convince doctors and patients to widely prescribe and use opioids for chronic pain. The acts occurred continuously from the launch of the Opioid Manufacturers branded opioid drugs in or around the 1990s until the present time.

733. The Opioid Manufacturers' behavior poses a threat of continued racketeering activity, as they have not ceased making false and misleading representations concerning opioids and have tried to discount their role in creating the opioid crisis.

734. Plaintiff is a "person," within the meaning of RICO, and has been injured in its business by paying directly or financing opioid addiction treatment of patients.

735. Plaintiff's injuries and financial damages were proximately caused by the conduct constituting the RICO violation because such conduct caused the opioid epidemic and resulting policies that affect healthcare provider reimbursement.

### B. The Opioid Diversion Enterprise

736. The Opioid Distributors were part of an associated-in-fact enterprise within the meaning of RICO because they had a common purpose of, through unlawful means, engaging in a subversion campaign to ensure that the DEA would not be able to close down their opioid distribution warehouses that were unlawfully supplying problem prescribers and pharmacies with millions of dollars in opioids that would be diverted into the illegal market. There was a relationship between the Opioid Distributors not only through their business ties, but also through their joint lobbying efforts to hamper or hamstring the DEA. The duration of the enterprise spanned years, from the 1990s until the present time, providing more than sufficient time to pursue the enterprise's goals.

737. Alternatively, the Opioid Distributors were members of a legal entity enterprise, through which the Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States. Specifically, the Healthcare Distribution Alliance is a distinct legal entity that satisfies the definition of a RICO enterprise. The Healthcare Distribution Alliance is a non-profit corporation formed under the laws of the District of Columbia. As a non-profit corporation, Healthcare Distribution Alliance qualifies as an "enterprise" within the definition set out in FL Stat § 895.02(5). because it is a corporation and a legal entity. The Opioid Distributors are members of Healthcare Distribution Alliance; each Opioid Distributor has one of its

executives on Healthcare Distribution Alliance's board of directors; and each Opioid Distributor acted through Healthcare Distribution Alliance.

738. Despite their association as part of an enterprise, the Opioid Distributors and their lobbying organizations, such as Healthcare Distribution Alliance, are distinct entities with different organizational structures.

739. The enterprise engaged in interstate commerce by transacting business and marketing across state lines.

740. The Opioid Distributors participated in the conduct of the enterprise by knowingly implementing the enterprise's agenda.

741. The Opioid Distributors knowingly participated in a scheme to obtain money or property through use of false or fraudulent pretenses. The scheme sought to misrepresent the Opioid Distributors' compliance with their duties to report and stop suspicious orders and to hamstring the DEA's investigation of and ability to investigate the Opioid Distributors' compliance with their legal obligations, so that the Opioid Distributors could continue to profit from the diversion of opioids that they knew, or should have known, were ending up in the illegal market.

742. In reality, the Opioid Distributors were not complying with their legal obligations and had no intention to do so. The Opioid Distributors willfully ignored blatant red flags that certain pharmacies were diverting the Opioid Distributors' drugs into the illegal market. For example, "On Oct. 5, 2010, when Cardinal investigator Vincent Moellering visited Gulf Coast Medical Pharmacy, a drugstore in Fort Myers, Fla., he found evidence of diversion everywhere, records show, including suspicious customers who came in groups to fill their prescriptions. The pharmacy's owner told Moellering that he could sell even more narcotics if Cardinal would supply them, according to Moellering's report … Moellering labeled the drugstore 'high risk'

and wrote: 'I am not convinced that the owner is being forthright pertaining to his customers' origin or residence. I have requested permission to contact DEA to resolve this issue.' But Cardinal didn't notify the agency or cut off Gulf Coast's drug supply, the DEA contends. Instead, the shipments kept going out."[309]

743. The above representations were material because the DEA and other government officials relied on them in not revoking the Opioid Manufacturers' registration permitting them to distribute prescription opioids throughout the United States. McKesson, for example, avoided revocation of five of its warehouses' registrations by representing, along with other distributors, that it was doing the best that it could in terms of compliance.

744. The Opioid Distributors intended to mislead government officials about their compliance programs so that they could continue to profit immensely from the diversion of their opioid drugs into the unlawful marketplace.

745. In furtherance of the enterprise's agenda, the Opioid Distributors engaged in two or more predicate acts of mail and/or wire fraud.

746. The Opioid Distributors used the mail and/or interstate wire communications to deliver the enterprise's false and misleading representations to government officials and the public. For example, two lobbyists for Cardinal Health, "former deputy attorneys general, Jamie S. Gorelick, who served in the Clinton administration, and Craig S. Morford, who served in the George W. Bush administration" used interstate telephone wires to separately contact the DEA, telephone records show, says the Washington Post.[310] The lobbyists' goal was to impede or stop

[309] Bernstein, How drugs intended for patients ended up in the hands of illegal users, supra note 172.
[310] Bernstein, Investigation: The DEA slowed enforcement while the opioid epidemic grew out of control, supra note 166.

Rannazzisi's Distributor Initiative that was attempting to enforce distributors' obligations to report and stop suspicious shipments of opioids.[311]

747. There is a pattern of two or more predicate acts because the acts were related and continuous. All mail and wire fraud were in furtherance of the same scheme to misrepresent their ability to comply with their federal obligations to report and stop suspicious orders of opioids. The acts occurred continuously from in or around the 1990s until the present time.

748. The Opioid Distributors' behavior poses a threat of continued racketeering activity, as they have not ceased making false and misleading representations to government officials and to the public.

749. Plaintiff is a "person," within the meaning of RICO, and has been injured in its business or property by paying directly for costs associated with the opioid crisis, such as opioid addiction treatment and other unreimbursed medical costs.

750. Plaintiff's injuries and financial damages were proximately caused by the conduct constituting the RICO violation because such conduct fueled the opioid epidemic.

## COUNT III FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICE ACT

751. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

752. Defendants violated Florida's Unfair and Deceptive Trade Practice Act ("FUCTPA"), FL. Stat. § 501.201, et seq., because they engaged in unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of a material fact or facts in connection with the sale or advertisement of merchandise.

---

[311] *Id.*

753. In overstating the benefits of and evidence for the use of opioids for chronic pain and understating their very serious risks, including the risk of addiction; in falsely promoting abuse-deterrent formulations as reducing abuse; in falsely claiming that opioids provide 12 hours of relief; and in falsely portraying their efforts or commitment to detect and prevent the diversion and abuse of opioids. Defendants have engaged in misrepresentations and knowing omissions of material fact.

754. Specifically, misrepresentations and false pretenses include, but are not limited to:

a. Defendants' claims that the risks of long-term opioid use, especially the risk of addiction were overblown;

b. Defendants' claims that signs of addiction were "pseudo addiction" reflecting undertreated pain, and should be responded to with more opioids;

c. Defendants' claims that screening tools effectively prevent addiction;

d. Defendants' claims that opioid doses can be increased until pain relief is achieved;

e. Defendants' claims that opioids differ from NSAIDS in that they have no ceiling dose;

f. Defendants' claims that evidence supports the long-term use of opioids for chronic pain;

g. Defendants' claims that chronic opioid therapy would improve patients' function and quality of life;

h. Defendants' claims that abuse-deterrent opioids reduce tampering and abuse;

i. Defendants' claims that their opioids provide a full 12 hours of pain relief; and

j. Defendants' claims that they cooperate with and support efforts to prevent opioid abuse and diversion.

755. By engaging in the acts and practices alleged herein, Defendants omitted to state material facts, with the intent that others rely on their omissions or suppression of information, that they

had a duty to disclose by virtue of Defendants' other representations, including, but not limited to, the following:

a. opioids are highly addictive and may result in overdose or death;

b. no credible scientific evidence supports the use of screening tools as a strategy for reducing abuse or diversion;

c. high dose opioids subject the user to greater risks of addiction, other injury, or death;

d. exaggerating the risks of competing products, such as NSAIDs, while ignoring the risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and dizziness, increased falls and fractures in the elderly, neonatal abstinence syndrome, and potentially fatal interactions with alcohol or benzodiazepines;

e. Defendants' claims regarding the benefits of chronic opioid therapy lacked scientific support or were contrary to the scientific evidence;

f. Defendants' opioids fail to last a full twelve hours in many patients;

g. Defendants' abuse-deterrent formulations are not designed to address, and have no effect on, the most common route of abuse (oral abuse), can be defeated with relative ease; and may increase overall abuse; and

h. Defendants' failure to report suspicious orders and prescribers.

756. Defendants' statements about the use of opioids to treat chronic pain were not supported by or were contrary to the scientific evidence, as confirmed by the CDC and FDA.

757. Further, Defendants' omissions, which were false and misleading in their own right, rendered even seemingly truthful statements about opioids false and misleading and likely to mislead prescribers and consumers when taken in the context of the surrounding circumstances.

758. Defendants' acts and practices regarding prescribers and consumers as alleged in this Complaint are unconscionable commercial practices and are immoral, unethical, and offensive to established public policy, including:

a. The mental healthcare providers, as well as Plaintiffs, objective to promote mental health and treat substance abuse;

b. The policy, reflected by the CDC and SAMSHA' guidelines' that patients be informed about opioid addiction treatment options;

c. The creation of a Suspicious Activity Report ("SAR") portal to facilitate reports, of reporting suspicious orders to authorities;

759. Defendants' acts and practices as alleged constituted unfair competition. At all times relevant to this Complaint, Defendants marketed their opioids as safe, effective, and nonhabit forming for the treatment of chronic pain; promoted their opioids as providing 12 hours of pain relief; and promoted abuse-deterrent formulations of its opioids as more difficult to abuse and less addictive as means of maintaining a competitive advantage against other pharmaceuticals and treatment options. At all times relevant to this Complaint, Defendants promoted opioids as superior to competing products, such as NSAIDs, and exaggerated the risks of NSAIDs while ignoring risks of adverse effects of opioids.

760. The Plaintiff is part of the broad class of persons that may avail themselves of a remedy under the FDUTPA.

761. The Plaintiff has been injured as a direct and proximate result of Defendants' violations of the FUDTPA as alleged in this Complaint.

762. The Plaintiff has suffered ascertainable loss of money or property as a result of Defendants acts and practices alleged in this Complaint.

763. Defendants are liable for three times the Plaintiff's actual damages and reasonable attorneys' fees, filing fees, and reasonable costs of suit.

764. In addition to this, the Plaintiff has a right to recovery for the ascertainable loss suffered by them as a direct result of the unlawful conduct of Defendants.

765. Defendant's employed unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and knowingly concealed, suppressed, and omitted material facts in connection with the sale and advertisement of their products, which caused significant injury and loss to the Plaintiff.

768. Defendant's violations of the FUDTPA caused a quantifiable and measurable loss to the Plaintiff including, but not limited to, the expenses and/or losses suffered by them as a result of Defendant's unlawful conduct, as well as future out of pocket expenses and all other costs that will be incurred by them as a result of the numerous violations by Defendants.

769. Each unconscionable commercial practice and/or act of deception by Defendant constitutes a separate violation under the FUDTPA, including attorney's fees, FL. Stat. §501.2075.

## COUNT IV NEGLIGENT MISREPRESENTATION

770. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

771. Defendants, individually and acting through their employees and agents, made misrepresentations and omissions of facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth in detail above.

772. In overstating the benefits of and evidence for the use of opioids for chronic pain and understating their very serious risks, including the risk of addiction; in falsely promoting abuse-

deterrent formulations as reducing abuse; in marketing their opioids as safe, effective, and non-habit forming for the treatment of chronic pain; in promoting their opioids as providing 12 hours of pain relief; and in falsely portraying their efforts or commitment to report and prevent the diversion and abuse of opioids.

773. Defendants have engaged in misrepresentations and knowing omissions of material fact. Specifically, misrepresentations or omissions include, but are not limited to:

a. Defendants' claims that the risks of long-term opioid use, especially the risk of addiction were overblown;
b. Defendants' claims that signs of addiction were "pseudo addiction" reflecting undertreated pain, and should be responded to with more opioids;
c. Defendants' claims that screening tools effectively prevent addiction;
d. Defendants' claims that opioid doses can be increased until pain relief is achieved;
e. Defendants' claims that opioids differ from NSAIDS in that they have no ceiling dose;
f. Defendants' claims that evidence supports the long-term use of opioids for chronic pain;
g. Defendants' claims that chronic opioid therapy would improve patients' function and quality of life;
h. Defendants' claims that abuse-deterrent opioids reduce tampering and abuse;
i. Defendant's claims that their opioids provide a full 12 hours of pain relief; and
j. Defendants' claims that they cooperate with and support efforts to prevent opioid abuse and diversion.

774. By engaging in the acts and practices alleged herein, Defendants omitted to state material facts that it had a duty to disclose by virtue of Defendants' other representations, including, but not limited to, the following:

a. opioids are highly addictive and may result in overdose or death;

b. no credible scientific evidence supports the use of screening tools as a strategy for reducing abuse or diversion;

c. high dose opioids subject the user to greater risks of addiction, other injury, or death;

d. exaggerating the risks of competing products, such as NSAIDs, while ignoring the risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, and dizziness, increased falls and fractures in the elderly, neonatal abstinence syndrome, and potentially fatal interactions with alcohol or benzodiazepines;

e. Defendants' claims regarding the benefits of chronic opioid therapy lacked scientific support or were contrary to the scientific evidence;

f. Defendants' opioids fail to last a full twelve hours in many patients;

g. Defendants' abuse-deterrent formulations are not designed to address, and have no effect on, the most common route of abuse (oral abuse), can be defeated with relative ease; and may increase overall abuse; and

h. h. Defendants' failed to report suspicious orders and prescribers.

**COUNT V FRAUD (against All Defendants)**

775. Plaintiff incorporates the allegations within all prior paragraphs within this complaint as if they were fully set forth herein.

776. Defendants violated their general duty not to actively deceive, and have made knowingly false statements and have omitted and/or concealed information which made statements by Defendants knowingly false. Defendants acted intentionally and/or unlawfully.

777. As alleged herein, Defendants made false statements regarding their compliance with state and federal law regarding their duties to prevent diversion, their duties to monitor, report and halt suspicious orders, and/or concealed their noncompliance with these requirements.

778. As alleged herein, the Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

779. As alleged herein, Defendants knowingly and/or intentionally made representations that were false. Defendants had a duty to disclose material facts and concealed them. These false representations and concealed facts were material to the conduct and actions at issue. Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading Plaintiff, Plaintiff's community, the public, and persons on whom Plaintiff relied.

780. These false representations and concealments were reasonably calculated to deceive Plaintiff, Plaintiff's Community, and the physicians who prescribed opioids for persons in Plaintiff's Community, were made with the intent to deceive, and did in fact deceive the County, Plaintiff, and Plaintiff's Community.

781. Plaintiff, Plaintiff's Community, and the physicians who prescribed opioids reasonably relied on these false representations and concealments of material fact.

782. Plaintiff justifiably relied on Defendants' representations and/or concealments, both directly and indirectly. Plaintiff's injuries were proximately caused by this reliance.

783. The injuries alleged by Plaintiff herein were sustained as a direct and proximate cause of Defendants' fraudulent conduct.

784. Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity, including fraudulent misrepresentations and fraudulent concealment.

**COUNT VI UNJUST ENRICHMENT (Against All Defendants)**

785. Plaintiff incorporates the allegations within all prior paragraphs within this complaint as if they were fully set forth herein.

786. Defendants are liable for unjust enrichment because Defendants received a benefit at the expense of the plaintiffs and it would be inequitable or unjust for Defendants to retain that benefit.

787. The Opioid Manufacturers were enriched by promoting the falsity that opioids are safe, non-addictive, and effective for long-term pain. Members of Plaintiff's community were misled into prescribing and/or taking opioid medications that they would not otherwise have taken because these medications have adverse side effects, are highly addictive, and are not effective for long-term pain management, since patients develop a tolerance to opioid medications over time.

788. The Opioid Distributors were enriched by their conduct of concealing and refusing to report suspicious orders of opioids from prescribers and pharmacies. These pharmacies and prescribers diverted millions of opioid pills to the black market, and used illegally acquired funds to pay the Opioid Distributors hundreds of millions, if not billions, of dollars.

789. Plaintiff suffered a loss. Their community was subjected to an opioid epidemic, which increased addiction rates to prescription opioids and heroin, overdose rates, rates of asthma related complications, and rates of blood-borne illnesses. Plaintiff was forced to expend

substantial resources fighting the opioid epidemic in their community, such as the cost of increased hospitalizations, law enforcement, criminal justice, and social scrviccs.

790. There is a nexus between Plaintiff's losses and the Defendants' enrichment. The Opioid Manufacturers caused the opioid epidemic by ensuring that opioids would be widely prescribed for chronic pain, and the Opioid Distributors fanned the flames of the epidemic by covering for pharmacies and prescribers who had suspicious ordering patterns due to their black market activities. This opioid crisis directly led to Plaintiff's losses.

791. To permit Defendants to maintain their pecuniary gains from their wrongful conduct would work an injustice. Inequity would result because Defendants should not be permitted to profit from their role in causing the worst drug epidemic in U.S. history. A bad precedent would be set if pharmaceutical companies and distributors are permitted to profit from lying to the public about the safety and efficacy of their medications and knowingly selling prescription drugs to pharmacies and prescribers that had order patterns indicating resale on the black market.

792. There is no public policy in Florida that would prevent application of unjust enrichment doctrine. On information and belief, no contract exists between Plaintiff and the Defendants that would govern rather than quasi-contractual theories.

793. By reason of the foregoing, Defendants must disgorge their unjustly acquired revenues and provide restitution to the Plaintiff.

**COUNT VII NEGLIGENCE (Against All Defendants)**

794. Plaintiff incorporates the allegations within all prior paragraphs within this complaint as if they were fully set forth herein.

795. Florida tort law imposes responsibility for damages caused by negligence or fault.

796. Defendants have both common law and statutory duties to exercise reasonable care in the sale and distribution of opioids.

797. The Opioid Manufacturers breached their duties by failing to exercise reasonable care in instructing doctors how and when to prescribe opioids. Specifically, Opioid Manufacturers told doctors that they should prescribe opioids for chronic pain, even though for the vast majority of chronic-pain patients, the risks from opioids outweigh the potential benefits. The Opioid Manufacturers had a duty to disclose to doctors the true risk of prescribing opioids. Manufacturers had a duty not to fraudulently and deceptively promote their opioids for off-label uses that they knew or should have known they were not effective for. Doctors reasonably relied on the Opioid Manufacturers' assertions that opioids were safe, non-addictive, and effective for long-term pain. Doctors had a duty to their patients to do no harm. Patients reasonably relied on their doctors not to prescribe them a medication that was more likely to harm them than help them. As a result of patients' reliance, the opioid epidemic occurred and caused harm to Plaintiff.

798. The Opioid Distributors breached their duty of reasonable care by failing to report and prevent suspicious orders of prescription opioids and stop shipment. The opioid epidemic was a foreseeable result of the Opioid Distributors' failure to act. The opioid epidemic caused Plaintiff harm.

799. The Opioid Distributors also breached their duty of reasonable care by failing to disclose to law enforcement that suspicious orders of prescription opioids were being made. The Opioid Distributors have an obligation to monitor orders and disclose this information to the Drug Enforcement Administration, and have a duty to follow all obligations in their distribution of prescription drugs. The opioid epidemic occurring or being exacerbated was a foreseeable result of the Opioid Distributors failure to act. Plaintiff was harmed as a result of the opioid epidemic.

800. Plaintiff was harmed by the lost productivity of their residents and by paying increased cost for drug treatment and rehabilitation, other medical costs of overdose, withdrawal, asthma sufferers, and transferable diseases, increased cost of law enforcement, criminal justice, and criminal punishment, and increased cost for social services provided to wards of the State.

801. The opioid crisis was a reasonably foreseeable consequence of the Defendants' acts and omissions, and Plaintiff's harm was a reasonably foreseeable result of the opioid crisis.

802. Plaintiff is without fault in regard to the injuries they suffered as a result of Defendants' conduct.

## COUNT VIII NEGLIGENCE PER SE (Against All Defendants)

803. Plaintiff incorporates the allegations within all prior paragraphs within this complaint as if they were fully set forth herein.

804. Defendants opioids are regulated under Florida's "Controlled Dangerous Substances Laws", FL. Stat. § 893.03, et seq, and FL Stat.§ 456.44 et seq.

805. These statutes duties and obligations that Defendants have violated, including with respect to the labeling, misbranding, and reporting requirements for opioids.

806. As detailed above, the opioids sold, marketed, and distributed by the defendants are dangerous to health, even when they are used in the dosage or with the frequency or duration prescribed, recommended, or suggested in the labeling.

807. The Defendants manufactured, sold, and distributed drugs that were "misbranded" under Florida law.

808. Defendants' violations of the Controlled Substance laws and regulations constitute negligence per se.

809. Defendants' acts and omissions imposed an unreasonable and foreseeable risk of harm to others separately and/or combined with the improper or unlawful acts of third parties.

810. As a proximate result of the Defendants' breach of their duties of care, Defendants and its agents have caused excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids, the Plaintiff has borne massive costs of these illnesses and conditions by having to provide necessary resources for these costs and claims.

811. The Defendants' conduct was willful, wanton, and malicious, and was directed at the public generally, so as to justify an award of punitive damages.

**COUNT X CIVIL CONSPIRACY (Manufacturer Defendants)**

812. Plaintiff incorporates the allegations within all prior paragraphs within this complaint as if they were fully set forth herein.

813. Manufacturing Defendants and the Purdue-Related Defendants (including the Sackler entities and Stuart D. Baker) conspired with each other and with the KOLs and Front Groups to commit unlawful acts or lawful acts in an unlawful manner.

814. Defendants knowingly and voluntarily agreed to engage in unfair and deceptive practices to promote the use of opioids for the treatment of chronic pain by making and disseminating false, unsubstantiated, and misleading statements and misrepresentations to prescribers and consumers. Defendants enlisted KOLs and Front Groups to make and disseminate these statements in furtherance of their common strategy to increase opioid sales, and the Defendants—along with the Front Groups with whom each of them conspired—knew that the statements they made and disseminated served this purpose.

815. Defendants were aware of the misleading nature of the statements they issued and of the role they played in each scheme to deceptively promote opioids as appropriate for the treatment

of chronic pain. The Defendants and third parties nevertheless agreed to misrepresent the risks, benefits, and superiority of using opioids to patients and prescribers in return for increased pharmaceutical sales, financial contributions, reputational enhancements, and other benefits.

816. The Defendants conspired to commit unlawful acts or lawful acts in an unlawful manner by, among others, violation of consumer protection laws, creating a public nuisance, negligence, fraud, unjust enrichment, and negligent misrepresentation.

817. The Manufacturer Defendants continuously supplied prescription opioids to the Distributor Defendants despite having actual or constructive knowledge that the Distributor Defendants were habitually breaching their common law duties and violating Florida law.

818. Without the Manufacture Defendants' supply of prescription opioids, the Distributor Defendants would not be able to fill and dispense the increasing number of prescription opioids throughout the nation.

819. The Distributor Defendants continuously paid the Manufacturer Defendants to supply large quantities of prescription opioids in order to satisfy the demand for the drugs.

820. Neither side would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party.

821. Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

822. Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

823. Manufacturing Defendants conduct in furtherance of the conspiracy described herein was not mere parallel conduct. Defendants acted directly against their commercial interests in not

reporting the unlawful distribution practices of their competitors to the authorities, which they had a legal duty to do. Each Defendant acted against their commercial interests in this regard due to an actual or tacit agreement between the Defendants that they would not report each other to the authorities so they could all continue engaging in their unlawful conduct.

824. Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct, foreseeable, and proximate injury to Plaintiff alleged herein.

825. As a result of the concerted action between the Manufacturer Defendants the Plaintiff has suffered damage.

**COUNT X CIVIL CONSPIRACY (Manufacturer and Distributor Defendants)**

826. Plaintiff incorporates the allegations within all prior paragraphs within this complaint as if they were fully set forth herein.

827. Manufacturer Defendants and Distributor Defendants engaged in a civil conspiracy to ignore their duties to prevent diversion and to monitor, report, and prevent suspicious orders of opioids as required by federal and state law in order to harm Plaintiff.

828. The Distributor Defendants continuously supplied prescription opioids to the Pharmacy Defendants despite having actual or constructive knowledge that said pharmacies were habitually breaching their common law duties and violating Florida law.

829. Without the Manufacturer Defendants' negligent and deceptive marketing scheme, the Distributor Defendants would not be able to fill and dispense the increasing number of prescription opioids throughout the nation.

830. Without the Distributor Defendants' agreement to ignore their duties to monitor and report suspicious orders, the Manufacturer Defendants would not be able to flood Plaintiff's community with ever increasing amounts of opioids.

831. Furthermore, both schemes required the Defendants' coordinated actions to manipulate, fabricate, and control key source of information regarding opioids, which all of them knew or should have known to be false.

832. Additionally, the Pharmacy Defendants continuously paid the other Distributor Defendants to supply large quantities of prescription opioids in order to satisfy the demand for the drugs.

833. Neither side would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party.

834. Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

835. Manufacturer Defendants and Distributor Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

836. Manufacturer Defendants and Distributor Defendants conduct in furtherance of the conspiracy described herein was not mere parallel conduct because each Defendant acted directly against their commercial interests in not reporting the unlawful distribution practices of their competitors to the authorities, which they had a legal duty to do. Each Defendant acted against their commercial interests in this regard due to an actual or tacit agreement between the Defendants that they would not report each other to the authorities so they could all continue engaging in their unlawful conduct.

837. Manufacturer Defendants' and Distributor Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct, foreseeable, and proximate injury to Plaintiff as alleged herein.

838. As a result of the concerted action between the Manufacturer and Distributor Defendants, the County and her citizens have suffered damage.

**PUNITIVE DAMAGES**

839. Plaintiff re-alleges all paragraphs of this complaint as if set forth fully herein.

840. By engaging in the above-described intentional and/or unlawful acts or practices, Defendants acted with actual malice, wantonly, and oppressively. Defendants acted with conscious disregard to the rights of others and/or in a reckless, wanton, willful, or grossly negligent manner. Defendants acted with a prolonged indifference to the adverse consequences of their actions and/or omissions. Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of causing substantial harm. Defendants acted toward the Plaintiff with fraud, oppression, and/or malice, and/or were grossly negligent in failing to perform the duties and obligations imposed upon them under applicable Federal and State statutes, and law.

841. Defendants were selling and/or manufacturing dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific, or industrial channels. Because of the severe level of danger posed by, and indeed visited upon the nation by these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence and the safety of the community, and an award of punitive damages is appropriate, as punishment and deterrence.

842. By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and gross negligence, and exhibited an entire want of care that would raise the presumption of a conscious reckless indifference to consequences.

**PRAYER FOR RELIEF**

843. WHEREFORE, the Plaintiff respectfully requests that this Court grant the following relief:

844. An Order Entering Judgment in favor of the Plaintiff against each of the Defendants;

845. An Order Enjoining the Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from engaging in unlawful sales and/or distribution of prescription opioid pills and ordering temporary, preliminary or permanent injunction;

846. An Order that Defendants compensate the Plaintiff for past and future costs of unreimbursed opioid addiction treatment Plaintiff provided to opioid addicted patients;

847. An Order Awarding actual damages, treble damages, injunctive and equitable relief, forfeiture as deemed proper by the Court, and attorney fees and all costs and expenses of suit pursuant to Plaintiff's racketeering claims;

848. An Order that the conduct alleged herein constitutes violations of the FUDTPA;

849. An Order that Plaintiff is entitled to treble damages;

851. An Order that Defendants are negligent under Florida law;

852. An Order that Defendants have been unjustly enriched at Plaintiff's expense;

852. An Order Disgorging defendant of all profits that result from their unlawful conduct in Florida, as authorized by Florida Civil RICO Act;

853. An Order that Defendants' conduct constitutes violations of the Florida Racketeer Influenced and Corrupt Organizations Act ("Florida RICO").;

854. An Order that the conduct alleged herein constitutes a civil conspiracy under Florida law;

855. An Order that Plaintiff is entitled to treble damages pursuant to Florida RICO and other laws;

856. Awarding the Plaintiff the damages caused by the opioid epidemic, including:

a. costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

b. costs for providing treatment, counseling, and rehabilitation services;

857. Disgorging Defendants of all profits that resulted from their unlawful conduct in Florida.

858. Awarding judgment against the Defendants requiring Defendants to pay punitive damages;

859. Granting the Plaintiff:

a. The cost of investigation, reasonable attorneys' fees, and all costs and expenses;

b. Pre-judgment and post-judgment interest; and,

c. All other relief as provided by law and/or as the Court deems appropriate and just.

860. Plaintiff hereby requests trial by jury for all issues so triable.

Dated: August 27, 2019

Respectfully submitted,

Randi Kassan, Esq.
Attorney I.D. No. 323790
Sanders Phillips Grossman, LLC

100 Garden City Plaza, Ste. 500
Garden City, NY 11530
rkassan@thesandersfirm.com
516-741-5600

**DEMAND FOR TRIAL BY JURY**

Plaintiff(s) hereby demand a trial by jury as to all issues raised by these pleadings.

Randi Kassan, Esq.
Attorney I.D. No. 323790
Sanders Phillips Grossman, LLC
100 Garden City Plaza, Ste. 500
Garden City, NY 11530
rkassan@thesandersfirm.com
516-741-5600

**DESIGNATION OF TRIAL COUNSEL**

Plaintiff designates Randi Kassan, Esq. as trial counsel in this matter.

Randi Kassan, Esq.
Attorney I.D. No. 323790
Sanders Phillips Grossman, LLC
100 Garden City Plaza, Ste. 500
Garden City, NY 11530
rkassan@thesandersfirm.com
516-741-5600